USAO - EDOK (Rev. 5/08) Criminal Complaint

# United States District Court

__EASTERN__ **DISTRICT OF** __OKLAHOMA__

**UNITED STATES OF AMERICA,**

*Plaintiff,*

vs.

**BOBBY FAIRCHILD, MICHAEL CASON, aka Mike Cason, RICHARD BURRIS, LOUIS MONTOYA, JIMMY SMITH, CALVIN HARVEY FRENCH, a/k/a Harvey French, and ALFREDO GUZMAN,**

*Defendants.*

**SEALED**

**CRIMINAL COMPLAINT**

**CASE NUMBER:** 0 8 - M J - 0 1 0 5 - S P S



I, Michael W. Rupe, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From in or about 2003 and continuing through in or about December 2008, in Muskogee County, in the Eastern District of Oklahoma, and elsewhere, **BOBBY FAIRCHILD, MIKE CASON, RICHARD BURRIS, LOUIS MONTOYA, JIMMY SMITH, CALVIN HARVEY FRENCH, a/k/a Harvey French, and ALFREDO GUZMAN,** defendants herein, did willfully and knowingly combine, conspire, confederate, and agree together, and with others known and unknown, to commit offenses against the United States, to wit: Possession with Intent to Distribute Controlled Dangerous Substances, in violation of Title 21, United States Code, Section 846; and conspired to commit money laundering in violation of Title 18, United States Code, Section 1956(h).

I further state that I am a Special Agent with the Drug Enforcement Administration, and that this complaint is based on the following facts: See attached Affidavit of Special Agent Michael W. Rupe which is attached hereto and made a part hereof by reference.

Continued on the attached sheet and made a part hereof: Yes [ X ] No [ ]

MICHAEL W. RUPE
Special Agent, DEA

Sworn to before me and subscribed in my presence at: __MUSKOGEE, OKLAHOMA__

Date: __12/15/08__

STEVEN P. SHREDER
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

Signature of Judicial Officer

## COMPLAINT AFFIDAVIT

I, Michael W. Rupe, am employed as a Special Agent with Drug Enforcement Administration (DEA), United States Department of Justice.  I have been a Special Agent with the DEA since September 2004.  Prior to my employment with the DEA as a Special Agent, I was employed with the City of Tulsa Police Department while attending the Tulsa Police Department Academy.   I have received specialized training and experience in the investigation of narcotics-related offenses including the manufacture, transportation, distribution and sale of controlled substances.   I am currently assigned to the DEA Tulsa Resident Office, in Tulsa, Oklahoma.  As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 21, United States Code, Section 878(a).

## PROFESSIONAL EXPERIENCE OF AFFIANT

Affiant states that during my law enforcement career, I have received over 1,000 hours in specialized training from various federal, state and local law enforcement agencies.  This training has focused upon methods of unlawful manufacturing of illegal narcotics  via clandestine laboratories, smuggling and distribution techniques, methods of drug trafficking, as well as the means by which drug traffickers derive, launder and conceal their profits from drug trafficking, the use of assets to facilitate unlawful drug trafficking activity and the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate the drug violations.  I have participated in numerous drug related criminal investigations. I have authored search warrants, and participated in Title III investigations, conducted surveillance in the purchase of controlled substances and have participated in controlled deliveries of narcotics.

My participation in drug trafficking investigations has resulted in both the successful prosecution of numerous individuals and the forfeiture to the United States Government of assets purchased with the proceeds from unlawful drug trafficking, as well as assets used to facilitate said violations. In connection with drug trafficking investigations, I have participated in and/or executed several search and seizure warrants at residences, stash houses used as storage and distribution points for controlled substances, and other locations.

This affidavit is made in support of a Complaint and Arrest Warrants for **BOBBY FAIRCHILD, MICHAEL CASON, aka Mike Cason, RICHARD BURRIS, LOUIS MONTOYA, JIMMY SMITH, CALVIN HARVEY FRENCH, aka Harvey French,** and **ALFREDO GUZMAN** for violation of Title 21, United States Code, Section 846 – Conspiracy to Distribute Controlled Substances, and Title 18, United States Code, Section 1956(h) – Conspiracy to Commit Money Laundering.

