

**FILED**

DEC 1 1 2008

WILLIAM B. GUTHRIE
Clerk, U.S. District Court

By: _____
Deputy Clerk

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF OKLAHOMA

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA FOR
AN ORDER AUTHORIZING THE INTERCEPTION
OF WIRE COMMUNICATIONS

Case No. 08-MC-13-JHP

### MOTION FOR LEAVE TO DISCLOSE
### SEALED APPLICATIONS FOR WIRE INTERCEPTION

COMES NOW the United States of America, through Sheldon J. Sperling, United States

Attorney for the Eastern District of Oklahoma, and Rob Wallace, Assistant United States

Attorney, and moves this Honorable Court to allow the government to disclose the contents of

the applications for wire interception in the noted case numbers to United States Magistrate

Judge Steven P. Shreder. In support of its motion, the government alleges and states:

    1.    The government has applied to this Court for and received from this Court the

following Title III wire intercepts:

| | | |
|---|---|---|
| a. | (918) 704-5940 | July 23, 2008 |
| b. | (918) 696-1755 | August 8, 2008 |
| | Extended | September 5, 2008 |
| | Extended | October 10, 2008 |
| c. | (918) 457-8398 | September 5, 2008 |
| | Extended | October 3, 2008 |
| d. | (918) 629-3876 | November 3, 2008 |
| e. | (270) 994-3072 | December 2, 2008 |

    2.    Each of the intercept applications has been supported by an affidavit of Drug

Enforcement Administration (DEA) Special Agent Cory Hallum, DEA Tulsa Resident Agency.

    3.    Each of the applications, orders and supporting materials have been filed with this

Court under seal and access to the matters has been strictly limited.



**GOVERNMENT
EXHIBIT
A**

4.      On December 5, 2008, and December 8, 2008, pleadings were presented to United

States Magistrate Judge Steven P. Shreder seeking the issuance of a complaint and arrest

warrants on **BOBBY FAIRCHILD, MICHAEL CASON, aka Mike Cason, RICHARD**

**BURRIS, LOUIS MONTOYA, JIMMY SMITH, CALVIN HARVEY FRENCH, aka**

**Harvey French,** and **ALFREDO GUZMAN,** for violations of Title 21, United States Code,

Section 846.  Magistrate Judge Shreder declined to find probable cause to issue the arrest

warrants.  The pleadings included an affidavit of DEA Special Agent Michael Rupe purporting to

set forth probable cause to believe that the noted subjects had conspired to violate the federal

drug law.  The affidavit summarized portions of the above-listed wire intercept applications.

5.      The government intends to re-present the Application for a Criminal Complaint to

Magistrate Judge Shreder.  Permission to disclose the intercept applications as part of its

Application for Criminal Complaint will allow Magistrate Judge Shreder access to the sealed

documents without the necessity and burden to recreate such documents as part of the affidavit to

support the complaint and arrest warrants.

6.      Extant investigative, operational and safety concerns regarding the unsealing and

disclosure of the materials contained within the subject documents, operate to limit the scope of

the requested disclosure to Magistrate Judge Shreder.

WHEREFORE, premises considered, the government respectfully prays this Honorable

Court for permission to disclose the above-listed Applications for Wire Interception, including

the attached Affidavits in Support, to Magistrate Judge Shreder.

SHELDON J. SPERLING
United States Attorney

ROB WALLACE, OBA #13130
Assistant United States Attorney

2

# FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

OCT 2 1 2008

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By:_____
Deputy Clerk

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION ) | |
| OF THE UNITED STATES OF AMERICA ) | |
| FOR AN ORDER AUTHORIZING ) | **FILED UNDER SEAL** |
| THE INTERCEPTION OF WIRE ) | |
| COMMUNICATIONS TO AND FROM A ) | **NO. 08-MC-0013-JHP** |
| CELLULAR TELEPHONE UTILIZING ) | |
| NUMBER (918) 704-5940, BEARING ) | |
| INTERNATIONAL MOBILE SUBSCRIBER ) | |
| IDENTITY (IMSI) 310410189938550, ) | |
| SUBSCRIBER UNKNOWN ) | |

### ORDER TO EXTEND AND CONTINUE SERVICE OF INVENTORY
### AND NOTICE OF INTERCEPTED WIRE COMMUNICATIONS
### OCCURRING OVER TARGET TELEPHONE #1

Upon the Second Application of the United States of America for an Order to Extend

and Continue the Service of the Inventory and Notice of Intercepted Wire Communications,

pursuant to Title 18, United States Code Section 2518(d):

The Court finds that the Wiretap Order regarding Target Telephone #1, as set forth

in the Government's Application, has resulted in a number of pertinent telephone calls being

intercepted. These calls have assisted in the investigation of criminal activities and will lead

to criminal charges and Indictments being returned by the grand jury in and for the Eastern

District of Oklahoma. Further, there are ongoing investigations that could possibly result in

future defendants being charged as well as other criminal charges being brought by the

government. To reveal and disclose the existence of the wiretaps, their supporting affidavits

and orders would thereby prematurely compromise other potential defendants and other

criminal activities.

**IT IS THEREFORE ORDERED,**

That the Service of Inventory and Notice on named subjects and other target interceptees of the recordings made of wire communications occurring on Target Telephone #1 be extended and continued for a period of sixty (60) days from the date of this Order. Further, that for good cause shown, the government shall be permitted to file additional applications with the Court, to extend and continue the service of the inventory and notice, if the need should arise due to the ongoing nature of the investigation.

**SO ORDERED** this 21st day of October, 2008.

CHIEF JUDGE JAMES H. PAYNE
UNITED STATES DISTRICT COURT

I hereby certify that the annexed instrument is a true and correct copy of the original on file in my office.
ATTEST
WILLIAM B. GUTHRIE
Clerk, U.S. District Court
Eastern District of Oklahoma

By_____ Deputy Clerk
Dated_____



**FILED**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

OCT 2 1 2008

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By: _____ Deputy Clerk

IN THE MATTER OF THE APPLICATION )
OF THE UNITED STATES OF AMERICA )
FOR AN ORDER AUTHORIZING )            **FILED UNDER SEAL**
THE INTERCEPTION OF WIRE )
COMMUNICATIONS TO AND FROM A )        **NO. 08-MC-0013-JHP**
CELLULAR TELEPHONE UTILIZING )
NUMBER (918) 704-5940, BEARING )
INTERNATIONAL MOBILE SUBSCRIBER )
IDENTITY (IMSI) 310410189938550, )
SUBSCRIBER UNKNOWN )

### APPLICATION TO EXTEND AND CONTINUE SERVICE OF INVENTORY AND NOTICE OF INTERCEPTED WIRE COMMUNICATIONS OCCURRING OVER TARGET TELEPHONE #1

COMES NOW, the United States of America, by and through counsel, Sheldon J.

Sperling, United States Attorney, and Rob Wallace, Assistant United States Attorney, and

pursuant to Title 18, United States Code, Section 2518(d), applies for an order authorizing

the government to delay the notification and extend and continue the service of the inventory

and notice of the wire communications occurring over Target Telephone #1 for a period of

at least sixty (60) days.

In support of this Application, the United States of America shows as follows:

1.      On July 23, 2008, the government applied for an order from the United States

District Court authorizing the interception of wire communications occurring to and from

**Target Telephone #1 (918) 704-5940**, subscriber unknown, and utilized by **BOBBY**

**FAIRCHILD**, bearing International Mobile Subscriber Identity (IMSI) 310410189938550.

The application for authorization to intercept wire communications over said telephone

number was supported by probable cause to believe that **BOBBY FAIRCHILD, JOSE ESPARZA** and others as yet unknown, had been and were committing offenses involving the importation and distribution of (and possession with intent to distribute) controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843 (b), 846, 952, 960 and 963; the laundering of monetary instruments being the proceeds from a specified unlawful activity and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1956 and/or 1957; and interstate and foreign travel to promote, manage, establish, carry-on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity, to wit: an enterprise involving a controlled substance, in violation of Title 18, United States Code, Section 1952; and that evidence of said violations would be obtained through the interception of the subject wire communications.

2.      On July 23, 2008, Chief U.S. District Judge James H. Payne signed an Order authorizing electronic surveillance over **Target Telephone #1 (918) 704-5940**, for a period not to exceed thirty (30) days;

3.      From July 24, 2008, through August 23, 2008, the intercepted wire communications were recorded, and the recordings have been preserved in a manner that protects the recordings from editing or other alterations.  The recordings are contained on a magneto optic disk presented to the Court on September 11, 2008, for sealing in conjunction

2

with the government's Initial Application to Seal Recordings of Intercepted Wire Communications Occurring Over Target Telephone #1;

4.     On September 11, 2008, U.S. District Judge Frank H. Seay signed an Initial Order Sealing Recordings of Intercepted Wire Communications which permitted, among other provisions, the government to file a report with the Court on whether it may be necessary to continue the serving of an inventory and notice on the subjects named therein with ninety (90) days;

5.     Title 18, United States Code, Section 2518(8)(a), requires that immediately upon the expiration of the Interception Order, or extensions thereof, the recordings must be made available to the judge issuing the order, and sealed under his direction.   On September 11, 2008, U.S. District Court Judge Frank H. Seay signed the Order to Seal the Recordings of Intercepted Wire Communications Occurring on Target Telephone #1;

6.     The above referenced wire tap orders regarding Target Telephone #1 have resulted in the interception of a number of pertinent telephone calls that have been useful to the investigators may lead to charges as set forth above.   However,   investigations are currently ongoing and further charges, Indictments, and additional defendants related to the investigations are imminent.   To reveal and disclose the existence of the wiretaps, their affidavits, applications and orders would prematurely compromise and jeopardize the continued and ongoing investigations as to other potential defendants and other criminal activities.

3

WHEREFORE, the government requests that the Court extend and continue the service of the inventory and notice on named subjects and other target interceptees with regard to the above referenced Target Telephone #1 for a period of sixty (60) days, or a later date consistent with the Court's order. Further that upon good cause being shown, the government be permitted to apply to the Court for additional applications to extend and continue the service of the inventory and notice, if such need should arise due to the ongoing nature of the investigations.