## INTRODUCTION

1.      In June 2008, Agents in the Drug Enforcement Administration (DEA), Tulsa Resident Office,  received an inquiry from DEA El Paso, Texas.  DEA El Paso is a part of a nationwide coordinated investigation into the drug trafficking activities of a Mexican poly-drug trafficking cartel known as the Gulf Cartel.  The Gulf Cartel is an organization based in the Republic of Mexico which brokers large quantities of marijuana, methamphetamine and cocaine from South America based and Mexico based producers of the illegal drugs.   The Cartel provides United States/Mexico border crossing, marketing and distribution services for illegal drugs into the United States.

2      As part of the nationwide coordinated Gulf Cartel investigation, DEA El Paso opened a Title III investigation.  One of the targets of DEA El Paso's Title III investigation is

2

Jose Esparza (Esparza). During the course of interception of telephone conversations of Esparza, DEA El Paso intercepted a telephone conversation between Esparza and a subject in the Eastern District of Oklahoma identified as **Bobby FAIRCHILD (FAIRCHILD)**. The contents of intercepted calls between Esparza and **FAIRCHILD** show that there is a drug trafficking business relationship between Esparza and **FAIRCHILD**.

3.      Based upon the El Paso, Texas, inquiry, DEA Tulsa opened an investigation into possible drug trafficking activity by **FAIRCHILD**. DEA Tulsa gathered criminal intelligence from law enforcement agencies in the Eastern District of Oklahoma, and elsewhere, regarding prior law enforcement knowledge of illegal drug activity by **FAIRCHILD**. Most of the information in this investigation was gained through the use of Title III wire communication interceptions of telephones used by **FAIRCHILD**. Chief United States District Judge James H. Payne for the Eastern District of Oklahoma, authorized the interception of five (5) separate telephones during the course of the investigation. Copies of the Applications and Orders are attached. (Exhibit A, Case No. 08-MC-13-JHP; Exhibit B, Case No. 08-MC-14-JHP; Exhibit C, Case No. 08-MC-16-JHP; Exhibit D, Case No. 08-MC-21 and Exhibit E, Case No. 08-MC-23) The body of information gathered by DEA Tulsa showed that **FAIRCHILD** has been engaged in illegal drug trafficking for a period of years. The Oklahoma Bureau of Narcotics and Dangerous Drugs has a large body of intelligence showing that **FAIRCHILD** has a history of large scale distribution of various illegal drugs.

4.      The DEA Tulsa investigation of **FAIRCHILD** shows that **FAIRCHILD** is the leader of an interstate drug conspiracy. **FAIRCHILD** uses his activity as a breeder of gamecocks as a cover for his illegal drug brokerage and distribution business which is based in Oktaha, Muskogee County, Oklahoma.

3

5.      From his residence in rural Muskogee County, **FAIRCHILD** brokers large drug transactions from sources of supply in Mexico to various destinations in the United States. He further coordinates the collection of money generated by the sale of the drugs so that additional large quantities of illegal drugs may be purchased from Mexican sources of supply. The flow of illegal drugs into **FAIRCHILD's** business and the flow of the proceeds of the drug sales through **FAIRCHILD's** business to the Mexican sources of supply are integral to the continued operation of the illegal enterprise.

6.      The nature and scope of the conspiracy require **FAIRCHILD** to engage other co-conspirators to provide services to the enterprise. These co-conspirators assist **FAIRCHILD** in the transportation of illegal drugs and the money generated as proceeds from illegal drug sales.

7.      During the course of Title III interceptions, Agents of the DEA Tulsa Resident Office have learned **FAIRCHILD** utilizes various code words in discussing the drug trafficking activities with co-conspirators. In particular, the code word "stags" is used to describe marijuana. Other code words used by the organization are "kelsos," believed to be kilograms of cocaine; "puppies," believed to be drugs; and "soap," believed to be marijuana. Affiant knows that drug traffickers often use code words to disguise their drug trafficking activities.