Respectfully submitted,

SHELDON J. SPERLING
United States Attorney

ROB WALLACE, OBA #13130
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK 74401
(918) 684-5100 (telephone)
(918) 684-5150 (facsimile)
rob.a.wallace@usdoj.gov (e-mail)

4

Case 6:08-mc-00013-JHP *SEALED*   Docu~~~~~~iled~~~SDC ED/OK on 07/23/2008   Page 1 of 48

**SEALED**

**ORIGINAL**

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF OKLAHOMA

**FILED**

**JUL 2 3 2008**

WILLIAM B. GUTHRIE
Clerk, U.S. District Court

By:_____
Deputy Clerk

IN THE MATTER OF THE )
APPLICATION OF THE UNITED )
STATES OF AMERICA FOR AN ORDER )
AUTHORIZING THE INTERCEPTION )
OF WIRE COMMUNICATIONS )
TO AND FROM AT&T WIRELESS )
TELEPHONE NUMBERS (918) 704-5940 )
IMSI: 310410189938550 )
IMEI/ESN: 011395003051936 )

08 - MJ - 00060 - JHP

08 - MC - 00013 - JHP

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR WIRE INTERCEPTION

### INTRODUCTION

1.      Affiant, Cory Hallum, Special Agent, U.S. Department of Justice, Drug Enforcement Administration, being duly sworn under oath, states as follows:

2.      I, Cory Hallum, am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

3.      I am currently employed as a Special Agent with the Drug Enforcement Administration (DEA), and have been so employed since 1998. In February 1999 I was temporarily assigned to the Oklahoma City District Office. In May 1999, I reported to the Houston Field Division, Corpus Christi Resident Office, at which time I was assigned to the High Intensity Drug Trafficking Area (HIDTA) group. I remained an active member of the HIDTA group, until 2002, when I was transferred to Enforcement Group One. In June 2006, I was transferred to the Tulsa Resident Office where I am currently assigned to the HIDTA group.

4.    Since becoming a Special Agent with DEA, I have conducted investigations of unlawful drug distribution in violation of Title 21, United States Code, Sections 841, 843, 846, and have participated in wire and physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of informants and reviews of taped conversations and drug records.    Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed and the methods of payment for such drugs.  I have received numerous hours in training from various federal, state, and local law enforcement agencies.

5.    As a Special Agent, I have initiated more than 85 DEA cases.  These cases have lead to the arrest and indictment of more than 135 defendants; the successful seizure of more than 37,000 pounds of marijuana, more than 1,140 pounds of cocaine and more than 125 pounds of Methamphetamine.   In Addition to being the Lead Case Agent in more than 85 DEA investigations, I have assisted with more than 1,000 Drug trafficking investigations.

6.    I have authored Affidavits for Title III investigations and search warrants.  I have participated in an undercover capacity for the purchase, distribution and trafficking of illegal substances.  I have executed numerous controlled deliveries of narcotics.  As a result of my law enforcement service, I have gained a considerable amount of knowledge through my training and experience.   I have interviewed hundreds of defendants involved in the use, manufacture, transportation, and illegal sale of controlled dangerous substances.  During the course of these interviews, I have inquired and learned how individuals involved in drug distribution schemes and networks use and disperse the illegal proceeds generated due to the illegal sale of controlled dangerous substances, including but not limited to chemicals commonly utilized in the illegal manufacture of methamphetamine. During the course of my training and interviews with various

2

defendants I have learned how individuals involved in drug distribution schemes maintain records and conspire to deceive law enforcement as well as rival distributors of controlled dangerous substances. I have learned how individuals that are involved in these types of crimes involving the distribution of controlled dangerous substances maintain records and secret monies gained as a result of participation in illegal drug distribution networks. The information contained in this affidavit is known personally or was learned from other Officers or Agents and by reviewing reports and documents.

7.    I submit this affidavit in support of an application for an order pursuant to Section 2518 of Title 18, United States Code, authorizing the interception and recording of wire communications occurring over **TARGET TELEPHONE #1** assigned telephone number (918) 704-5940, International Mobile Subscriber Identity (IMSI) 310410189938550[1], with service provided by AT&T Wireless , and any telephone numbers subsequently assigned to or accessed by the instruments bearing the same IMSI as the **TARGET TELEPHONE #1,** as well as any IMSI subsequently assigned to the instrument bearing the same telephone number assigned to **TARGET TELEPHONE #1** concerning offenses enumerated in Section 2516 of Title 18, United States Code, that is, offenses involving the importation and distribution of (and possession with intent to distribute) controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843 (b), 846, 952, 960 and 963; the laundering of monetary instruments being the proceeds from a specified unlawful activity and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1956 and/or 1957; and Interstate and

---

[1] The International Mobile Subscriber Identification (IMSI) number is encoded on a computer chip within the **TARGET TELEPHONE.** The chip can be removed and inserted into any similarly equipped telephone and be used to operate that telephone. The IMSI is unique to the subscriber and cannot be changed. Accordingly, the DEA is seeking authorization to intercept wire communications over any telephones or telephone numbers accessed by or through the IMSI number noted above.

foreign travel to promote, manage, establish, carry-on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity, to wit: a business enterprise involving a controlled substance, in violation of Title 18, United States Code, Section 1952.

8.     I submit that there is probable cause to believe that these offenses have been committed, are being committed, and will continue to be committed by persons who are the subjects of this investigation, including, among others Bobby Fairchild, Jose Esparza, and others as yet unidentified **(TARGET VIOLATORS)**. The requested Order is sought for a period of time until the requested interceptions fully reveal the identity of and manner in which the **TARGET VIOLATORS** engage in the above-described offenses, or for a period of thirty (30) days, whichever occurs first, pursuant to Title 18, United States Code, Section 2518 (5). Pursuant to Section 2518 (5) of Title 18, United States Code, it is further requested that the 30-day period be measured from the date on which a law enforcement agent first begins to conduct the interception under the court order or ten days after the order is entered whichever is earlier.

9.     This case is being investigated by the DEA in Tulsa, Oklahoma, El Paso, Texas, Denver, Colorado and Las Cruces, New Mexico, and the Oklahoma Bureau of Narcotics and Dangerous Drugs, and is based on my personal participation in this investigation; reports made to me by other DEA agents and law enforcement authorities; and information provided by confidential sources discussed in more detail below. Except where otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement was made by other law enforcement officers (who may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed. Such statements

4

are reported in substance and in part, unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance.

10.     Since this affidavit is being submitted for the limited purpose of securing an order authorizing the interception of wire communications, I have not included details of every aspect of this investigation to date. Facts not set forth herein are not being relied on in reaching my conclusion that an order should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an order authorizing the interception of wire communications. Where I have described conversations, I have described them in substance and in part, and not verbatim. Unless otherwise indicated, the information I have set forth herein is based on information I have gained from reports written by other agents and officers, and discussion with other agents and officers.

## SUBJECTS AND OFFENSES

11.     This application is based upon an investigation of a drug trafficking group involved with the importation of multi-kilograms of methamphetamine and cocaine from Mexico to the United States, and with the distribution of this methamphetamine and cocaine in Texas, Oklahoma, Louisiana and Kansas.

12.     As discussed below, there is probable cause to believe that the **TARGET VIOLATORS** have committed, are committing and will continue to commit the following offenses: the importation and distribution of, and possession with intent to distribute, controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same and attempts to do the same, all in violation of Title 21, United States Code, Sections 841, 843 (b), 846, 952, 960 and 963; the laundering of monetary instruments being the proceeds from a

5

specified unlawful activity and conspiracy to commit the same, in violation of Title 18, United

States Code, Sections 1956 and/or 1957; and Interstate and foreign travel to promote, manage,

establish, carry-on, or facilitate the promotion, management, establishment, or carrying on of an

unlawful activity, to wit: a business enterprise involving a controlled substance, in violation of

Title 18, United States Code, Section 1952 **(TARGET OFFENSES).**

## THE DESIGNATED CELLULAR TELEPHONES

13.    There is probable cause to believe that the **TARGET VIOLATORS** of this

investigation are also the **TARGET INTERCEPTEES** and are using and will in the future use

**TARGET TELEPHONE #1** assigned telephone number (918) 704-5940, International Mobile

Subscriber Identity (IMSI) 310410189938550, which is an AT&T prepaid cellular telephone

distributed by Tracfone.   Due to the fact **TARGET TELEPHONE #1** is a prepaid cellular

telephone the subscriber is unknown.  Service was established with AT&T on May 9, 2008.

**TARGET TELEPHONE #1** is being used to facilitate, accomplish, and to commit the above-

described **TARGET OFFENSES.**

14.    There is probable cause to believe that **TARGET TELEPHONE #1** will be used

during the period of interception applied for herein by the **TARGET INTERCEPTEES,** Bobby

Fairchild and others not yet identified in order to accomplish, to discuss, and to commit the

**TARGET OFFENSES.**

15.    I have been informed by other law enforcement personnel who are familiar with

applicable telephone technology that a "portable cellular telephone" (or a mobile telephone) can

be used both within a vehicle and outside a vehicle through the use of a portable battery pack.

The cellular telephone system divides Oklahoma and other areas into small coverage areas,

which are called cells.  As a vehicle in which a portable cellular telephone is located or the

cellular telephone itself is moved from one cell to another, transmitters within each cell and a master switching network permit wire communications to be completed. Each portable cellular telephone that does not contain party lines bears a unique International Mobile Subscriber Identification (IMSI) and an assigned telephone number. It is requested that interception be permitted over any changed telephone numbers subsequently assigned to the instrument with the above listed IMSI for **TARGET TELEPHONE #1.**

16.     It is anticipated that the **TARGET INTERCEPTEES** will use **TARGET TELEPHONE #1** to place calls to other telephones to and from the Eastern District of Oklahoma, as well as other locations. This belief is supported by the facts described below.

17.     In any event, pursuant to United States v. Rodriquez, 968 F.2d 130 (2d Cir.), cert. denied, 506 U.S. 847 (1992), a Court in the Eastern District of Oklahoma is empowered to issue an Order for the interception of wire communications over telephones located in other districts.