## SOURCES OF SUPPLY

A.      **Jose Esparza**

8.      Esparza has been indicted by a Federal grand jury in the Southern District of Texas on drug related charges. DEA El Paso has learned through their Title III investigation of Esparza that he has a direct link to both the Gulf Cartel and the Vicente Carrillo-Fuentes Mexican drug trafficking organization. On June 8, 2008, and on several subsequent dates, Esparza contacted **FAIRCHILD** via cellular telephone to discuss the supply of illegal drugs to

**FAIRCHILD** and his customers. The calls were initially intercepted in DEA El Paso's Title III investigation and later in DEA Tulsa's Title III investigation.

9.      During the course of the intercepted calls, **FAIRCHILD** was inquiring of Esparza when it was likely that illegal drugs will be brought across the United States/Mexico border. There was discussion between Esparza and **FAIRCHILD** regarding the difficulty that organizations were having in bringing drugs across the border. They discussed the level of violence among the Mexican cartels and its impact on business.

10.      In November 2008,  DEA El Paso coordinated a traffic stop on a Hispanic female who they believed was transporting a large quantity of illegal drugs.   During the course of the traffic stop, law enforcement officers found in excess of 200 pounds of marijuana in the vehicle. DEA El Paso interviewed the Hispanic female regarding the illegal drugs. She told Agents from DEA El Paso that she was employed by Jose Esparza to drive the marijuana to Oklahoma for delivery to an Esparza customer. DEA El Paso reviewed all of the intercepted calls on the Esparza Title III interception and found that the only Oklahoma telephones being contacted by Esparza were being used by **FAIRCHILD**.

**B.      Alfredo Guzman**

11.      On July 23, 2008, DEA Tulsa initiated a Title III interception of telephones used by **FAIRCHILD**.   From July 23, 2008, until November 9, 2008, DEA Tulsa continuously intercepted calls on telephones used by **FAIRCHILD**. On December 3, 2008, DEA Tulsa began interception of a cellular telephone used by **FAIRCHILD** and has continuously monitored activity on the phone since that date.

12.      During the course of the interceptions, DEA Tulsa has monitored calls between **Alfredo GUZMAN (GUZMAN)** and **FAIRCHILD**.   On August 4, 2008, **FAIRCHILD** had

5

traveled to Ft. Worth, Texas, to a bull riding event in which his teenage son was performing. On August 6, 2008, while in Ft. Worth, Texas, **FAIRCHILD** met with **GUZMAN**. DEA Tulsa, in conjunction with DEA Ft. Worth, established surveillance on **FAIRCHILD** and **GUZMAN**. While the two men were together, they traveled to a residential neighborhood in Ft. Worth in **GUZMAN's** pickup truck. While in the residential neighborhood, **GUZMAN** stopped at a specific house where **GUZMAN** excited the vehicle and met in the yard with a Hispanic male. Following the meeting, **GUZMAN** and **FAIRCHILD** parted company. **GUZMAN** and **FAIRCHILD** immediately separated and **GUZMAN** left the location and traveled to the Dallas/Fort Worth airport where he boarded an airplane for Lexington, Kentucky.

13.     Pursuant to the request of DEA Tulsa, DEA London, Kentucky, established surveillance of **GUZMAN** when he arrived at the Lexington airport. **GUZMAN** rented a car and subsequently traveled to a building in Hazard County, Kentucky. The building had two bays which were accessed by overhead doors. While in Hazard County, Kentucky, **GUZMAN** rented a forklift which was delivered to the same building. Later the same evening, a semi-tractor trailer arrived at the same building. Numerous pallets were removed from the semi-truck. **GUZMAN** photographed the unloading process and the pallets in place in the building. **GUZMAN** left the building, traveled to Lexington, Kentucky, stayed the night in a hotel and flew back to Ft. Worth, Texas.

14.     After the semi-truck left the building, it was stopped by law enforcement and a drug canine was deployed around the truck. The canine indicated the presence of drugs. The truck was searched and no drugs were found. Affiant knows that it is not unusual for a drug canine to indicate the presence of drugs in locations where drugs have been but are no longer present. This is due to the sensitivity of the canine olfactory mechanism.

6

15.     DEA London sought and received a no notice search warrant for the building in Hazard County, Kentucky.  The warrant was executed by DEA London late on the evening of August 6, 2008, or early in the morning of August 7, 2008.  No contraband was located among the pallets in the building.