18.     In connection with the telecommunication company which provides the service for **TARGET TELEPHONE #1,** all interceptions over **TARGET TELEPHONE #1** will automatically be routed to Dallas, Texas, regardless of where the telephone calls are placed to or from. The intercepted telephone calls will be monitored by the DEA Dallas Field Division (DEA/DFD) located in Dallas, Texas. This remote monitoring is necessary due to the needed technical expertise, equipment and personnel which are available at DEA/DFD. DEA/DFD is located within the Northern District of Texas. During the requested wire surveillance, all monitoring will be performed in Dallas, Texas, by law enforcement officers authorized under Section 2510 (7) of Title 18, United States Code, including law enforcement officers with the DEA and Government employees or individuals operating under a contract with the Government, including, if necessary, translators, who will be acting under the supervision of

investigative or law enforcement officers authorized to conduct the interception, and specifically under the supervision of law enforcement officers from the DEA. The intercepted telephone calls may further be transmitted to the DEA Tulsa Resident Office, located in Tulsa, Oklahoma.

19.     Because of the mobility of portable cellular telephones, pursuant to Title 18, United States Code, Section 2518 (3), authorization is requested for interception of wire communications both within the Eastern District of Oklahoma, and, in the event that **TARGET TELEPHONE #1** is transferred outside the jurisdiction of this Court, in any other jurisdiction within the United States. In addition, it is requested that background conversations, in the vicinity of **TARGET TELEPHONE #1** while it is off the hook or otherwise in use, also be permitted to be intercepted.

## OBJECTIVES

20.     There is probable cause to believe that the interception of wire communications, the authorization for which is sought herein, will help to reveal: (i) the nature, extent and methods of operation of the controlled substances activities of the **TARGET INTERCEPTEES;** (ii) the identities of the **TARGET INTERCEPTEES**, their accomplices, aiders, abettors, co-conspirators, and participants in their illegal activities, (iii) the source, receipt, and distribution of controlled substances, contraband, and money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records; (vi) The locations and sources of resources used to finance their illegal activities: and (vii) the locations and disposition of the proceeds from those activities. In addition, these wire communications are expected to constitute admissible evidence of the commission of the above-described offenses.

## PRIOR APPLICATIONS

21.    Based upon ELSUR (electronic surveillance) record checks of the DEA, ICE, and FBI indices, on July 2, 2008, there have been no other federal applications for an order authorizing or approving the interception of wire, oral, or electronic communications of **TARGET TELEPHONE #1** or of the TARGET INTERCEPTEES specified in this affidavit, except for those listed below.

22.    On June 11, 2008, United States District Judge Lewis T. Babcock, in the District of Colorado, authorized the interception of wire communications occurring over TARGET TELEPHONE-4 (telephone number 303-350-6195, UFMI Number 121*768*1637, and IMSI Number 316010007454991).   The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a.: "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a.: "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA, a.k.a.: "Ulysses"; (11) Erubiel SOLIS, a.k.a.: "El Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a.: Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez GARCIA, a.k.a: "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a.: "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a.: FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36)

FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16;
(41) Christopher SARINANA; (42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose
Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49)
FNU LNU, a.k.a.: Tocayo; (50) Christian NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53)
Santos CHAVEZ, Jr., a.k.a: Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18; (56) FNU
LNU-19 (57) Meño LNU; (58) Patricia MORALES, a.k.a. Patty; (59) Carlos Ramon
CARRILLO, a.k.a.: Carlos LNU-3; (60) FNU LNU-20; (61) FNU LNU-21; (62) FNU LNU-22.

23.     On April 6, 2007, in a Federal Bureau of Investigation case, United States District
Judge David Briones, of the Western District of Texas, entered an order in which he authorized
the interception of wire communications occurring over a telephone.  In the application Daniel
SHAW, date of birth: December 9, 1973, was listed as TARGET INTERCEPTEES/SUBJECTS
OF THE INVESTIGATION.  An order authorizing the continued wire interception of wire
communications was authorized on May 8, 2007.

24.     On May 27, 2008, United States District Judge David Briones, of the Western
District of Texas, authorized the continued interception of wire communications occurring over
TARGET TELEPHONE-4 (telephone number 303-350-6195, UFMI Number 121*768*1637 and
IMSI Number 316010103004633).  The following individuals were listed in the application as
TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis
TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda
MILEDI; (5) Alma Rosa GANEM, a.k.a.: "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio
RODRIGUEZ-Lopez, a.k.a.: "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo
MONTALVO; (10) Luis Alfonso AMAYA, a.k.a.: "Ulysses"; (11) Erubiel SOLIS, a.k.a.: "El
Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis

10

GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a.: Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez GARCIA, a.k.a: "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a.: "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a.: FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) Christopher SARINANA; (42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49) FNU LNU, a.k.a.: Tocayo; (50) Christian NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53) Santos CHAVEZ, Jr., a.k.a: Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18; (56) FNU LNU-19 (57) Meño LNU; (58) Patricia MORALES, a.k.a. Patty; (59) Carlos Ramon CARRILLO, a.k.a.: Carlos LNU-3; (60) FNU LNU-20; (61) FNU LNU-21; (62) FNU LNU-22.

     25.    On May 6, 2008, United States District Judge Kathleen Cardone, of the Western District of Texas, authorized the continued interception of wire communications occurring over El Paso's TARGET TELEPHONE-1 (telephone number 011-52-656-282-2726, UFMI Number 62*229760*9 and IMSI Number 334010010692193) and TARGET TELEPHONE-6 (telephone number 915-850-2339, UFMI Number 121*729*5368, and IMSI Number 316010105520756). Although activation of El Paso's TARGET TELEPHONE-1 began on May 7, 2008 at approximately 10:03 a.m., the interception of El Paso's TARGET TELEPHONE-1 did not begin until 12:29 p.m., on May 7, 2008. On May 7, 2008, an amended application for authorization to continue the interception of conversations occurring over El Paso's TARGET TELEPHONE-1 and TARGET TELEPHONE-6 was filed with Judge Cardone, because the original paperwork

filed with the court reflected that continued interception for thirty days would commence at the termination of the current order. At the time, a current order did not exist for El Paso's TARGET TELEPHONE-1. An amended order was entered to reflect that continued interception would begin on May 6, 2008. The interception of conversations occurring over El Paso's TARGET TELEPHONE-1 did not begin until after Judge Cardone entered the amended order. The following individuals were listed in the application and amended application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a.: "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a.: "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA, a.k.a.: "Ulysses"; (11) Erubiel SOLIS, a.k.a.: "El Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a.: Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez GARCIA, a.k.a: "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a.: "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a.: FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) Christopher SARINANA; (42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49) FNU LNU, a.k.a.: Tocayo; (50) Christian NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53) Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18; and (56) FNU LNU-19.

26.   On April 25, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the interception of wire communications occurring over TARGET TELEPHONE-2 (telephone number 915-727-0328, UFMI Number 128*1021280*7 and IMSI Number 316010007454991) and TARGET TELEPHONE-4 (telephone number 303-350-6195, UFMI Number 121*768*1637, and IMSI Number 316010007454991).   The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION:(1) Jose Luis TERRAZAS, a.k.a: "Gordo"; (2) Jesus Rodolfo MARTINEZ, a.k.a: "Compita"; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a.: "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a.: "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA. a.k.a.: "ULYSSES"; (11) Erubiel SOLIS, a.k.a.: "El Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ, a.k.a.: "Manny"; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a.: Rene  LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael PEREZ- Garcia, a.k.a.: "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a.: "Chaparrito";  (28) Jesus Armando ARANDA, a.k.a.: FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) FNU LNU-17; (42) FNU LNU-18; (43) FNU LNU-19; (44) Christopher SARINANA; (45) Herman MARRUFO; (46) Aaron ARANDA; (47) Jose Javier ARANDA; (48) Greg LNU; (49) Wayne LNU; (50) Hector LNU; (51) Lalo LNU; (52) FNU LNU, a.k.a.: Tocayo; and (53) Christian

13

NAVARRETE.

27.     On April 15, 2008, U.S. District Judge David Briones, of the Western District of Texas, authorized the original interception of wire communications occurring over a telephone using 915-727-3278, PTT number 128*969*3608, and IMSI number 316010159208403. The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: Rafael PEREZ-Garcia, Jose Luis TERRAZAS and Eusebio MARTINEZ.

28.     On April 3, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the original interception of wire communications occurring over TARGET TELEPHONE-6 (915-850-2339, PTT Number 121*729*5368, IMSI Number 316010105520756).

29.     The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: Jose Luis TERRAZAS; Jesus Rodolfo MARTINEZ; Richard ESCARCEGA; Hermelinda MILEDI; Alma Rosa GANEM, a.k.a. "Elma"; Miguel Arturo MILEDI; Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; Rogelio RODRIGUEZ-Lopez; Victor Hugo MONTALVO; Luis Alfonso AMAYA. a.k.a. "Ulysses"; Erubiel SOLIS, a.k.a. "El Jefe" and FNU LNU-1; Luis Carlos CORONEL; Michael AVILA; Jose Luis GABALDON; Manuel Enrique GONZALEZ; Nancy LARA; Beto LNU; Carlos LNU-1; Carlos LNU-2; Rene LNU; Manuel LNU; Joe LNU; Ricardo ESPINOZA; Rafael PEREZ-Garcia, a.k.a "Guero"; Max LNU; Miguel LNU; Eusebio MARTINEZ, a.k.a. "Chaparrito"; FNU LNU-3; FNU LNU-4; FNU LNU-5; FNU LNU-6; FNU LNU-7; FNU LNU-8; FNU LNU-10; FNU LNU-11; FNU LNU-12; FNU LNU-13; FNU LNU-14; FNU LNU-15; and FNU LNU-16. On April 6, 2008, the interception of conversations occurring over TARGET

14

TELEPHONE-6 commenced.

30.     On April 2, 2008, U.S. District Judge David Briones, of the Western District of
Texas, authorized the original interception of wire communications occurring over a telephone
using 915-892-0868, PTT: 128*969*2700, IMSI 316010159206607 which is used by Rafael
PEREZ-Garcia.  In the application for the continued authorization for this telephone Rafael
PEREZ-Garcia, Manuel Enrique GONZALEZ, Jose Luis TERRAZAS and Eusebio MARTINEZ
were identified as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION.