**C.     FNU LNU (unknown Hispanic Male)**

16.     On December 4, 2008, DEA Tulsa established a Title III interception of a fifth cellular telephone used by **FAIRCHILD**.  Immediately, calls were intercepted between **FAIRCHILD** and an unknown Hispanic male (UHM).  The conversations between the UHM and **FAIRCHILD** contained coded language DEA Tulsa agents recognize as related to drug trafficking.

## UNITED STATES CUSTOMERS

**A.     Jeremy Stewart**

17.     Jeremy Stewart (Stewart) has been indicted in the State of Kentucky on drug trafficking charges.  During the course of DEA Tulsa's Title III investigation, Stewart has been intercepted talking with **FAIRCHILD** about the acquisition of illegal drugs from the above-described sources of supply and the delivery of the drugs to Stewart in Kentucky.

18.     In September 2008, Stewart traveled to Muskogee, Oklahoma, where DEA Tulsa established surveillance on Stewart at a hotel in Muskogee.  During the surveillance, agents saw **FAIRCHILD** deliver a green duffle bag to Stewart.

19.     In early November 2008, Stewart traveled to Muskogee, Oklahoma, to pick up a truck that he was purchasing from **FAIRCHILD**.  Intercepted calls between Stewart and **FAIRCHILD** before Stewart's arrival in Muskogee indicated that there were illegal drugs available for Stewart to pick up from **FAIRCHILD**.  **FAIRCHILD** commented to Stewart that

7

he (**FAIRCHILD**) did not want Stewart to haul the illegal drugs in the truck, because he

(**FAIRCHILD**) did not want the drugs attributed to him (**FAIRCHILD**) if the truck should be

stopped by law enforcement.

20.     On November 6, 2008, Stewart arrived in Muskogee, Oklahoma.  Stewart was

accompanied by his wife, Diane, and an unknown female and an unknown male.  They were

traveling in a White Nissan Altima registered to Jeremy and Diane Stewart, PO Box 536,

Dorton, Kentucky.  Upon arrival, they checked into the same hotel where the transaction

involving the duffle bag had occurred.  After nightfall, Stewart traveled from the hotel to

**FAIRCHILD's** residence in Oktaha, Oklahoma, driving the White Altima.  DEA Tulsa

maintained ground and ariel surveillance of Stewart.  While at **FAIRCHILD's** residence, the

White Nissan Altima and a pick up truck were seen leaving **FAIRCHILD's** residence.  The

vehicles traveled together across a pasture at **FAIRCHILD's** residence to an outbuilding located

on the premises.  While en route across the pasture, both vehicles intentionally turned off their

headlights.  The vehicles remained at the outbuilding for a short period of time and then returned

to **FAIRCHILD's** residence.  Both vehicles traveled to the outbuilding a second time and

remained there for approximately an hour.  A short time later, Stewart returned to the hotel in the

White Nissan Altima followed by **FAIRCHILD** in the red Chevrolet pickup.  **FAIRCHILD**

then entered Stewart's Nissan, and Stewart took **FAIRCHILD** back to his residence.  Stewart

then returned to the hotel.

21.     On November 7, 2008, Stewart and one of the unknown females left the hotel in

the pickup truck registered to **FAIRCHILD**.  The White Nissan Altima left immediately after

the pickup truck with the unknown male and the other unknown female.  DEA Tulsa maintained

surveillance on the two vehicles as they headed east on Interstate 40.  Near Little Rock,

8

Arkansas, an Arkansas Highway Patrolman stopped the White Nissan Altima for a traffic violation. The patrolman deployed a drug detection canine around the vehicle. The canine alerted to the presence of illegal drugs. The Nissan was taken to a nearby body shop to be searched for illegal drugs. None were found.

22.     Surveillance agents observed **FAIRCHILD's** pickup truck stopped at a roadside rest area near the location where the Nissan was stopped. Stewart was seen coming out of a wooded area and getting back in the pickup truck. A subsequent search of the wooded area in the vicinity of the truck did not result in the recovery of any contraband.