31.     On March 28, 2008, United States District Judge David Briones, of the Western
District of Texas, authorized the interception of wire communications occurring over TARGET
TELEPHONE-2 (telephone number 915-727-0328, UFMI Number 128*1021280*7 and IMSI
Number 316010007454991), TARGET TELEPHONE-3 (UFMI Number  62*13*14785 and
IMSI Number 334010010880350) TARGET TELEPHONE-4 (telephone number 303-350-6195,
UFMI Number 121*768*1637, and IMSI Number 316010007454991) and TARGET
TELEPHONE-5 (UFMI Number 52*302646*12, and IMSI Number 334010005003083).   The
following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS
OF THE INVESTIGATION: Jose Luis TERRAZAS; Jesus Rodolfo MARTINEZ; Richard
ESCARCEGA; Hermelinda MILEDI; Alma Rosa GANEM, a.k.a. "Elma"; Miguel Arturo
MILEDI; Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; Rogelio RODRIGUEZ-Lopez; Victor
Hugo MONTALVO; Luis Alfonso AMAYA, a.k.a. "Ulysses"; Erubiel SOLIS, a.k.a. "El Jefe"
and FNU LNU-1; Luis Carlos CORONEL; Michael AVILA; Jose Luis GABALDON; Manuel
Enrique GONZALEZ; Nancy LARA; Beto LNU; Carlos LNU-1; Carlos LNU-2;  Rene LNU;
Manuel LNU;  Joe LNU;  Ricardo ESPINOZA; Rafael PEREZ-Garcia, a.k.a. "Guero"; Max

LNU; Miguel LNU;  Eusebio MARTINEZ, a.k.a. "Chaparrito"; FNU LNU-3; FNU LNU-4;

FNU LNU-5; FNU LNU-6; FNU LNU-7; FNU LNU-8; FNU LNU-10; FNU LNU-11; FNU

LNU-12; FNU LNU-13; FNU LNU-14; FNU LNU-15; and FNU LNU-16. On March 29,

2008, the interception of conversations occurring over TARGET TELEPHONE-2, TARGET

TELEPHONE-3, TARGET TELEPHONE-4 and TARGET TELEPHONE-5 commenced. On

April 16, 2008, the interception of conversations occurring over TARGET TELEPHONE-3 and

TARGET TELEPHONE-5 terminated.

32.    On March 26, 2008, U.S. District Judge David Briones, of the Western District of

Texas, authorized the continued interception of wire communications occurring over a telephone

using PTT: 62*14*53219, which is used by Roberto GUERRERO-Valles, a.k.a. "Beto." In the

application for the continued authorization for this telephone Jose Luis TERRAZAS was

identified as a TARGET INTERCEPTEE/SUBJECT OF THE INVESTIGATION.

33.    On March 5, 2008, United States District Judge David Briones, of the Western

District of Texas, authorized the continued interception of wire communications occurring over

El Paso's TARGET TELEPHONE-1 (number 011-52-1-656-282-2726, UFMI Number

62*229760*9, and IMSI Number 334010010692193). The following individuals were listed in

the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1)

Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4)

Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a. "Elma"; (6) Miguel Arturo MILEDI; (7)

Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo

MONTALVO; (10) Luis Alfonso AMAYA. a.k.a. "Ulysses"; (11) Erubiel SOLIS, a.k.a. "El

Jefe", and FNU LNU-1; (12)Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis

GABALDON, (15) Manuel Enrique GONZALEZ, a.k.a. "Manny", (16) Nancy LARA, (17) Beto

LNU, (18) Carlos LNU-1, (19) Carlos LNU-2, (20) Rene LNU, (21) Manuel LNU, (22) Joe LNU, (23) Ricardo ESPINOZA, (24) Rafael PEREZ- Garcia, a.k.a. "Guero", (25) FNU LNU-3, (26) FNU LNU-4, (27) FNU LNU-5, (28) FNU LNU-6, (29) FNU LNU-7, (30) FNU LNU-8, (31) FNU LNU-10, (32) FNU LNU-11, (33) FNU LNU-12, (34) FNU LNU-13, (35) FNU LNU-14, (36) FNU LNU-15, and   (37) FNU LNU-16.   On March 6, 2008, the interception of conversations occurring over El Paso's TARGET TELEPHONE-1 continued, but were terminated on April 4, 2008.

34.    On February 4, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the original interception of wire communications occurring over El Paso's TARGET TELEPHONE-1 (number 011-52-1-656-282-2726, UFMI Number 62*229760*9, and IMSI Number 334010010692193). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a. "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA a.k.a. "Ulysses"; (11) FNU LNU-1. a.k.a. "El Jefe"; (12)Luis Carlos CORONEL; (13) Michael AVILA; and (14) Jose Luis GABALDON.    On February 5, 2008, the interception of conversations occurring over El Paso's TARGET TELEPHONE-1 commenced.

35.    On February 26, 2008, U.S. District Judge David Briones, of the Western District of Texas authorized the original interception of wire communications occurring over a telephone using PTT: 62*14*26012, which is used by Roberto GUERRERO-Valles, a.k.a. "Beto". Jose Luis  TERRAZAS  was  listed  as  a  TARGET  INTERCEPTEE/SUBJECT  OF  THE

INVESTIGATION.

## **BACKGROUND OF THE INVESTIGATION**

36.     On June 20, 2008, Agents with the Drug Enforcement Administration (DEA) Tulsa Resident Office initiated an investigation on the Bobby FAIRCHILD drug trafficking organization (DTO).     Agents determined that Bobby FAIRCHILD has been documented in numerous state and local law enforcement agency reports of investigation (ROI) and has been known as a large scale distributor of methamphetamine for over approximately five (5) years. Bobby FAIRCHILD is believed to have connections to higher ranking criminal associates located on the southwest border of the United States and other associates in Mexico.

37.     Bobby FAIRCHILD has been identified as a source of supply (SOS) of large amounts of methamphetamine for a number of locations throughout eastern Oklahoma and possibly throughout the entire state of Oklahoma.     Additionally, agents from the Tulsa Resident Office have received information relating to the illegal drug trafficking activities of Bobby FAIRCHILD through witnesses, law enforcement reports of investigation and through numerous conversations with state and local law enforcement agents/officers.

38.     Members of the DEA Tulsa Resident Office have determined that Bobby FAIRCHILD resides in the town of Oktaha, Muskogee County, Oklahoma, and controls and coordinates his illegal enterprise from that area.  Bobby FAIRCHILD has been identified as a distributor/transporter and organization leader, of his drug trafficking organization based in Oklahoma.     FAIRCHILD has subsequently been identified as the cell head of the drug trafficking organization based in Oklahoma.

39.     Statements, reports of investigation and information gathered by members of the DEA Tulsa Resident Office and other law enforcement agencies show that beginning in

18

approximately 2003 through the present time, Bobby FAIRCHILD has been and is currently responsible for coordinating and/or transporting large shipments of methamphetamine from areas in Mexico along the southwestern border to locations in Oklahoma and other locations throughout the United States yet to be identified.

40.     Intelligence and investigative information indicates Bobby FAIRCHILD is responsible for concealing shipments of drugs and/or drug proceeds in various conveyances, which he then coordinates and/or transports to a number of locations in Oklahoma and possibly to other locations in the United States. Based on conversations with agents of the Oklahoma Bureau of Narcotics and Dangerous Drugs (OBNDD), Bobby FAIRCHILD is, according to their information and investigation, one of, if not the largest methamphetamine dealer in the state of Oklahoma. Additionally, agents from OBNDD believe that Bobby FAIRCHILD is responsible for receiving and further distributing over fifty (50) kilograms of methamphetamine per month.

41.     On June 19, 2008, members of the DEA Tulsa Resident Office received information from members of the DEA El Paso, Texas, office who, during an ongoing Title III investigation, intercepted telephone conversations between **TARGET TELEPHONE #1**, used by Bobby FAIRCHILD, and their target, Jose ESPARZA (**TARGET TELEPHONE #7**). Members of the DEA El Paso office relayed intercepted telephone conversations between **TARGET TELEPHONE #7** (ESPARZA) and **TARGET TELEPHONE #1** (FAIRCHILD) involved the planning and coordination of a future shipment of drugs from an unidentified location destined for Bobby FAIRCHILD in Oklahoma. Agents in El Paso explained Jose ESPARZA is the target of their large Title III investigation. The agents further explained ESPARZA has been identified through their investigation, witnesses and through debriefings of confidential sources as a high ranking member of an extremely sophisticated large scale drug

19

trafficking organization. Agents further explained ESPARZA is the source of supply for this highly sophisticated drug trafficking organization operating in Mexico and the United States with known identified links to Juaquin CHAPO-GUZMON of the Sinaloa Cartel. CHAPO-GUZMON is a part of the Attorney General's Consolidated Priority Organization Target (CPOT) list. Agents explained that the links to the Juaquin CHAPO-GUZMON Sinaloa Cartel are direct and currently active. Agents further explained ESPARZA also had links to the Vicente CARILLO-FUENTEZ (VCF) CPOT target.

42.    Agents from El Paso explained, in October 2005, the El Paso Field Division (EPFD) initiated an investigation into the Rogoberto Saenz Drug Trafficking Organization (DTO). This organization was responsible for the transportation of millions of dollars of drug proceeds from cities throughout the U.S. to El Paso, Texas. These proceeds were subsequently smuggled into Ciudad Juarez, Mexico. This investigation has been linked to Consolidated Priority Organization Targets (CPOT) Ignacio CORONEL-Villareal and Vicente CARRILLO-Fuentes (VCF).

43.    Based on the afore-mentioned information and in conjunction with past information and intelligence, members of the DEA Tulsa Resident Office initiated an investigation regarding the illegal international drug trafficking activities of Bobby FAIRCHILD. This investigation will be conducted by the members of the Drug Enforcement Administration Tulsa Resident Office, DEA El Paso Field Division, Oklahoma Bureau of Narcotics and Dangerous Drugs (OBNDD), the Internal Revenue Service (IRS), the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the Federal Bureau of Investigation (FBI) and the United States Attorney's Office (USAO) of the Eastern District of Oklahoma (EDOK).