23.     After the Nissan was stopped, **FAIRCHILD's** pickup truck, being driven by Stewart, exited Interstate 40 and drove to a convenience store. DEA Tulsa Agents observed the truck stop near the store at a trash can. Stewart and the unknown female cleaned out the contents of the truck. It appeared that they removed every piece of paper they could find in the pick up truck and place them in the trash can. The unknown female emptied her purse into the trash can and then went into the ladies restroom in the convenience store. The unknown female was in the restroom for an extended period of time. A subsequent search of the trash can and the ladies restroom did not reveal any contraband.

24.     After Stewart had cleaned out the truck, he called the unknown male driver of the Nissan and asked to speak to the Arkansas State Policeman that had stopped the Nissan. Stewart told the Highway Patrolman that the car (Nissan) was his (Stewart's) and that he (Stewart) was coming back to the scene of the traffic stop. The Highway Patrolman explained that he did not want Stewart to come to the scene of the traffic stop, but instructed Stewart to meet at the body shop where the search of the car would occur.

25.     Later that same day, a telephone call from Stewart to **FAIRCHILD** was intercepted by DEA Tulsa.  In the call, Stewart expressed relief that they (Stewart and **FAIRCHILD**) had listened to his (Stewart's) "gut" and not loaded those "stags" because they (Stewart and **FAIRCHILD**) would have "lost 'em".  Stewart told **FAIRCHILD** that the Arkansas Highway Patrolman said that he could smell "green legged stags" and that is why he (the Patrolman) searched the vehicle.

**B.      Joe Wolcott**

26.     Joe Wolcott (Wolcott) has been indicted by a federal Grand Jury seated in the Middle District of Tennessee.  Wolcott has been the target of a Title III investigation by DEA Nashville.

27.     On September 27, 2008, a telephone conversation between Wolcott and **FAIRCHILD** was intercepted.  Wolcott asked **FAIRCHILD** about "stags."  **FAIRCHILD** responded that his source of supply was "making some promises."  Wolcott said "that boy" wanted to look at "that boy's stags" before **FAIRCHILD** wasted his time bringing the "stags" to him.  **FAIRCHILD** said that Wolcott could look at the "stags."  **FAIRCHILD** said that everything was going to break loose in the next month.  **FAIRCHILD** told Wolcott that everyone was having problems.  **FAIRCHILD** told Wolcott that he had been getting a few "stags" on occasion, but nothing substantial.

**C.      Harvey French**

28.     During a judicially authorized Title III intercepted conversation between July of 2008 and December of 2008, **FAIRCHILD** told **Calvin Harvey FRENCH, also known as Harvey French (FRENCH)** "they keep promising they're going to bring me some 'stags' any day." **FAIRCHILD** said there are a bunch of "stags" down there, but they cannot get them

across.  **FRENCH** replied he wanted some "stags."  **FAIRCHILD** said the "stags" would be sent directly to him or **FRENCH** and they would "bust" every one of them open to make sure they worked.  Affiant believes "stags" is a code word for drugs and to "bust" the "stags" open would be to distribute the drugs and see if the customers were satisfied with the quality.

29.     **FAIRCHILD** was also intercepted during a judicially authorized Title III conversation during September of 2008 telling **FRENCH** that he (**FAIRCHILD**) had three separate sources from whom he obtains shipments of drugs and that each source was currently unable to provide any drugs to **FAIRCHILD**.  During the conversation, **FAIRCHILD** explained that he knew of four (4) currency seizures, referred to as "lost paperwork," that had occurred in the last month. Also during the conversation, **FAIRCHILD** explained the lull in the availability with drugs from Mexico as the problem being on "that side," and it happened every time they get a new president.  **FAIRCHILD** believed the current shortage of drugs was due partly to the new president of Mexico and the ongoing territorial problems associated with the Mexican Cartels and trafficking drugs across the United States/Mexico border.

30.     Conversations intercepted within the last 30 days during a judicially authorized Title III investigation show that **FAIRCHILD** is organizing, coordinating and implementing three separate shipments of controlled substances with a source of supply (SOS), who is an unidentified male (UM) located in El Paso, Texas.  The three shipments of controlled substances are originating from El Paso, Texas, and the destination of these three shipments are currently being coordinated and controlled by **FAIRCHILD** to other criminal associates involved in distributing illegal controlled substances.