## BACKGROUND AND PROBABLE CAUSE TO INTERCEPT

### FAIRCHILD'S TELEPHONE

44.    On June 17, 2008, a court ordered interception began in El Paso, Texas, on telephone number (915) 217-8066, belonging to or utilized by Jose ESPARZA, hereafter referred to at **TARGET TELEPHONE #7**. Pursuant to the interception, agents identified the following telephone being utilized by Bobby FAIRCHILD to further his drug trafficking activities: (918) 704-5940 (**TARGET TELEPHONE #1**), subscriber unknown. Below are summaries from calls intercepted pursuant to the June 17, 2008, Order. Unless otherwise noted, the information provided is based on summaries of the telephone calls.

### TARGET TELEPHONE #1

45.    On June 19, 2008, at approximately 9:58 p.m., ESPARZA utilized TARGET **TELEPHONE #7** and called Bobby FAIRCHILD on a telephone assigned number 918-704-5940, **TARGET TELEPHONE #1**, (Call Number 218). During the conversation, FAIRCHILD stated "Hello." ESPARZA then stated "What's going on my friend?" FAIRCHILD then stated "Hey, ain't nothing man. Are you still alive?"[VOICES OVERLAP]. ESPARZA then stated "[STUTTERS] I've been calling you sending you messages, you don't answer." FAIRCHILD then stated "Bullshit!" ESPARZA then stated "I [STUTTERS] swear to God I have. I [STUTTERS] I've been to Phoenix I barely got here this morning my friend uh ..." [VOICES OVERLAP]. FAIRCHILD then stated "On my six nine six (918-696-1755, which is subscribed to Bobby FAIRCHILD) old number you sent my messages?" ESPARZA then stated "Huh?" FAIRCHILD then stated "On my six nine six (696) number you sent my messages?" ESPARZA then stated "[STUTTERS] I'll tell you right now when I go to the truck I've been sending you

21

messages and shit like that, then I was in Phoenix and uh...."[VOICES OVERLAP].

FAIRCHILD then stated "No you've been sending me, you've been sending me wrong on that

phone that I had to throw away." ESPARZA then stated "Oh okay, okay, okay. Yeah and, and

[STUTTERS] stuff like that..."[VOICES OVERLAP].   FAIRCHILD then stated "Anytime,

anytime you couldn't get a hold of me you called that six nine six (696) phone number and

uh..."[VOICES OVERLAP].   ESPARZA then stated "Yeah but I didn't want to you know...uh

but I'm here trying to make everything work (drug transaction) you for..."[VOICES OVERLAP].

FAIRCHILD then stated "I've been in, I've been in, I've been in jail."  ESPARZA then stated

"Uh, fuck no my friend."  FAIRCHILD then stated "Yeah my son-in-law got smart with me and

I ran over him in my fucking truck."  ESPARZA then stated "Oh shit!"  FAIRCHILD then stated

"He was standing out in the yard and I just pulled up in the fucking yard and I was..."

ESPARZA then stated "Oh shit! [PAUSE] But everything cool with you? Everything okay?"

FAIRCHILD then stated " I don't know he called me yesterday he said he wanted to drop all the

charges and shit for one hundred thousand ($100,000.00). And I told him I wasn't giving him no

fucking money."  ESPARZA then stated "Oh okay, no, no my friend of mine I'm just trying to

get everything and uh...I'll see you uh, I've been in Phoenix my friend. I've been staying in

Phoenix. I came to my house because my wife was bitching so I came right here to my house

today and uh, and I'll go up there to."[VOICES OVERLAP].  FAIRCHILD then stated "Nah I

don't need to see you I just called to check on you. I want to make sure that you're still

alive."[VOICES OVERLAP].  ESPARZA then stated "No, no, no, no I'm fine my friend. No,

no, no I'm fine my friend. I'm fine. It's just that things (drug trade) are real bad right here (El

Paso, Texas) my friend. Here with the family. You understand?"  FAIRCHILD then stated "Oh I

know."  ESPARZA then stated "And uh...but uh..." [VOICES OVERLAP].   FAIRCHILD then

22

stated "I know that's why I was calling to check on you. I wanted to make sure that you wasn't dead." ESPARZA then stated "No, no, no, no my other friend ... they [STUTTERS] they...uh I'll tell you when I see you. I'll go up there and see you and uh, I've got a plan (drug transaction) already..." [VOICES OVERLAP]. FAIRCHILD then stated "Oscar (Oscar Rene RONQUILLO) is all right ain't he?" ESPARZA then stated "Huh?" FAIRCHILD then stated "Oscar is okay ain't he?" ESPARZA then stated "Oh yeah Oscar is okay, but uh, one of Oscar's relative's is not okay and uh...I don't know if you remember uh...two (2) dogs (men) came a long time ago to the store. Remember?" FAIRCHILD then stated "Yeah." ESPARZA then stated "Well all that family is gone (deceased)." FAIRCHILD then stated "That girl?" ESPARZA then stated "Yeah, yeah, yeah, yeah, yeah, yeah. Remember?" FAIRCHILD then stated "Yeah they got that girl?" ESPARZA then stated "Yeah, yeah the mother, her, her brother, and the other sister and two young uh and two young ones. They uh..." [VOICES OVERLAP]. FAIRCHILD then stated "I'll be damn .... ESPARZA then stated "Yeah, yeah but it's been really bad and uh [LAUGHS] inside a vehicle..." FAIRCHILD then stated "[SNORTS]. ESPARZA then stated "...about two hundred (200), two hundred (200 rounds of ammunition) shots and little babies. You understand that's not right you know." FAIRCHILD then stated "Yeah." ESPARZA then stated "Yeah but I'll go see you my friend and I already have."..I have a plan (drug transaction) so I could make everything up to you and I already got a new plan (drug transaction)." FAIRCHILD then stated "Okay." ESPARZA then stated "I've been, I've been trying. I've been working and uh...I just, I didn't know..." [VOICES OVERLAP]. FAIRCHILD then stated "Dude I ain't even, I ain't even trying to do nothing." ESPARZA then stated "Yeah..." [VOICES OVERLAP]. FAIRCHILD then stated "Because every time that I try to do something (drug transaction) it turns to shit I've just been uh. I've just been uh...I'll just sit around and wait." [VOICES OVERLAP]. ESPARZA

23

then stated "You now what ... remember, remember, the ....the roosters (illegal drug) that we that you were going to fight the fourth (4[th]) of July with your friends? Remember?" FAIRCHILD then stated "Yeah." ESPARZA then stated ".....Derby?...derby those were very nice (good quality) my friend. You know uh but I know how to do it (drug transaction) and everything my friend so I'll see you up this week for sure." FAIRCHILD then stated "Okay all right it's all .... [VOICES OVERLAP]. ESPARZA then stated "I promise, I promise I'll go see you." FAIRCHILD then stated "All right, see you buddy." ESPARZA then stated "All righty? Okay my friend." FAIRCHILD then stated "Bye." ESPARZA then stated "I'll see you."

46.   In the conversation in the previous paragraph, it is believed that ESPARZA is checking in with FAIRCHILD. Further, it is believed that ESPARZA has been leaving messages for FAIRCHILD, which FAIRCHILD denies that he has received. Further, it is believed that the references to "plan" and "make things right" made by ESPARZA are references to a drug transaction. It is believed that ESPARZA possibly owes FAIRCHILD a drug transaction and it is believed that ESPARZA has a plan implemented to provide FAIRCHILD with illegal drugs. It is also believed that FAIRCHILD's reference to "Oscar" is reference to Oscar Rene RONQUILLO, who is a known drug trafficker in the El Paso, Texas, area. During the conversation ESPARZA has to explain that some relatives of Oscar Rene RONQUILLO had been shot to death. Information provided by the DEA El Paso, Texas, Field Division indicate with the recent increase in drug related violent crimes in Juarez, Chihuahua, Mexico, it is believed that the killing involving Oscar Rene RONQUILLO's relatives was drug related.

47.   On June 21, 2008, at approximately 9:57 p.m., FAIRCHILD utilized a telephone assigned number 918-704-5940, **TARGET TELEPHONE #1,** to call ESPARZA on **TARGET TELEPHONE #7** (Call Number 838). During the conversation, ESPARZA then stated "Hello

24

my friend." FAIRCHILD then stated "What are you doing there, you little fucker?" ESPARZA

then stated "Yeah, shh... I'm trying to, I'm going to Phoenix again, my friend. I'm trying to,

figure out what to do my friend." FAIRCHILD then stated "Are you really?" ESPARZA then

stated "Yeah, it's been ..." [VOICES OVERLAP]. FAIRCHILD then stated "What about..."

ESPARZA then stated "Huh?" FAIRCHILD then stated "What about, what about the Kelso

Sage? You still can't me none of them?" ESPARZA then stated "No, my friend. No they, they,

they, they uh, they had the, they, they had problems, they had problems there (unknown

location)." FAIRCHILD then stated "I'll be damn, I have one (one unknown subject) bring me

ten (kilograms of cocaine)." ESPARZA then stated "It, it yeah." [VOICES OVERLAP].

FAIRCHILD then stated "It's that fucking, they're fucking gone (sold), just like that. And uh..."

ESPARZA then stated "Yeah my friend they had problems there at the... uh right there with the...

you know where the, the people that like chicken, you know that like chicken and watermelon

(possible reference to African Americans)." FAIRCHILD then stated "Yeah." ESPARZA then

stated "Yeah they had problems there. But not them, uh the... uh somebody else uh, uh I don't

know exactly who, but that's what uh, but he had told me yes, and... and stuff like that but uh

I'm... I'm trying on that uh, the other stuff and uh, and I'm just told them that uh, you that you

needed to check everything and that uh, yeah, yeah I just uh actually spoke to him (unknown

subject) earlier today and I told him that uh, he needs to make up whatever... he said no, that, that

was fine, that he was going to start doing that (providing more illegal drugs) and... well that what

I'm trying to do, I'm on the road right now my friend." FAIRCHILD then stated "No I was... I

need the, I need the new ones like I talked to you about." ESPARZA then stated "Okay."