31.     On December 4, 2008, the first shipment being discussed involved **FAIRCHILD** and the unknown male (UM), located in El Paso, Texas, involving a large shipment of controlled

11

substances. Based on the judicially authorized Title III intercepted conversations, **FAIRCHILD** has coordinated this shipment of controlled substances to be delivered to **FRENCH** who is located in Princeton, Kentucky. **FAIRCHILD** relayed to **FRENCH** that he has "seven and seven" and quoted a cost of 650 for seven and 750 for the other seven. **FAIRCHILD** ended the conversation by telling **FRENCH** that this load of "seven and seven" will be delivered in eight (8) days. Affiant and other investigators involved with this investigation have interpreted the amount of the controlled substances to be 1,400 pounds of marijuana. Agents also believe that the load of marijuana consists of seven hundred pounds at a cost of six-hundred and fifty dollars ($650) per pound and the other seven hundred pounds and a cost of seven-hundred and fifty dollars ($750) per pound.

32.     On December 4, 2008, the second shipment being discussed during the judicially authorized Title III intercepted conversations involved **FAIRCHILD** and the same UM in El Paso, Texas, coordinating a shipment of "10" items of an unknown substance to Stewart in Kentucky. **FAIRCHILD** and Stewart then have a discussion about the shipment being delivered in a couple days and further discuss breaking down the items into smaller quantities and adding an unknown substance to them to "move" the items.

33.     On December 4, 2008, the third shipment being discussed during the judicially authorized Title III intercepted conversations involved **FAIRCHILD** and the UM located in El Paso, Texas. This shipment being coordinated involves a shipment of "5 stags" which is being delivered to **FAIRCHILD**. Based on the conversations involving this shipment, Affiant believes this shipment will be delivered to **FAIRCHILD** at an undetermined time in December of 2008.

12

## UNITED STATES CURRENCY (USC)

**A.      Seizure of $283,210.00 from Jimmy Clinton SMITH**

34.      Affiant knows that on August 15, 2008, Agents began reviewing the pertinent calls from the Title-III investigation involving **FAIRCHILD**.  Information obtained through an intercepted conversation between **FAIRCHILD** and **Jimmy SMITH (SMITH)** showed that **SMITH** had already picked a "package" up and would be departing the Knoxville area at approximately 3:30 pm or 4:00 pm, destined for **FAIRCHILD** in Oktaha, Oklahoma.

35.      Through various law enforcement indices, members of the DEA Tulsa Resident Office obtained further information that **SMITH** had an arrest and pending case on file in Cumberland County, Tennessee, from March 2007.  **SMITH** was arrested in March of 2007 as the result of a seizure of approximately nine-hundred and eighty (980) pounds of marijuana and the seizure of approximately eighty two thousand dollars ($82,000.00) United States Currency (USC).

36.      At approximately 4:30 pm, on August 15, 2008, a DEA Agent received a telephone call from Cumberland County Sheriff's Department who informed Agents that the Tennessee Highway Patrol had stopped **SMITH** for a traffic violation on Interstate 40.

37.      Agents were advised that a K-9 alerted on the tractor which resulted in the search of the tractor and also advised when the Trooper made his initial contact with **SMITH**, the Trooper could smell the strong odor of burnt marijuana coming from within the compartment of the tractor.  Agents were informed  that during a search of the semi-truck the Troopers located approximately five (5) tightly wrapped bundles of United States Currency hidden under the bunk in the sleeper compartment of the truck.  An official count had been reached from the five (5) bundles of USC and the total count was $283,210.00.

13

38.     Agents reviewed subsequent intercepted telephone conversations between
**FAIRCHILD** and **SMITH**.  During an intercepted telephone conversation, **SMITH** advised
**FAIRCHILD** that he was Department of Transportation checked and they found something.  He
reported to **FAIRCHILD** that he told them (the Troopers) whatever it was that they found did
not belong to him (**SMITH**). **FAIRCHILD** acknowledged the information and told **SMITH** that
he (**FAIRCHILD**) would talk to him when he got in.