FAIRCHILD then stated "*Queso, queso.* [cheese], (cocaine)." ESPARZA then stated "Yeah,

yeah I know the, the, the one that you put on the *tortilla*, yeah I know which one, I know which

one my friend. And uh... the uh, the in... let me talk him today the... not today but tomorrow my friend, and I'll tell him that, the only thing my friend that uh, with those and those restaurant, on that restaurant well it has to be uh, you know, I don't know uh, has to be quicker. Is that okay?" FAIRCHILD then stated "I just, I just need a week (to dispose of or sell)." ESPARZA then stated "You just need a week?" FAIRCHILD then stated "Yeah." ESPARZA then stated "Okay my friend." FAIRCHILD then stated "Uh don't, no bring me, no more then ten (10 kilograms of cocaine) though, cause I can't, I can't take care of ten (10 kilograms of cocaine), no quicker then that, but bring me ten (10 kilograms of cocaine)." ESPARZA then stated "Okay, okay, let me, let me uh..." FAIRCHILD then stated "Now how, how, how much are they (price per kilogram of cocaine)?" ESPARZA then stated "Well I don't know, they, they say they were like uh, remember like I told you, like twenty ($20,000.00 per kilogram) dollars, I don't know how much you got em for, my friend." FAIRCHILD then stated "I promise you, I promise you, I'll tell you the truth, okay." ESPARZA then stated "Uh-huh." FAIRCHILD then stated "I promise you, I got em eighteen five ($18,500.00 per kilogram)." ESPARZA then stated "Well that's a very dis... bad-ass my friend." FAIRCHILD then stated "Right here (Oklahoma) man, they was right here (Oklahoma). They (unknown third party) wouldn't put them up there for that. They put them right here for eighteen five ($18,500.00 per kilogram)." ESPARZA then stated "Where, at your house?" FAIRCHILD then stated "Yeah." ESPARZA then stated "Okay now, well I can do that." FAIRCHILD then stated "Okay, well put them here, put them here, I'll take them tomorrow." ESPARZA then stated "Okay, let me, well let me tell them I'm here, and I'm headed to Phoenix." FAIRCHILD then stated "All right." ESPARZA then stated "Uh-huh..." FAIRCHILD then stated "I need, I need, I need em, I need em whole (complete kilogram and uncut), with, with the tattoo (the logo commonly stamped by drug trafficking organizations)."

26

ESPARZA then stated "No, no, no yes uh, yes my friend, I you got the ta... yeah, I got the tattoo

artist and everything (source of supply)."    FAIRCHILD then stated "Okay."    ESPARZA then

stated "Okay?  They got the tattoo (logo) artist and everything but uh... but uh ... I mean

[LAUGHS] it's getting hardly, nobody drives more then, then ten (10 kilograms) stands, you

know?  It's been, I don't know, it's been real bad (reference to the violence in Juarez,

Chihuahua, Mexico and rival drug cartels) but I'm just trying my friend,  I'm working real hard,

and I'm headed out to Phoenix and, uh call me uh, uh... but my other phone, my other friend

got's it but uh, I'll let you know exactly everything what's going on."  FAIRCHILD then stated

"Okay."  ESPARZA then stated "All righty and uh, I'll let you know and... hey but you, are you

okay, everything's fine over there, shit?"  FAIRCHILD then stated "Oh yeah, I mean I might

wind up having go to the penitentiary, but it'll be a year. They'll drag it out for a long time."

ESPARZA then stated "Shit!"  FAIRCHILD then stated "But... I mean, I don't know what's

going to happen, I don't know, it don't..."  ESPARZA then stated "So..."  FAIRCHILD then

stated "... we gotta, it don't..."    ESPARZA then stated "Well you know my friend, yeah..."

[VOICES OVERLAP].  FAIRCHILD then stated "... even, even if, even if I go I mean, I still

have to do something (drug transaction)."  ESPARZA then stated "Yeah, yeah my friend, but no,

no, I hope you don't my friend, I hope you, I hope you figure out something before, you know."

FAIRCHILD then stated "Yeah."  ESPARZA then stated "If you can bring out something, but

no, no my friend, I'm here to help you, now I'm gonna do that my friend. And uh... so I'll be

calling you, to let you know, but I'm here to help my friend."    FAIRCHILD then stated

"Alright."  ESPARZA then stated "And I'll, I'll do whatever I need to do uh, for you too."

FAIRCHILD then stated "Okay."  ESPARZA then stated "Okay my friend."  FAIRCHILD then

stated "All right." ESPARZA then stated "Now take care."

48.    In the conversation in the previous paragraph, it is believed that FAIRCHILD is calling ESPARZA to ask him for 10 kilograms of cocaine.   Further, it is believed that FAIRCHILD was able to obtain an unknown quantity of cocaine for the price of $18,500 per kilogram.   It is also believed that FAIRCHILD uses this to negotiate with ESPARZA in an attempt to lower ESPARZA's offer of $20,000.00 per kilogram of cocaine.   It is also believed that FAIRCHILD intends to obtain the 10 kilograms of cocaine from ESPARZA and will then need a week to sell the cocaine.

### TELEPHONE TOLL ANALYSIS OF TARGET TELEPHONE #1

### (918) 704-5940

49.    The use of telephone toll records and pen register data to record numbers dialed or pulsed over various telephones; show specific telephone numbers have been called.   Such information does not indicate the manner or delivery of a drug shipment, or the methods the organization uses to import and distribute the drugs.   This type of information does not specify the identity, participation and role of the person(s) initiating or receiving the telephone calls, or the importation and distribution network of which the **TARGET INTERCEPTEES,** and others as yet unknown, are a part of.   At best, this information provides evidence of contact between telephone numbers subscribed to certain people.   Subscriber information records subpoenaed by law enforcement only provide the name of the person(s) to whom the telephone number(s) is/are assigned and does not provide accurate data about who actually speaks on the telephone.   This information is not adequate, because it is the content of the calls, not the fact that they are being made, that will reveal the totality and complexity of the conspiracy.

50.    On July 2, 2008, United States Magistrate Judge Steven P. Shreder, Eastern

28

District of Oklahoma, signed a Pen Register Order, Under Seal, authorizing the capturing of telephone numbers placing calls to/from **TARGET TELEPHONE #1** (918) 704-5940, in addition to any other dialed digits. A Pen Register for this telephone number was installed on July 3, 2008.

51.    I have conducted an analysis of pen register, trap and trace and toll information for **TARGET TELEPHONE #1**. Based upon my review of the calls made to and from this telephone facility, I believe that **TARGET TELEPHONE #1** is being used to contact conspirators (on telephones not subject to court-authorized interception) in furtherance of the criminal activity specified above. A synopsis of the pen register, trap/trace and tolls data which substantiates my belief regarding the use of **TARGET TELEPHONE #1** follows.

52.    As a result of toll records from June 3, 2008 through June 23, 2008 and the Pen Register from July 3, 2008 through July 8, 2008 for the **TARGET TELEPHONE #1** (918) 704-5940 revealed four hundred ninety-nine (499) total telephone calls to/from different numbers.

53.    **TARGET TELEPHONE #1** (918) 704-5940 placed/received two hundred ninety-seven (297) calls to/from (918) 457-8039. between June 3, 2008 and June 23, 2008 and placed/received fifty-nine (59) calls to/from (918) 457-8039 between July 3, 2008 and July 8, 2008. According to the analysis conducted on the tolls for **TARGET TELEPHONE #1**, July 8, 2008, was the last day **TARGET TELEPHONE #1** placed/received a call to/from (918) 457-8039. Telephone number (918) 457-8039 has been identified as being the telephone number subscribed to Richard Burris, RR 4, Box 1632, Checotah, Oklahoma. A records check indicates that Richard Burris, also known as (AKA) James Gilbert. The records check further indicates that Richard Burris, AKA James Gilbert, was arrested in November 1998 for trafficking marijuana. DEA records and investigations indicate that in November 2004 Richard Burris,

29

AKA James Gilbert, was also involved in the clandestine manufacturing and distribution of methamphetamine in Adair County, Oklahoma.

54.   **TARGET TELEPHONE #1** (918) 704-5940 placed/received two (2) calls to/from (915) 217-8066 between June 19, 2008 and June 21, 2008. According to the analysis conducted on the tolls for **TARGET TELEPHONE #1**, June 21, 2008, was the last day **TARGET TELEPHONE #1** placed/received a call to/from (915) 217-8066. Telephone number (915) 217-8066 has been identified as being the telephone number subscribed and utilized by Jose Esparza, 12031 Valley Quail Drive, El Paso, Texas. As listed in paragraphs 45 thru 48, Esparza is the current target in an on going Title III investigation out of El Paso Texas. During the investigation recorded conversations were captured between **TARGET TELEPHONE #1** and (915) 217-8066 negotiating the distribution of illegal drugs.

55.   **TARGET TELEPHONE #1** (918) 704-5940 placed/received three (3) calls to/from (918) 360-6686. According to the analysis conducted on the tolls for **TARGET TELEPHONE #1**, June 18, 2008 was the last day **TARGET TELEPHONE #1** placed/received a call to/from (918) 360-6686. DEA indices indicate that this telephone is subscribed to Bob EPPERSON in Muskogee, Oklahoma. Telephone number (918) 360-6686 is documented in an ongoing narcotics investigation by the Muskogee Police Department. Your Affiant learned through investigators with the Muskogee Police Department that telephone number (918) 360-6686 is being used by EPPERSON to assist with his ongoing criminal enterprise.

56.   **TARGET TELEPHONE #1** (918) 704-5940 placed/received one (1) call to/from (931) 788-2001 on July 8, 2008. Telephone number (931) 788-2001 has been identified as being the telephone number subscribed and utilized by Kevin Wolcott, 3979 Taylors Chapel Road, Crossville, Tennessee. Kevin WOLCOTT is a white male, who lives in the Crossville,

30

Tennessee area. Kevin WOLCOTT is part of a cocaine, methamphetamine, and marijuana distribution organization that distributes these controlled substances in Tennessee, Kentucky, and elsewhere. Telephone number (931) 788-2001 is documented in an ongoing Title III investigation by the DEA, Nashville District Office. Your Affiant learned through investigators with the DEA, Nashville District Office, that telephone number (931) 788-2001 is being used by Kevin WOLCOTT to facilitate the distribution of illegal drugs.