39.     On September 8, 2008, a telephone conversation between Stewart and
**FAIRCHILD** was intercepted regarding the $283,210.00 that was seized by law enforcement.
During the conversation, Stewart explained to **FAIRCHILD** how he intended to falsify
legitimate transactions in an effort to develop a fictional explanation for possession of the
currency.  In numerous intercepted telephone calls, **STEWART** stated he was completing the
paperwork for his attorney to file a claim for the return of the money.  Affiant knows based on
his training and experience that drug traffickers often claim cash advances, inheritances,
winnings from gambling/casinos, the sale of expensive property, collectible vehicles or other
expensive items as a way to attempt to reacquire possession of drug proceeds that have been
seized by law enforcement officials.

**B.      Seizure of $14,893.00 from Richard Anthony BURRIS**

40.     On August 12, 2008, Affiant reviewed pertinent telephone conversations pursuant
to the judicially authorized Title III investigation between **FAIRCHILD** and **Richard Anthony
BURRIS (BURRIS)**. The intercepted telephone conversation which took place on August 12,
2008, and indicated **BURRIS** was going to transport "a little over two…at least two" of
something for **FAIRCHILD**. Agents interpreted this to mean **BURRIS** would receive a quantity
of drugs or currency from **FAIRCHILD** and then transport it to an unknown destination.

14

41.     On August 14, 2008, Affiant reviewed pertinent telephone conversations pursuant to the judicially authorized Title III investigation. Intercepted telephone conversations occurring on August 14, 2008, indicated that **FAIRCHILD** was going to bring **BURRIS** "that three dollars." Agents interpreted this to mean **FAIRCHILD** was going to bring **BURRIS** a quantity of currency.

42.     On August 16, 2008, Affiant reviewed pertinent telephone conversations pursuant to the judicially authorized Title III investigation. During an intercepted telephone conversations occurring on August 16, 2008, between **FAIRCHILD** and **BURRIS**, **BURRIS'** said he was going to return home after stopping at Billy Bob's Texas in Ft. Worth, Texas.

43.     On August 16, 2008, Affiant responded to Billy Bob's Texas and established surveillance on the maroon Chevrolet truck registered to **BURRIS**. Affiant maintained surveillance on the truck until **BURRIS** returned to the vehicle. Affiant watched **BURRIS** leave Billy Bob's Texas.

44.     On August 17, 2008, at approximately 1:45 a.m., an Oklahoma Highway Patrol Trooper conducted a traffic stop on **BURRIS**. Pursuant to **BURRIS'** consent, the Trooper searched the vehicle and **BURRIS'** person. The Trooper discovered $14,893.00 USC on **BURRIS'** person. A drug detecting canine alerted on the currency. Pursuant to the alert, the Trooper decided to seize the $14,893.00 in **BURRIS'** possession.

**C.     Seizure of $33,000.00 from Luis MONTOYA**

45.     On September 17, 2008, surveillance was established at the residence of **FAIRCHILD**. Agents observed **Michael CASON, aka Mike Cason (CASON),** on a green tractor driving south on Oktaha Road, coming from the direction of **FAIRCHILD'S**

15

property/ranch. A DEA Agent observed the tractor turn west onto a gravel road off of Old

Oktaha Road and come to a stop in front of a fenced/gated piece of land.

46.     Agents then observed a red dually truck pulling a red trailer emerge out of the

fenced property and drive north on Oktaha Road. Agents observed the truck drive into

**FAIRCHILD's** property/ranch and turn around. Agents then observed the truck travel south on

Old Oktaha Road, enter Highway 69 and travel to the Flying J Truck Stop in Checotah,

Oklahoma.

47.     A short time later, **CASON** exited the red pickup truck towing the red trailer and

talked to the Hispanic male driving a black pickup truck which was registered to **CASON**.

Agents observed the driver of the black truck, later determined to be **Louis MONTOYA**

(**MONTOYA**), walk several times between the black pickup truck and the red pickup truck.

48.     During this exchange of vehicles, agents observed the red truck belonging to

**FAIRCHILD** parked across the street from the Flying J Truck Stop. **FAIRCHILD** was

observed watching the meeting between **CASON** and **MONTOYA** from the red truck.

49.     Agents observed the red truck and trailer, then driven by **MONTOYA**, exit the

truck stop and leave the location, enter Highway 69 and travel northbound on Highway 69.

50.     A District 25 Attorney's Drug Task Force Agent initiated a vehicle stop of the red

pickup truck for the traffic violation of driving on the shoulder of the roadway. The Deputy

identified the driver as **MONTOYA**. Upon a consensual search of the trailer, the Deputy

located a white plastic shopping bag which contained approximately $33,000.00 in USC.