57.  In or about April 2003, DEA Agents in Little Rock, Arkansas interviewed a Confidential Source (CS) about his/her involvement in the illegal distribution of marijuana and cocaine. After waiving his/her Miranda warnings, the CS provided agents with information regarding the marijuana distribution activities of WOLCOTT. The CS told agents that in or around October 2000, he/she began assisting in the delivery of marijuana to WOLCOTT in Crossville, Tennessee. The stated that he assisted in approximately six (6) deliveries of marijuana to WOLCOTT. The CS stated that three (3) of these marijuana deliveries were for two-hundred (200) pounds each and that the remaining three deliveries were five-hundred (500) pounds each. According to the CS the marijuana was being supplied by sources in south Texas.

58.  Based on my training and experience, narcotics traffickers often carry multiple cellular telephones. Each of these cellular telephones is assigned a different telephone number. Each cellular telephone is utilized by the narcotics trafficker to make contact with specific members of the drug trafficking organization when needed. This method of communication is commonly used by narcotics traffickers for the purpose of concealing their identity to law enforcement if one or more of the members of the drug trafficking organization were arrested. Based on the pen register activity of **TARGET TELEPHONE #1** to include the number of calls made by **TARGET TELEPHONE #1** to various cellular telephones along with the volume of

31

calls made to specific telephones, affiant believes that **TARGET TELEPHONE #1** is specially

being utilized by Bobby Fairchild for the purpose of narcotics trafficking negotiations.

## **NEED FOR INTERCEPTION**

59.     Normal investigative procedures have been tried and failed or appear unlikely to

succeed if tried, or are too dangerous to employ. These investigative procedures are detailed

below. Traditional methods of investigation will not be sufficient to accomplish the full goals of

this investigation, which include discovering:

    a.    The manner and means of the commission of the offenses;

    b.    The nature, extent and methods of operation of the drug trafficking business of the **TARGET INTERCEPTEES** and others yet unknown;

    c.    The identities and roles of accomplices, aiders, abettors, co-conspirators and participants in their illegal activities;

    d.    The distribution and transfer of the contraband money involved in criminal activities;

    e.    The existence and location of records;

    f.    The location and source of resources used to finance illegal activities;

    g.    The locations and items used in furtherance of those activities;

    h.    The location of facilities used to store narcotics in preparation of their further distribution;

    i.    The location and disposition of the proceeds of the **TARGET INTERCEPTEES'** illegal activities; and

    j.    The physical location of the **TARGET INTERCEPTEES**, co-conspirators, and associates.

## **PHYSICAL SURVEILLANCE**

60.     Physical surveillance has been regularly utilized by investigating agents in this

case, and has proven useful in gathering some information as to areas frequented by Bobby

FAIRCHILD. Physical surveillance, however, unaccompanied by electronic surveillance, is of limited value. For example, physical surveillance has not and will not enable agents to gather evidence of the whole scope of Bobby FAIRCHILD's criminal activity under investigation, and has not, and most likely will not establish conclusively the identities of various co-conspirators, including the identity of all the individuals supplying Bobby FAIRCHILD with narcotics or the identity of those to whom Bobby FAIRCHILD is selling the narcotics.

61. Furthermore, the ultimate destination of the drug and currency shipments coordinated by Bobby FAIRCHILD is unknown; therefore, there has been no opportunity to perform physical surveillance on these locations. In addition, the location of Bobby FAIRCHILD's residence and property does not allow for effective surveillance. Bobby FAIRCHILD's property is located in rural Muskogee County, Oklahoma. The appearance of strange vehicles would arouse suspicion. In addition, the layout of the outbuildings would prevent observation of the residence from the roadway. Accordingly, the prospects for fruitful physical surveillance at this time are extremely limited. In addition, based on my experience and training, drug traffickers are extremely surveillance conscious. If the intensity of existing surveillance were to be increased, and if the subjects of this investigation became alerted to the existence of such surveillance, the result might be the temporary cessation of their illegal activities or a change in their instrumentalities or methods at a critical point in the investigation. Moreover, physical surveillance will not assist law enforcement in identifying **TARGET INTERCEPTEES** or narcotics-related locations in other states. Physical surveillance, unaccompanied by electronic surveillance, is also unlikely to identify additional conspirators and their respective roles, the methods by which the narcotics are imported into and distributed in the United States, or to accomplish all of the other goals of this investigation. For the foregoing

33

reasons, I do not believe that physical surveillance alone will be sufficient to accomplish the goals of the investigation.

## STATIONARY SURVEILLANCE

62.    Stationary surveillance, in the form of a police camera or closed circuit television, will not be sufficient to accomplish the goals of the investigation. Stationary surveillance, even when it can be utilized effectively, is unlikely to establish the nature and scope of Bobby FAIRCHILD's drug activities or the roles and identities of co-conspirators. Stationary surveillance, unaccompanied by the requested wire interception, would be insufficient to conclusively establish the identity of individuals at the identified residences who are involved in narcotics trafficking. Individuals who assist Bobby FAIRCHILD with the shipment, delivery and sale of narcotics would also be very difficult to identify.

63.    The use of pole cameras for remote surveillance would not be possible and if attempted could compromise the investigation. The only location which has been identified is the residence of Bobby FAIRCHILD. As previously described, the location of this residence makes it such that the installation of a pole camera would not yield an appreciable amount of intelligence. In addition, the equipment and activity associated with the installation would be readily noticed and highly suspicious. Experience has shown that pole cameras, which must be placed on a utility pole with an integral power source, are placed too far away to accurately record the license plates of vehicles. Distance also prevents accurate recognition of the faces of people entering and leaving Bobby FAIRCHILD's residence. Another obstacle to stationary surveillance devices is that at night, even when augmented by artificial lights such as street lamps, the effectiveness of stationary surveillance is dramatically reduced.

64.    Even if agents were successful in installing a pole camera at Bobby

34

FAIRCHILD's residence, the information provided by this stationary surveillance device is limited. It would be unlikely that vehicles would load or unload drugs in view of the camera. Agents believe that if this type of activity would occur it would more than likely occur in one of the buildings located on the ranch. In addition, the use of pole cameras would not reveal the location of pickup and delivery points in other states, nor would it identify the other individuals involved in the organization.

## TELEPHONE TOLL RECORDS, PEN REGISTER, AND TRAP AND TRACE INFORMATION

65.     Telephone toll, pen register, traps and trace information and data are of limited use in a traditional wire intercept investigation. The use of telephone toll records, and pen registers and trap and trace data has uncovered significant activity on **TARGET TELEPHONE #1** and the other telephones being used by organization members and associates. However, due to the fact that members of the organization can disguise, change or conceal the actual users of the telephones, subscriber information obtained from toll records and pen register and trap and trace data is not very helpful or insightful. Subscriber information records only reveal the name of the person to whom the telephone number is assigned and not the actual or ultimate user. Pen register and trap and trace data and telephone toll records only allow the review of telephone numbers called and the duration of an unknown conversation. Additionally, a Mexican cell phone's pen register, trap and trace, and toll data can only be captured when that telephone is utilized within the U.S. Further, DEA cannot obtain subscriber information, pen register, trap and trace, and toll records for Mexican phones. The accumulation of numerical statistics only indicates the known fact that the criminal subjects are regularly conversing and communicating with other individuals. These records cannot provide the identities of the people actually making

or receiving the telephone calls, their degree of criminal involvement, or any details concerning the matters discussed. The information alone is inadequate, in that it is the content of the calls, not the fact that they are being made, that will reveal the extent of the criminal activity and the conspiracy.

66. While DEA knows that the **TARGET INTERCEPTEES** are communicating with each other and others unknown, information derived from this data does not advise DEA who the **TARGET INTERCEPTEES** are talking to, the nature of the conversations, the manner in which they are committing the crime, the identities of the coconspirators or the location of the **TARGET INTERCEPTEES**.

## GLOBAL POSITIONING SYSTEM (GPS)

67. Since **TARGET TELEPHONE #1** is a United States cell phone, DEA agents would be able to obtain a court warrant to authorize the activation and/or monitoring of the Global Positioning System (GPS) function of **TARGET TELEPHONE #1** to determine and to track the movement and location of **TARGET TELEPHONE #1**. However, the Los Angeles Field Division HIDTA Group 47 advised DEA agents that pursuant to a California State court authorized wire interception, they were pinging their target telephone in an attempt to locate their subject and make a large currency seizure. What the agents didn't know and what was later confirmed by Sprint/Nextel Representatives after the fact, based on their CS' information, is that every time the agents pinged the Target Telephone, a notice was going into the GPS function of his cellular telephone and confirming that law enforcement elements were pinging his telephone which was depicted with all zeros on the telephone screen. This information further corroborated why the Target had numerous cell phones and discontinued his use on a frequent basis. This is a function built into the cell phones by the individual manufacturer. Thus, obtaining a court

36

warrant to authorize the activation and/or monitoring of the Global Positioning System (GPS) function of **TARGET TELEPHONE #1** may compromise the integrity of this investigation.

## USE OF SEARCH WARRANTS

68.    At this stage of the investigation, without additional information from electronic surveillance and other sources, the execution of search warrants in this matter could not be reasonably expected to produce incriminating evidence indicative of the full scope of the **TARGET INTERCEPTEES'** activities or the identity of all co-conspirators. Also search warrants would not be appropriate at this stage of the investigation, as the locations where the **TARGET INTERCEPTEES** receive, hide, and distribute their drugs have not been identified. It is my opinion that without electronic surveillance of the **TARGET INTERCEPTEES**, law enforcement will not be able to fully identify all of the stash locations used by Bobby FAIRCHILD or his co-conspirators on which to execute search warrants.

69.    Furthermore, it is unlikely that all or even many of the co-conspirators would be present during the execution of any search warrants at the various locations, which may become the subject of search warrants in the future. Those not present during the execution of the search warrants would likely be alerted to the existence of this investigation, allowing them to further insulate themselves from successful detection. Furthermore, I know that following seizures and other enforcement activity, it is common practice for trafficking groups to flee to Mexico for months at a time, apparently returning only after assuring themselves that law enforcement is no longer interested in their activities.