**MONTOYA** also had approximately $1,000.00 in USC on his person.

16

**ASSETS**

51.     **FAIRCHILD** has acquired a number of acres in the Oktaha, Oklahoma, area. **FAIRCHILD** has built a residence and several outbuildings on the property. The property has been improved to sustain a large number of gamecock shelters.

52.     **FAIRCHILD** drives late model pick up trucks and has farm equipment on his property.

53.     **FAIRCHILD's** only apparent means of legitimate income is the breeding and sale of gamecocks. However, during the DEA Tulsa Title III investigation, Agents have intercepted calls in which **FAIRCHILD** said that he has not been to his gamecock shelters in several months.

**INTERVIEWS**

54.     On 12/11/2008 S/A Cory Hallum debriefed a DEA cooperating defendant (CD#1) that had been indicted and arrested in a related federal investigation. CD#1 was asked about the drug trafficking activities of Bobby **FAIRCHILD**. The CD stated that since 2006 he/she had conducted between 10 to 12 marijuana transactions, in which, he delivered in excess of 1000 kilograms (collectively) of marijuana to **FAIRCHILD**, or to members of **FAIRCHILD's** organization at **FAIRCHILD's** direction, to include Richard BURRIS. CD#1 further stated that during negotiations for these loads the CD and **FAIRCHILD** used code words to describe the drug product. CD#1 stated that they used the term "stags" to referred to pounds of marijuana and "kelsos" to refer to kilograms of cocaine. CD#1 instructed S/A Hallum that **FAIRCHILD** and CD#1 used name "kelso" because, in the same way that cocaine is white, a fighting chicken with white legs is called a "kelso." These code words are consistent with the code words intercepted by the DEA Tulsa Office on **FAIRCHILD's** telephone (previously described). CD#1 further

17

stated that he/she had been to **FAIRCHILD's** residence on numerous occasions and accurately

described **FAIRCHILD's** residence located in Oktaha, Oklahoma to Agent Hallum.  CD#1 has

also received large amount of US currency from **FAIRCHILD** as payment for past drug

transactions.

## CRIMINAL HISTORIES

     55.    According to NCIC searches, below are the known criminal histories of the

targets:

| | | |
|---|---|---|
| A. | **Bobby FAIRCHILD**: | Robbery |
| B. | **Michael CASON**: | Theft by Receiving; Uttering a Forged Instrument; Possession Controlled Substance with intent to Deliver; Robbery or Attempted Robbery with Dangerous Weapon; Assault with a Deadly Weapon; Receipt/Possess/Conceal Stolen Property; Distribution of controlled Substances, including Possession with Intent; Carrying Firearms After Conviction/During Probation; Knowingly Concealing Stolen Property |
| C. | **Richard BURRIS** : | Distribution of Marijuana; Possession of Controlled Drug with Intent to Distribute |
| D. | **Louis MONTOYA**: | Conspiracy to Commit/Trafficking in Illegal Drugs; Trafficking in Illegal Drugs; Maintaining Place for Keeping/Selling Controlled Dangerous Substances; Fraud; Auto Theft |
| E. | **Jimmy SMITH**: | Manufacturing, Delivering, Selling Controlled Substances |
| F. | **Calvin Harvey FRENCH**: | No known criminal history. |
| G. | **Alfredo GUZMAN**: | No known criminal history. |

Based upon the foregoing, Affiant believes there is probable cause to believe that

**BOBBY FAIRCHILD, MICHAEL CASON, aka Mike Cason, RICHARD BURRIS, LOUIS**

**MONTOYA, JIMMY SMITH, CALVIN HARVEY FRENCH, aka Harvey French,** and

**ALFREDO GUZMAN,** have committed violations of Title 21, United States Code, Section 846

(Conspiracy to Distribute Controlled Substances), and Title 18, United States Code, Section

1956(h) (Conspiracy to Commit Money Laundering).

MICHAEL W. RUPE
Special Agent, DEA

Subscribed and sworn before me this 5 day of December, 2008.

STEVEN P. SHREDER
United States Magistrate Judge

19