## USE OF UNDERCOVER AGENT(S)

70.    The use of undercover (UC) government agents to infiltrate the **TARGET**

37

**INTERCEPTEES'** organization does not appear likely to succeed in producing evidence that will achieve all of the goals of the investigation. At this juncture in the investigation, Affiant believes it would be of little value to introduce an under cover agent into the DTO. Essentially, under these circumstances in this investigation, there is not a role which an undercover agent could assume to further the investigation.

71.    I have learned through agents with the Oklahoma Bureau of Narcotics (OBN) concerning the use of undercover agents (UC) into the Bobby FAIRCHILD Drug Trafficking Organization (DTO). During the course of the OBN investigation into Bobby FAIRCHILD's DTO, beginning in or around 2002, UC agents were utilized to make a purchase from members of the DTO. The use of undercover agents was successful to a limited degree with lower level members of the DTO. Further attempts to utilize UC agents for the purpose of purchasing and identifying higher ranking organization members failed.

72.    The use of undercover agents is an important part of an investigation of narcotics law violations. However, unless an undercover agent is taken into the confidence of significant narcotics violators, he/she is unlikely to learn the full scope of the violators' illegal activities. In addition, it is not in the interest of narcotics violators to reveal to others, including other narcotics traffickers, the way he/she conducts his/her narcotics trafficking activities, since other traffickers may seek to interfere with those activities.

### CONFIDENTIAL SOURCE/SOURCE OF INFORMATION

73.    Since the beginning of the Oklahoma Bureau of Narcotics (OBN) investigation, attempts have been made to identify confidential informants capable of infiltrating, providing testimony and fully neutralizing the illegal activities of the **TARGET INTERCEPTEES** and other co-conspirators not yet identified. To date, the government has been unsuccessful in

locating such a confidential informant.   Although the OBN has identified and utilized a Source of Information (SOI) who was successful in the introduction of an agent to a lower ranking member of the drug trafficking organization.   The SOI is currently not in a position to infiltrate the current Interceptees.

## USE OF GRAND JURY SUBPOENAS

74.   Based on my training and experience, I believe that serving grand jury subpoenas on persons and their associates believed to be involved in this conspiracy would not be successful in achieving the stated goals of this investigation.   If Bobby FAIRCHILD, his co-conspirators, or other participants were to be called to testify before a grand jury, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify.

75.   The issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the **TARGET INTERCEPTEES** to this investigation.   Witnesses who could provide additional relevant evidence to a grand jury have not been identified or would themselves be participants trafficking drugs.   Such individuals would face prosecution themselves; it is unlikely therefore that any of them would testify voluntarily.   Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony.   Immunizing them could thwart the public policy that they be held accountable for their crimes.   Moreover, it is likely that such subjects would prefer to be held in contempt rather that testify.

76.   The issuance of grand jury subpoenas to other individuals likely would not lead to the discovery of critical information and undoubtedly would alert the **TARGET INTERCEPTEES** to the pendency of an investigation.   Moreover, not all of the **TARGET INTERCEPTEES** have been identified or located, and, in absence of further evidence

39

identifying co-conspirators and their respective involvement in drug trafficking, it is difficult to determine whom to subpoena to the Grand Jury. Finally, some of the **TARGET INTERCEPTEES** may travel or live outside the United States, beyond the Grand Jury's subpoena power.

## INTERVIEWS OF TARGET INTERCEPTEE

77.     Based upon my training and experience, I believe interviews of Bobby FAIRCHILD, or his other known and unknown associates, would produce negligible results and also compromise the investigation. Foremost, the majority of the **TARGET INTERCEPTEES** have not yet been identified or located. I also believe that any responses to interviews would contain a significant number of untruths, diverting the investigation with false leads that would frustrate the purposes of this investigation. Additionally, questioning any of the co-conspirators would alert the other co-conspirators, and cause a change in their methods of operation before all of the co-conspirators are identified, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence, and the possibility of harm to cooperating sources whose identities may become known or whose existence may otherwise be compromised. Finally, for the same reasons set forth above in connection with use of Grand Jury subpoenas, the use of interviews will not accomplish the stated goals of this investigation, and would prematurely alert Bobby FAIRCHILD and co-conspirators of this investigation.

## FINANCIAL INVESTIGATION

78.     Although this investigation has lead Agents to believe that money laundering has been committed, is being committed and/or will be committed, Agents have not obtained any financial records, but are beginning to identify assets. DEA Tulsa is waiting to seize U.S.

currency and/or illegal drugs before moving forward with an aggressive financial investigation.

## OTHER COURT AUTHORIZED WIRE INTERCEPTIONS

79.     If the Court were to authorize the interception of conversations occurring over **TARGET TELEPHONE #1,** I believe that these interceptions would confirm that Bobby FAIRCHILD distributes large quantities of narcotics throughout the United States and would provide information on who are Bobby FAIRCHILD's co-conspirators. Further, the intercepted conversations of Bobby FAIRCHILD will possibly provide Agents with Bobby FAIRCHILD's day-to-day drug activities and will fully disclose the conversations between Bobby FAIRCHILD and other interceptees. I believe that conducting a court authorized wire interception of conversations occurring over **TARGET TELEPHONE #1,** which is utilized by Bobby FAIRCHILD, will also assist Agents to identify possible stash houses in the Muskogee, Oklahoma, area.

## TRASH SEARCHES

80.     No trash searches at this stage of this investigation have been conducted. The reason for this is that no locations have been credibly established as stash houses that would likely yield any controlled substances, or potentially useful evidence. Therefore, no intelligence can be gathered utilizing this investigative technique. The **TARGET INTERCEPTEES'** heightened awareness of law enforcement surveillance will likely cause them to become even more cautious in their illegal activities. In addition, the use of trash searches to gain intelligence is not possible at Bobby FAIRCHILD's residence. As previously described, it is located off of the main road in a rural area. There is no central location for the accumulation of trash by area residents. Therefore, the risk of being detected and compromised during a trash search far outweighs the amount of intelligence to be gained from an effort. I believe that only a court

authorized wire interception conducted on **TARGET TELEPHONE #1** will be able to provide real time information that will allow this investigation to attain the investigative goals set forth herein.

## ARRESTS

81.    Attempting to arrest the **TARGET INTERCEPTEES** at this point would mean that several of the objectives of this investigation would be unfulfilled.  Most of the **TARGET VIOLATORS** have yet to be identified.  If the DEA tried to make any arrests, unidentified co-conspirators would almost certainly cease their illegal activities or change the locations, instrumentalities and methods used to conduct their illegal activities, thereby frustrating the investigation.

82.    As discussed above, the purpose of this investigation is to identify, locate and arrest the persons responsible for the importation and distribution of the above-described shipments of Methamphetamine.  As indicated above, and as discussed below, several investigative techniques have been tried, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ to achieve these objectives

83.    For the above listed reasons, I believe that alternative investigative techniques would fail to accomplish the objectives of the investigation.

## MINIMIZATION

84.    All monitoring of wire communications over the **TARGET TELEPHONES** will be minimized in accordance with Chapter 119 of Title 18, United States Code.

85.    The investigative or law enforcement officers of the United States and translators, if necessary, who are to carry out the requested interception of wire communications, will be

42

instructed concerning the steps they should take to avoid infringing upon any attorney-client privilege or other recognized privileges. In addition, all communications intercepted will be conducted in such a way as to minimize the interception of communications not otherwise criminal in nature or subject to interception under Chapter 119, Title 18, United States Code. All monitoring will cease when it is determined that the monitored conversation is not criminal in nature. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that target subjects or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If an interception is minimized, monitoring agents shall spot check to insure that the conversation has not turned to criminal matters.

86.     It is requested that the order provide that, if necessary, translators be authorized to assist in conducting this wire surveillance and to receive disclosure of intercepted communication. Certain subjects of this investigation may communicate with each other in Spanish. It is therefore necessary to secure the services of translators in order to assist the agents in monitoring the wire surveillance and translating the intercepted communications. All such translators will be under contract to the DEA and will be directly supervised by the DEA and/or deputized law enforcement officers. It is further requested, pursuant to Section 2518(5), Title 18, United States Code, that in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, that minimization may be accomplished as soon as practicable after such interception.

## AUTHORIZATION REQUEST

43

87.    As described above, **TARGET TELEPHONE #1** is crucial to the drug transportation/distribution activities of the Bobby FAIRCHILD Drug Trafficking Organization. Bobby FAIRCHILD utilizes (918) 704-5940 **(TARGET TELEPHONE #1)** to coordinate the pick up and transportation schemes of drug and currency shipments arranged by Bobby FAIRCHILD and other individuals not yet identified.

88.    Based on the foregoing, it is my opinion that the interception of communications occurring over **TARGET TELEPHONE #1**, as specified above, is essential to uncover the full scope of the illegal activity described herein.

89.    Inasmuch as the illegal operation described herein is a continuing conspiracy involving persons as yet unidentified and unknown, it is requested that it be ordered, as more fully stated in the accompanying application, that authorization to intercept not terminate when the sought wire communications are first obtained, but continue until interception fully reveals the objectives set forth above, or for a period of thirty (30) days, whichever is earlier. The 30-day period shall be measured from the date on which a law enforcement agent first begins to conduct the interception under the court order or ten days after the order is entered, whichever is earlier.

90.    Pursuant to the provisions of Title 18, United States Code, Sections 2518 (4), it is requested that it be ordered that AT&T Wireless, the service provider for **TARGET TELEPHONE #1**, furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the person whose communications are to be intercepted (including all dial digits, including all incoming and outgoing calls pen register information, and audio interception capability whether the cellular telephone is in roaming mode or otherwise). The assistance of this provider is

44

required to accomplish the objectives of the requested interceptions. Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

91.    Because the need for contemporaneous information concerning the intercepted communications is especially important in the present investigation, it is further requested that AT&T Wireless, and any other service providers of intercepted telephone calls be ordered to provide originating and terminating cell site information for the intercepted wire communications, by permitting the DEA to access such information. It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

Cory Hallum, Special Agent
United States Drug Enforcement Administration

Subscribed and sworn to before me this 23th day of July, 2008.

James H. Payne
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF OKLAHOMA