

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF OKLAHOMA

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA FOR
AN ORDER AUTHORIZING THE INTERCEPTION
OF WIRE COMMUNICATIONS

Case No. 08-MC-16-JHP

## MOTION FOR LEAVE TO DISCLOSE
## SEALED APPLICATIONS FOR WIRE INTERCEPTION

COMES NOW the United States of America, through Sheldon J. Sperling, United States

Attorney for the Eastern District of Oklahoma, and Rob Wallace, Assistant United States

Attorney, and moves this Honorable Court to allow the government to disclose the contents of

the applications for wire interception in the noted case numbers to United States Magistrate

Judge Steven P. Shreder. In support of its motion, the government alleges and states:

    1.    The government has applied to this Court for and received from this Court the

following Title III wire intercepts:

| | | |
|---|---|---|
| a. | (918) 704-5940 | July 23, 2008 |
| b. | (918) 696-1755 Extended Extended | August 8, 2008 September 5, 2008 October 10, 2008 |
| c. | (918) 457-8398 Extended | September 5, 2008 October 3, 2008 |
| d. | (918) 629-3876 | November 3, 2008 |
| e. | (270) 994-3072 | December 2, 2008 |

    2.    Each of the intercept applications has been supported by an affidavit of Drug

Enforcement Administration (DEA) Special Agent Cory Hallum, DEA Tulsa Resident Agency.

    3.    Each of the applications, orders and supporting materials have been filed with this

Court under seal and access to the matters has been strictly limited.



GOVERNMENT
EXHIBIT
C

4.      On December 5, 2008, and December 8, 2008, pleadings were presented to United States Magistrate Judge Steven P. Shreder seeking the issuance of a complaint and arrest warrants on **BOBBY FAIRCHILD, MICHAEL CASON, aka Mike Cason, RICHARD BURRIS, LOUIS MONTOYA, JIMMY SMITH, CALVIN HARVEY FRENCH, aka Harvey French,** and **ALFREDO GUZMAN,** for violations of Title 21, United States Code, Section 846. Magistrate Judge Shreder declined to find probable cause to issue the arrest warrants. The pleadings included an affidavit of DEA Special Agent Michael Rupe purporting to set forth probable cause to believe that the noted subjects had conspired to violate the federal drug law. The affidavit summarized portions of the above-listed wire intercept applications.

5.      The government intends to re-present the Application for a Criminal Complaint to Magistrate Judge Shreder. Permission to disclose the intercept applications as part of its Application for Criminal Complaint will allow Magistrate Judge Shreder access to the sealed documents without the necessity and burden to recreate such documents as part of the affidavit to support the complaint and arrest warrants.

6.      Extant investigative, operational and safety concerns regarding the unsealing and disclosure of the materials contained within the subject documents, operate to limit the scope of the requested disclosure to Magistrate Judge Shreder.

WHEREFORE, premises considered, the government respectfully prays this Honorable Court for permission to disclose the above-listed Applications for Wire Interception, including the attached Affidavits in Support, to Magistrate Judge Shreder.

SHELDON J. SPERLING
United States Attorney

ROB WALLACE, OBA #13130
Assistant United States Attorney

2

FILED

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

SEP 0 5 2008

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By:_____
Deputy Clerk

IN THE MATTER OF THE APPLICATION   )
OF THE UNITED STATES OF AMERICA FOR  )
AN ORDER AUTHORIZING THE INTERCEPTION )
OF WIRE COMMUNICATIONS         )
                                )

( 8 - M C - 1 6   -JH

SEALED

## ORDER AUTHORIZING THE INTERCEPTION OF WIRE COMMUNICATIONS

Application under oath having been made before me by Rob Wallace, Assistant United States Attorney, Eastern District of Oklahoma, United States Department of Justice, an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and an attorney for the Government as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure, for an Order authorizing the interception of wire communications pursuant to Section 2518 of Title 18, United States Code, and full consideration having been given to the matter set forth therein, the Court finds:

a.     there is probable cause to believe that Bobby FAIRCHILD, Melinda FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, and others as yet unknown have committed, are committing, and will continue to commit offenses involving the importation and distribution of (and possession with intent to distribute) controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843(b), 846, 952, 960 and 963; the laundering of monetary instruments being the proceeds from a specified unlawful activity and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1956 and/or 1957; and interstate and foreign travel to promote, manage, establish, carry-on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity, to wit: an enterprise involving a controlled substance, in violation of Title 18, United States Code, Section 1952;

b.     there is probable cause to believe that particular wire communications of Bobby FAIRCHILD, Melinda FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ,

Luis GONZALES, Angela BUHMESTER, and others as yet unknown concerning the above-described offenses will be obtained through the interception for which authorization is herein applied. In particular, there is probable cause to believe that the communications to be intercepted will concern the telephone numbers of associates of Bobby FAIRCHILD, Melinda FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, and the dates, times, places and plans for commission of the aforementioned federal felony offenses when Bobby FAIRCHILD, Melinda FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, and others as yet unknown communicate with their co-conspirators, aiders and abettors and other participants in the conspiracy, thereby identifying the co-conspirators and others as yet unknown, their places of operation, (etc.). In addition, these communications are expected to constitute admissible evidence of the above-described offenses;

c.      It has been established adequately that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ;

d.      there is probable cause to believe that the cellular telephone assigned telephone number (918) 457-8368, International Mobile Subscriber Identity (IMSI): 310410211638544, IMEI/ESN: 011426003272105, which is an AT&T cellular telephone, the subscriber to which is unknown, has been, is being and will continue to be used in connection with the commission of the above-described offenses.

WHEREFORE, IT IS HEREBY ORDERED that Special Agents of the Drug Enforcement Administration are authorized to intercept wire communications over the above-described facilities.

PROVIDED that such interception(s) shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which fully reveal the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of thirty (30) days measured from the day on which investigative or law enforcement

2

officers first begin to conduct an interception under this Order or ten (10) days after this Order is entered, whichever is earlier.

IT IS ORDERED FURTHER that, pursuant to 18 U.S.C. § 2518(3), in the event that the target facility is transferred outside the territorial jurisdiction of this court, interceptions may take place in any other jurisdiction within the United States.

IT IS ORDERED FURTHER that, based upon the request of the Applicant pursuant to Section 2518(4) of Title 18, United States Code, AT&T Wireless, a communication service provider(s) as defined in Section 2510(15) of Title 18, United States Code, shall furnish, and continue to furnish, the Applicant and the investigative agency/agencies with all information, facilities, and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such provider(s) is according the persons whose communications are to be intercepted, with the service provider(s) to be compensated by the Applicant for reasonable expenses incurred in providing such facilities or assistance.

IT IS ORDERED FURTHER that, to avoid prejudice to the Government's criminal investigation, the above provider(s) of wire communication service and its agents and employees are ordered not to disclose or cause a disclosure of this Order or the request for information, facilities, and assistance by the Drug Enforcement Administration or the existence of the investigation to any person other than those of its agents and employees who require said information to accomplish the services hereby ordered. In particular, said provider(s) and its agents and employees shall not make such disclosure to a lessee, telephone or paging device subscriber or any interceptee or participant in the intercepted communications.

IT IS ORDERED FURTHER that this Order shall be executed as soon as practicable and that all monitoring of the wire communications shall be recorded and examined by the monitoring agents or attorneys to determine the relevance of the intercepted wire communications to the pending investigation and that the disclosure of the contents or nature of the wire communications intercepted be limited to those communications relevant to the pending investigation, in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code. The interception of communications must terminate upon the attainment of the authorized objectives, not to exceed thirty (30) days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this Order or ten (10) days after the Order is entered.

IT IS ORDERED FURTHER that Assistant United States Attorney Rob Wallace or any other Assistant United States Attorney familiar with the facts of this case shall provide this Court with a report on or about the tenth, twentieth and thirtieth days following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the above-ordered reports should become due on a weekend or holiday, IT IS ORDERED FURTHER that such report shall become due on the next business day thereafter.

3

IT IS ORDERED FURTHER that this Order, the application, affidavit, and proposed Order(s), and all interim reports filed with this Court with regard to this matter shall be sealed until further order of this Court, except that copies of the Order(s), in full or redacted form, may be served on the Drug Enforcement Administration and the service provider(s) as necessary to effectuate this Order.

UNITED STATES DISTRICT COURT JUDGE
EASTERN DISTRICT OF OKLAHOMA

DATED this 5th day of September, 2008.

I hereby certify that the annexed instrument is a true and correct copy of the original on file in my office.

ATTEST:
WILLIAM B. GUTHRIE
Clerk, U.S. District Court
Eastern District of Oklahoma

BY _____

DATED 9/5/08

4

**FILED**

**UNITED STATES DISTRICT COURT
EASTERN  DISTRICT OF OKLAHOMA**

SEP 0 5 2008

WILLIAM B. GUTHRIE
Clerk, U.S. District Court

By:_____

Deputy Clerk

)
IN THE MATTER OF THE APPLICATION )
OF THE UNITED STATES OF AMERICA FOR )        0 8 - M C - 1 6   ᴶ JH⟨⟩
AN ORDER AUTHORIZING THE INTERCEPTION )
OF WIRE COMMUNICATIONS )
)

**SEALED**

### APPLICATION FOR INTERCEPTION OF WIRE COMMUNICATIONS

Rob Wallace, Assistant United States Attorney, Eastern District of Oklahoma, United States Department of Justice, being duly sworn, states:

1.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an attorney authorized by law to prosecute or participate in the prosecution of United States federal felony offenses. I am also an attorney for the Government as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure, and, therefore, pursuant to Section 2516(3) of Title 18, United States Code, I am authorized to make an application to a Federal judge of competent jurisdiction for an order authorizing the interception of wire communications.

2.      Pursuant to Section 2516 of Title 18, United States Code, an appropriate official of the Criminal Division, United States Department of Justice, specifically Barry Sabin, Deputy Assistant Attorney General, Criminal Division, having been specially designated by the Attorney General pursuant to Order Number 2943-2008, dated January 22, 2008, has approved this application for an order authorizing the interception of wire communications. Attached to this application as Exhibit A, and incorporated by reference herein, is a copy of that order and the memorandum of authorization approving this application.

3.      This application is for an order pursuant to Section 2518 of Title 18, United States Code, authorizing the interception of wire communications for a thirty (30) day period of Bobby FAIRCHILD, Melinda FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, and others as yet unknown to and from the cellular telephone assigned telephone number (918) 457-8368, International Mobile Subscriber Identity (IMSI): 310410211638544, IMEI/ESN: 011426003272105, which is an AT&T cellular telephone for which the subscriber is unknown, concerning federal felony offenses, that is, offenses involving violations of offenses involving the importation and distribution of (and possession with intent to distribute) controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same and attempts to do the same, in

violation of Title 21, United States Code, Sections 841, 843(b), 846, 952, 960 and 963; the laundering of monetary instruments being the proceeds from a specified unlawful activity and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1956 and/or 1957; and interstate and foreign travel to promote, manage, establish, carry-on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity, to wit: an enterprise involving a controlled substance, in violation of Title 18, United States Code, Section 1952.

4.     I have discussed all of the circumstances of the above offenses with Special Agent Cory Hallum of the Drug Enforcement Administration, who has directed and conducted this investigation, and have examined the Affidavit of Special Agent Cory Hallum of this date (attached to this application as Exhibit B, and which is incorporated by reference). Whereof your applicant states upon information and belief that:

a.     there is probable cause to believe that Bobby FAIRCHILD, Melinda FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, and others as yet unknown have committed, are committing and will continue to commit offenses involving the importation and distribution of (and possession with intent to distribute) controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843(b), 846, 952, 960 and 963; the laundering of monetary instruments being the proceeds from a specified unlawful activity and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1956 and/or 1957; and interstate and foreign travel to promote, manage, establish, carry-on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity, to wit: an enterprise involving a controlled substance, in violation of Title 18, United States Code, Section 1952.

b.     there is probable cause to believe that particular wire communications of Bobby FAIRCHILD, Melinda FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, and others as yet unknown concerning the above-described offenses will be obtained through the interception for which authorization is herein applied. In particular, there is probable cause to believe that the communications to be intercepted will concern the telephone numbers of associates of Bobby Fairchild, Jose Esparza and the dates, times and places for commission of the aforementioned federal felony offenses when Bobby FAIRCHILD, Melinda FAIRCHILD, Jose ESPARZA,

2

Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe
WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe
WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH,
Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria
ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, and others as yet
unknown communicate with their co-conspirators, aiders and abettors, and other participants in
the conspiracy, thereby identifying the co-conspirators and aiders and abettors of Bobby
Fairchild, Jose Esparza and others as yet unknown, and their places of operation.  In addition,
these communications are expected to constitute admissible evidence of the above-described
offenses;

            c.     normal investigative procedures have been tried and have failed,
reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ, as are
described in further detail in the attached affidavit of Special Agent Cory Hallum;  and

            d.     there is probable cause to believe that cellular telephone assigned
telephone number (918) 457-8368, IMSI: 310410211638544, IMEI/ESN: 011426003272105,
which is an AT&T cellular telephone for which the subscriber is unknown, is being, and will
continue to be used in connection with the commission of the above-described offenses.

     The attached affidavit contains a full and complete statement of facts concerning all
previous applications that have been made to any judge of competent jurisdiction for
authorization to intercept, or for approval of the interception of wire, oral or wire
communications involving any of the same individuals, facilities, or places specified in this
application.

     On the basis of the allegations contained in this application and on the basis of the
attached affidavit of Special Agent Cory Hallum,

     IT IS HEREBY REQUESTED that this Court issue an order, pursuant to the power
conferred on it by Section 2518 of Title 18, United States Code, authorizing the Drug
Enforcement Administration to intercept wire communications to and from the above-described
cellular telephone, and providing that such interceptions not terminate automatically after the
first interception that reveals the manner in which the alleged co-conspirators and others as yet
unknown conduct their illegal activities, but continue until all communications are intercepted
which reveal fully the manner in which the above-named persons and others as yet unknown are
committing the offenses described herein, and which reveal fully the identities of their
confederates, their places of operation, and the nature of the conspiracy involved therein, for a
period of thirty (30) days measured from the day on which investigative or law enforcement
officers first begin to conduct an interception under this Court's order or ten (10) days after this
order is entered, whichever is earlier.

IT IS REQUESTED FURTHER that in the event that the target facility is transferred outside the territorial jurisdiction of this Court, interceptions may take place in any other jurisdiction within the United States.

IT IS REQUESTED FURTHER that this Court issue an order pursuant to Section 2518(4) of Title 18, United States Code, directing that AT&T Wireless, a communication service provider as defined in Section 2510(15) of Title 18, United States Code, shall furnish, and continue to furnish, the applicant and investigative agency with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such providers are according the persons whose communications are to be intercepted, and to ensure an effective and secure installation of electronic devices capable of interception of wire communications to and from the above-described cellular telephone, with the service provider to be compensated by the applicant for reasonable expenses incurred in providing such facilities or assistance.

IT IS REQUESTED FURTHER that, to avoid prejudice to this criminal investigation, the Court order the said providers of wire communication service and their agents and employees not to disclose or cause a disclosure of this Court's order or the request for information, facilities and assistance by the Drug Enforcement Administration or the existence of the investigation to any person other than those of their agents and employees who require said information to accomplish the services hereby requested. In particular, said providers and their agents and employees should be ordered not to make such disclosure to a lessee, telephone subscriber, or any interceptee or participant in the intercepted communications.

IT IS REQUESTED FURTHER that this Court direct that this order be executed as soon as practicable after it is signed and that all monitoring of communications shall be recorded and examined by monitoring agents or attorneys to determine the relevance of the intercepted wire communications to the pending investigation and that the disclosure of the contents or nature of the wire communications intercepted be limited to those communications relevant to the pending investigation, in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code. The interception of communications authorized by this Court's order must terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this Court's order or ten (10) days after the order is entered, whichever is earlier.

IT IS REQUESTED FURTHER that the Court order that either Assistant United States Attorney Rob Wallace, or any other Assistant United States Attorney familiar with the facts of this case, provide to the Court a report on or about the tenth, twentieth and thirtieth days following the date of this order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the aforementioned reports should become due on a weekend or holiday, IT IS REQUESTED FURTHER that such report become due on the next business day thereafter.

4

IT IS REQUESTED FURTHER that the Court order that its orders, this application and the accompanying affidavit and proposed order(s), and all interim reports filed with the Court with regard to this matter be sealed until further order of this Court, except that copies of the order(s), in full or redacted form, may be served on the Drug Enforcement Administration and the service provider(s) as necessary to effectuate the Court's order as set forth in the proposed order(s) accompanying this application.

DATED this 5th day of September, 2008.

_____
Assistant United States Attorney

SUBSCRIBED and SWORN to before me this 5th day of September, 2008.

_____
UNITED STATES DISTRICT COURT JUDGE
EASTERN DISTRICT OF OKLAHOMA

5



**U.S. Department of Justice**

Criminal Division

---

*Washington, D.C. 20530*

<u>**MEMORANDUM**</u>

SEP – 4 2008

TO:      Maureen H. Killion, Director
             Office of Enforcement Operations
             Criminal Division

ATTN:    Rob Wallace

FROM:    Matthew W. Friedrich
             Acting Assistant Attorney General
             Criminal Division

SUBJECT:  Authorization for Interception Order Application

     This is with regard to your recommendation that an appropriately designated official of the Criminal Division authorize an application to a federal judge of competent jurisdiction for an order under Title 18, United States Code, Section 2518, authorizing for a thirty (30) day period, the interception of wire communications occurring to and from the cellular telephone bearing the number (918) 457-8368, with unknown subscriber information, and accessed through International Mobile Subscriber Identity (IMSI) number 310410211638544, in connection with an investigation into possible violations of Title 18, United States Code, Sections 1952, 1956, and 1957; and Title 21, United States Code, Sections 841, 843, 846, 952, 960, and 963, by Bobby Fairchild, Melinda Fairchild, Jose Esparza, Alfredo Guzman, Calvin French, Rhonda Valdivia, Kevin Joe Wolcott, Joseph McKinley Wolcott, Jeremy Stewart, Jimmy Smith, Richard Burris, Chris Shelton, Deborah Green, Jose Sevilla, Jimmy Gower, Maria Alcantara, Alejandro Perez, Luis Gonzales, Angela Buhmester, and other persons as yet unknown.

     By virtue of the authority vested in the Attorney General by Section 2516 of Title 18, United States Code, the Attorney General of the United States has by Order Number 2943-2008, dated January 22, 2008, designated specific officials in the Criminal Division to authorize applications for court orders authorizing the interception of wire and oral communications. As a duly designated official in the Criminal Division, this power is exercisable by the undersigned. WHEREFORE, acting under this



delegated power, the appropriately designated official authorizes the above-described application to be made by any investigative or law enforcement officer of the United States as defined in Section 2510(7) of Title 18, United States Code.

The authorization given is intended to apply not only to the target telephone number listed above, but also to any other telephone number or telephone accessed through the above-referenced IMSI number, and to any other IMSI number accessed through the target telephone number referenced above, within the thirty day period.  The authorization is also intended to apply to the target telephone number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use.

_____

Matthew W. Friedrich
Acting Assistant Attorney General
Criminal Division


_____ SEP - 4 2008 _____
Date


Barry Sabin
Deputy Assistant Attorney General
Criminal Division



**U.S. Department of Justice**

Criminal Division
Office of Enforcement Operations

*Maureen H. Killion, Director*                                    *Washington, D.C. 20005*

# Title III Implementation Information

In connection with the concomitantly transmitted documents approving your request to apply for a court order authorizing an interception pursuant to Title III, we would like to advise you of the following so that you might avoid issues in these areas:

**Pending Charges / Privileged Communications** - Monitoring personnel must exercise care to avoid intercepting communications of persons under indictment that may pertain to any such person's culpability in relation to the indictment, or the strategy that they contemplate employing as a defense, or communications involving a recognized privilege, e.g. doctor-patient. If such a communication is overheard inadvertently, monitoring personnel are to make notation of the incident in the intercept log and make an immediate report to the attorney who is supervising the interception.

**Sealing** - It is the obligation of the supervising attorney to ensure that the tapes of the intercepted conversations are protected adequately, and that these tapes are sealed by the court on a regular basis, preferably at the end of each 30-day period, if the interception is authorized to continue beyond the initial 30-day period. If there is a break in the interception period, this attorney should ensure that the tapes are sealed by the court as soon as practicable thereafter.

**Computation of the 30-Day Period** - Because of conflicting court decisions regarding the counting of the 30-day period for purposes of Title III interceptions, the supervising attorney should ensure that the method of computing time is set forth in the court's order and made known to monitoring personnel. *See, e.g., United States* v. *Gangi*, 33 F.Supp.2d 303 (S.D.N.Y. 1999) (counting calendar days rather than 24-hour periods, unless order provides otherwise), and *United States* v. *Smith*, 223 F.3rd 554, at 575 (7th Cir. 2000) (Fed.R.Crim.P. 45, minus weekend and holiday exception, applies). Notwithstanding the method used, communications should not be intercepted for longer than a strict counting of 30 days.

**Extensions** - All extensions **MUST** be approved by the Criminal Division before they are filed with the court.

**Reporting** - Section 2519 of Title 18, United States Code, requires that the Attorney General make an annual report to the Administrative Office of the United States Courts (AOUSC) each year regarding electronic surveillance by a federal agency under Title III. The statute requires you, through your investigative agency, to report specific post surveillance information, i.e., the number of resulting trials, the number of motions to suppress, whether the motions were granted or denied, and the number of convictions. These reports are compiled by AOUSC and provided to Congress and the public.

OEO's Electronic Surveillance Unit (ESU) can be reached at (202) 514-6809. Requests for surveillance authorized under T-III must be submitted to ESU by email through ESU.Requests@usdoj.gov or through our FAX-to-email server on (803) 726-2180.



# Office of the Attorney General
## Washington, D.C. 20530

ORDER NO.  2943-2008

### SPECIAL DESIGNATION OF CERTAIN OFFICIALS OF THE CRIMINAL DIVISION AND NATIONAL SECURITY DIVISION TO AUTHORIZE APPLICATIONS FOR COURT ORDERS FOR INTERCEPTION OF WIRE OR ORAL COMMUNICATIONS

By virtue of the authority vested in me as the Attorney General, including 28 U.S.C. § 510, 5 U.S.C. § 301, and 18 U.S.C. § 2516(1), the following officials are hereby specially designated to exercise the power conferred by section 2516(1) of title 18, United States Code, to authorize applications to a Federal judge of competent jurisdiction for orders authorizing or approving the interception of wire and oral communications by the Federal Bureau of Investigation or Federal agency having responsibility for the investigation of the offense(s) as to which such application is made, when such interception may provide evidence of any of the offenses specified in section 2516 of title 18, United States Code:

1.   The Assistant Attorney General in charge of the Criminal Division, any Acting Assistant Attorney General in charge of the Criminal Division, any Deputy Assistant Attorney General of the Criminal Division, and any Acting Deputy Assistant Attorney General of the Criminal Division;

2.   The Assistant Attorney General for National Security, any Acting Assistant Attorney General for National Security, any Deputy Assistant Attorney General for National Security, and any Acting Deputy Assistant Attorney General for National Security, with respect to those matters delegated to the supervision and responsibility of the Assistant Attorney General for National Security.  These officials of the National Security Division shall exercise this authority through, and in full coordination with, the Office of Enforcement Operations within the Criminal Division.

Attorney General Order No. 2887-2007 of July 3, 2007, is revoked effective at 11:59 p.m. of the day following the date of this order.

__January 22, 2008__
Date

Michael B. Mukasey
Attorney General

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF OKLAHOMA

IN THE MATTER OF THE )
APPLICATION OF THE UNITED )
STATES OF AMERICA FOR AN ORDER )
AUTHORIZING THE INTERCEPTION )
OF WIRE COMMUNICATIONS )
TO AND FROM AT&T WIRELESS )
TELEPHONE NUMBER **(918) 457-8368** )
IMSI: 310410211638544 )
IMEI/ESN: 011426003272105 )

**FILED**

**SEP 0 5 2008**

WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By:_____
Deputy Clerk

0 8 - M C - 1 6   -JHP

**SEALED**

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR WIRE INTERCEPTION

#### INTRODUCTION

1.     Affiant, Cory Hallum, Special Agent, U.S. Department of Justice, Drug Enforcement Administration, being duly sworn under oath, states as follows:

2.     I, Cory Hallum, am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

3.     I am currently employed as a Special Agent with the Drug Enforcement Administration (DEA), and have been so employed since 1998. In February 1999, I was temporarily assigned to the Oklahoma City District Office. In May 1999, I reported to the Houston Field Division, Corpus Christi Resident Office, at which time I was assigned to the High Intensity Drug Trafficking Area (HIDTA) group. I remained an active member of the HIDTA group, until 2002, when I was transferred to Enforcement Group One. In June 2006, I was transferred to the Tulsa Resident Office where I am currently assigned to the HIDTA group.

4.     Since becoming a Special Agent with DEA, I have conducted investigations of unlawful drug distribution in violation of Title 21, United States Code, Sections 841, 843, 846,

1



and have participated in wire and physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of informants and reviews of taped conversations and drug records. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and the methods of payment for such drugs. I have received numerous hours in training from various federal, state, and local law enforcement agencies.

5. As a Special Agent, I have initiated more than 85 DEA cases. These cases have lead to the arrest and indictment of more than 135 defendants; the successful seizure of more than 37,000 pounds of marijuana, more than 1,140 pounds of cocaine and more than 125 pounds of Methamphetamine. In addition to being the Lead Case Agent in more than 85 DEA investigations, I have assisted with more than 1,000 Drug trafficking investigations.

6. I have authored Affidavits for Title III investigations and search warrants. I have participated in an undercover capacity for the purchase, distribution and trafficking of illegal substances. I have executed numerous controlled deliveries of narcotics. As a result of my law enforcement service, I have gained a considerable amount of knowledge through my training and experience. I have interviewed hundreds of defendants involved in the use, manufacture, transportation, and illegal sale of controlled dangerous substances. During the course of these interviews, I have inquired and learned how individuals involved in drug distribution schemes and networks use and disperse the illegal proceeds generated due to the illegal sale of controlled dangerous substances, including but not limited to chemicals commonly utilized in the illegal manufacture of methamphetamine. During the course of my training and interviews with various defendants, I have learned how individuals involved in drug distribution schemes maintain records and conspire to deceive law enforcement as well as rival distributors of controlled

2

dangerous substances. I have learned how individuals that are involved in these types of crimes involving the distribution of controlled dangerous substances maintain records and secret monies gained as a result of participation in illegal drug distribution networks. The information contained in this affidavit is known to me personally or was learned from other Officers or Agents and by reviewing reports and documents.

7.    I submit this affidavit in support of an application for an order pursuant to Section 2518 of Title 18, United States Code, authorizing the interception and recording of wire communications occurring over **EDOK TARGET TELEPHONE #3** assigned telephone number (918) 457-8368, International Mobile Subscriber Identity (IMSI) 310410211638544[1], with service provided by AT&T Wireless, and any telephone numbers subsequently assigned to or accessed by the instruments bearing the same IMSI as the **EDOK TARGET TELEPHONE #3,** as well as any IMSI subsequently assigned to the instrument bearing the same telephone number assigned to **EDOK TARGET TELEPHONE #3** concerning offenses enumerated in Section 2516 of Title 18, United States Code, that is, offenses involving the importation and distribution of (and possession with intent to distribute) controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843 (b), 846, 952, 960 and 963; the laundering of monetary instruments being the proceeds from a specified unlawful activity and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1956 and/or 1957; and interstate and foreign travel to promote, manage, establish, carry-on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity, to

---

[1] The International Mobile Subscriber Identification (IMSI) number is encoded on a computer chip within the **TARGET TELEPHONE**. The chip can be removed and inserted into any similarly equipped telephone and be used to operate that telephone. The IMSI is unique to the subscriber and cannot be changed. Accordingly, the DEA is seeking authorization to intercept wire communications over any telephones or telephone numbers accessed by or through the IMSI number noted above.

wit: an enterprise involving a controlled substance, in violation of Title 18, United States Code, Section 1952.

    8. I submit that there is probable cause to believe that these offenses have been committed, are being committed, and will continue to be committed by persons who are the subjects of this investigation, including, among others Bobby FAIRCHILD, Melinda FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, , Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER and others as yet unidentified **(TARGET VIOLATORS)**.

    9. This case is being investigated by the DEA in Tulsa, Oklahoma, El Paso, Texas, Denver, Colorado, Las Cruces, New Mexico, Nashville, Tennessee, London, Kentucky and the Oklahoma Bureau of Narcotics and Dangerous Drugs. This affidavit is based upon my personal participation in the investigation; reports made to me by other DEA agents and law enforcement authorities; and information provided by confidential sources discussed in more detail below. Except where otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement was made by other law enforcement officers (who may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed. Such statements are reported in substance and in part, unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or

4

information provided directly or indirectly through other law enforcement officers who conducted such surveillance.

10.     Since this affidavit is being submitted for the limited purpose of securing an order authorizing the interception of wire communications, I have not included details of every aspect of this investigation to date. Facts not set forth herein are not being relied on in reaching my conclusion that an order should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an order authorizing the interception of wire communications. Where I have described conversations, I have described them in substance and in part, and not verbatim. Unless otherwise indicated, the information I have set forth herein is based on information I have gained from reports written by other agents and officers, and discussion with other agents and officers.

## SUBJECTS AND OFFENSES

11.     This application is based upon an investigation of a drug trafficking group involved with the importation of multi-kilogram loads of methamphetamine, cocaine and marijuana from Mexico to the United States, and with the distribution of the substances in Texas, Oklahoma, Louisiana, Kansas, Tennessee and Kentucky.

12.     As discussed below, there is probable cause to believe that the **TARGET VIOLATORS** have committed, are committing and will continue to commit the following offenses: the importation and distribution of, and possession with intent to distribute, controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same and attempts to do the same, all in violation of Title 21, United States Code, Sections 841, 843(b), 846, 952, 960 and 963; the laundering of monetary instruments being the proceeds from a specified unlawful activity and conspiracy to commit the same, in violation of Title 18, United

States Code, Sections 1956 and/or 1957; and interstate and foreign travel to promote, manage, establish, carry-on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity, to wit: an enterprise involving a controlled substance, in violation of Title 18, United States Code, Section 1952 **(TARGET OFFENSES).**

## THE DESIGNATED CELLULAR TELEPHONES

13.      There is probable cause to believe that the **TARGET VIOLATORS** of this investigation are also the **TARGET INTERCEPTEES** and are using and will in the future use **EDOK TARGET TELEPHONE #3** assigned telephone number (918) 457-8368, International Mobile Subscriber Identity (IMSI) 310410211638544, which is an AT&T prepaid cellular telephone distributed by Tracfone.  Due to the fact **EDOK TARGET TELEPHONE #3** is a prepaid cellular telephone the subscriber is unknown.  Service was established with AT&T on July 26, 2008.  **EDOK TARGET TELEPHONE #3** is being used to facilitate, accomplish, and to commit the above-described **TARGET OFFENSES.**

14.      There is probable cause to believe that **EDOK TARGET TELEPHONE #3** will be used during the period of interception applied for herein by the **TARGET INTERCEPTEES,** Bobby FAIRCHILD and others not yet identified in order to accomplish, to discuss, and to commit the **TARGET OFFENSES.**

15.      I have been informed by other law enforcement personnel who are familiar with applicable telephone technology that a "portable cellular telephone" (or a mobile telephone) can be used both within a vehicle and outside a vehicle through the use of a portable battery pack. The cellular telephone system divides Oklahoma and other areas into small coverage areas, which are called cells.  As a vehicle in which a portable cellular telephone is located or the cellular telephone itself is moved from one cell to another, transmitters within each cell and a

6

master switching network permit wire communications to be completed. Each portable cellular telephone that does not contain party lines bears a unique International Mobile Subscriber Identification (IMSI) and an assigned telephone number. It is requested that interception be permitted over any changed telephone numbers subsequently assigned to the instrument with the above listed IMSI for **EDOK TARGET TELEPHONE #3.**

16.   It is anticipated that the **TARGET INTERCEPTEES** will use **EDOK TARGET TELEPHONE #3** to place calls to other telephones to and from the Eastern District of Oklahoma, as well as other locations. This belief is supported by the facts described below.

17.   In any event, pursuant to United States v. Rodriquez, 968 F.2d 130 (2d Cir.), cert. denied, 506 U.S. 847 (1992), a Court in the Eastern District of Oklahoma is empowered to issue an Order for the interception of wire communications over telephones located in other districts.

18.   In connection with the telecommunication company which provides the service for **EDOK TARGET TELEPHONE #3,** all interceptions over **EDOK TARGET TELEPHONE #3** will automatically be routed to Dallas, Texas, regardless of where the telephone calls are placed to or from. The intercepted telephone calls will be monitored by the DEA Dallas Field Division (DEA/DFD) located in Dallas, Texas. This remote monitoring is necessary due to the needed technical expertise, equipment and personnel which are available at DEA/DFD. DEA/DFD is located within the Northern District of Texas. During the requested wire surveillance, all monitoring will be performed in Dallas, Texas, by law enforcement officers authorized under Section 2510 (7) of Title 18, United States Code, including law enforcement officers with the DEA and Government employees or individuals operating under a contract with the Government, including, if necessary, translators, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception, and specifically

7

under the supervision of law enforcement officers from the DEA. The intercepted telephone calls may further be transmitted to the DEA Tulsa Resident Office, located in Tulsa, Oklahoma.

19.     Because of the mobility of portable cellular telephones, pursuant to Title 18, United States Code, Section 2518 (3), authorization is requested for interception of wire communications both within the Eastern District of Oklahoma, and, in the event that **EDOK TARGET TELEPHONE #3** is transferred outside the jurisdiction of this Court, in any other jurisdiction within the United States. In addition, it is requested that background conversations, in the vicinity of **EDOK TARGET TELEPHONE #3** while it is off the hook or otherwise in use, also be permitted to be intercepted.

## OBJECTIVES

20.     There is probable cause to believe that the interception of wire communications, the authorization for which is sought herein, will help to reveal: (i) the nature, extent and methods of operation of the controlled substances activities of the **TARGET INTERCEPTEES;** (ii) the identities of the **TARGET INTERCEPTEES**, their accomplices, aiders, abettors, co-conspirators, and participants in their illegal activities, (iii) the source, receipt, and distribution of controlled substances, contraband, and money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records; (vi) the locations and sources of resources used to finance their illegal activities: and (vii) the locations and disposition of the proceeds from those activities. In addition, these wire communications are expected to constitute admissible evidence of the commission of the above-described offenses.

8

## PRIOR APPLICATIONS

21.     Based upon ELSUR (electronic surveillance) record checks of the DEA, ICE, and FBI indices on September 3, 2008, there have been no other federal applications for an order authorizing or approving the interception of wire, oral, or electronic communications of **EDOK TARGET TELEPHONE #3** or of the **TARGET INTERCEPTEES** specified in this affidavit, except for those listed below.

22.     On August 14, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the continued interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE-7** (915-217-8066, IMSI Number 310410162734704). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a.: "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a.: "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA, a.k.a.: "Ulysses"; (11) Erubiel SOLIS, a.k.a.: "El Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a.: Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez GARCIA, a.k.a: "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a.: "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a.: FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) Christopher SARINANA;

9

(42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49) FNU LNU, a.k.a.: Tocayo; (50) Christian NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53) Santos CHAVEZ, Jr., a.k.a: Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18; (56) FNU LNU-19 (57) Meño LNU; (58) Patricia MORALES, a.k.a. Patty; (59) Carlos Ramon CARRILLO, a.k.a.: Carlos LNU-3; (60) FNU LNU-20; (61) Jose Angel ESPARZA, a.k.a: FNU LNU-21, "El Perro," "El Perrillo," and "El Pelon;" (62) FNU LNU-22; (63) Oscar Rene RONQUILLO-Dominguez; (64) Rosa GUEVARA. a.k.a.: Rosa RONQUILLO; (65) Daniel James SHAW; (66) Benny RAMOS, a.k.a.: Benito Bosque RAMOS; (67) Juan Antonio TERRAZAS; (68) Edgar MAGALLANES-Cardenas; (69) Bobby FAIRCHILD; (70) Santiago Humberto PEREZ-Piñon.

23. On August 8, 2008, United States District Judge James H. Payne, in the Eastern District of Oklahoma, authorized the interception of wire communications occurring over **EDOK TARGET TELEPHONE #2** (telephone number (918) 696-1755, IMSI: 310410182378968 and IMEI/ESN: 355768013462026. The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Bobby FAIRCHILD; (2) Melinda FAIRCHILD (3) Jose ESPARZA; (4) Alfredo Guzman; (5) Harvey French; (6) Rhonda Valdivia; (7) Kevin Wolcott; (8) Joseph Wolcott; and (9) Chris LNU.

24. On July 23, 2008, United States District Judge James H. Payne, in the Eastern District of Oklahoma, authorized the interception of wire communications occurring over **EDOK TARGET TELEPHONE #1** (telephone number (918) 704-5940, IMSI 310410189938550 and IMEI/ESN: 011395003051936). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Bobby FAIRCHILD; (2) Jose ESPARZA.

25.     On July 15, 2008, United States District Judge Todd J. Campbell, in the Middle District of Tennessee, authorized the interception of wire communications occurring over **TENNESSEE'S TARGET TELEPHONE #1** (telephone number (270) 625-1208, IMSI 310410118069845. The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Bruce FERGUSON, (2) Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, (3) Jeffery Lynn COPAS a/k/a Jeffery Lyn COPAS a/k/a TERMITE, (4) Jerry Hale GLASS, (5) Kevin Joe WOLCOTT and (6) Calvin Eugene DAVIS.

26.     On July 15, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the continued interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE-7** ((915) 217-8066, IMSI Number 310410162734704). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a.: "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a.: "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA, a.k.a.: "Ulysses"; (11) Erubiel SOLIS, a.k.a.: "El Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a.: Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez GARCIA, a.k.a.: "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a.: "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a.: FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7;

11

(33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) Christopher SARINANA; (42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49) FNU LNU, a.k.a.: Tocayo; (50) Christian NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53) Santos CHAVEZ, Jr., a.k.a: Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18; (56) FNU LNU-19 (57) Meño LNU; (58) Patricia MORALES, a.k.a. Patty; (59) Carlos Ramon CARRILLO, a.k.a.: Carlos LNU-3; (60) FNU LNU-20; (61) Jose Angel ESPARZA, a.k.a: FNU LNU-21, "El Perro," "El Perrillo," and "El Pelon;" (62) FNU LNU-22; (63) Oscar Rene RONQUILLO-Dominguez; (64) Rosa GUEVARA. a.k.a.: Rosa RONQUILLO; (65) Daniel James SHAW; (66) Benny RAMOS, a.k.a.: Benito Bosque RAMOS; (67) Juan Antonio TERRAZAS; (68) Edgar MAGALLANES-Cardenas; (69) Bobby FAIRCHILD; (70) Santiago Humberto PEREZ-Piñon.

27.     On June 17, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the original interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE-7** ((915) 217-8066, IMSI Number 310410162734704). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a.: "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a.: "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA, a.k.a.: "Ulysses"; (11) Erubiel SOLIS, a.k.a.: "El Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-

12

Alvarado, a.k.a.: Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez GARCIA, a.k.a: "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a.: "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a.: FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) Christopher SARINANA; (42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49) FNU LNU, a.k.a.: Tocayo; (50) Christian NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53) Santos CHAVEZ, Jr., a.k.a: Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18; (56) FNU LNU-19 (57) Meño LNU; (58) Patricia MORALES, a.k.a. Patty; (59) Carlos Ramon CARRILLO, a.k.a.: Carlos LNU-3; (60) FNU LNU-20; (61) Jose Angel ESPARZA, a.k.a: FNU LNU-21, "El Perro," "El Perrillo," and "El Pelon;" (62) FNU LNU-22; (63) Oscar Rene RONQUILLO-Dominguez; (64) Rosa GUEVARA. a.k.a.: Rosa RONQUILLO; (65) Daniel James SHAW; (66) Benny RAMOS, a.k.a.: Benito Bosque RAMOS; (67) Juan Antonio TERRAZAS; (68) Edgar MAGALLANES-Cardenas.

28.     On June 11, 2008, United States District Judge Lewis T. Babcock, in the District of Colorado, authorized the interception of wire communications occurring over **COLORADO'S TARGET TELEPHONE-4** (telephone number (303) 350-6195, UFMI Number 121*768*1637, and IMSI Number 316010007454991). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a.: "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a.: "Tony"; (8) Rogelio RODRIGUEZ-

13

Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA, a.k.a.: "Ulysses"; (11) Erubiel SOLIS, a.k.a.: "El Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a.: Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez GARCIA, a.k.a: "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a.: "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a.: FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) Christopher SARINANA; (42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49) FNU LNU, a.k.a.: Tocayo; (50) Christian NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53) Santos CHAVEZ, Jr., a.k.a: Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18; (56) FNU LNU-19 (57) Meño LNU; (58) Patricia MORALES, a.k.a. Patty; (59) Carlos Ramon CARRILLO, a.k.a.: Carlos LNU-3; (60) FNU LNU-20; (61) FNU LNU-21; (62) FNU LNU-22.

29.     On April 6, 2007, in a Federal Bureau of Investigation case, United States District Judge David Briones, of the Western District of Texas, entered an order in which he authorized the interception of wire communications occurring over a telephone.  In the application Daniel SHAW, date of birth: December 9, 1973, was listed as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION.   An order authorizing the continued wire interception of wire communications was authorized on May 8, 2007.

30.     On May 27, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the continued interception of wire communications occurring over

14

**EL PASO'S TARGET TELEPHONE-4** (telephone number (303) 350-6195, UFMI Number 121*768*1637 and IMSI Number 316010103004633).   The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a.: "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a.: "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA, a.k.a.: "Ulysses"; (11) Erubiel SOLIS, a.k.a.: "El Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a.: Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez GARCIA, a.k.a: "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a.: "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a.: FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) Christopher SARINANA; (42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49) FNU LNU, a.k.a.: Tocayo; (50) Christian NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53) Santos CHAVEZ, Jr., a.k.a: Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18; (56) FNU LNU-19 (57) Meño LNU; (58) Patricia MORALES, a.k.a. Patty; (59) Carlos Ramon CARRILLO, a.k.a.: Carlos LNU-3; (60) FNU LNU-20; (61) FNU LNU-21; (62) FNU LNU-22.

     31.     On May 6, 2008, United States District Judge Kathleen Cardone, of the Western District of Texas, authorized the continued interception of  wire communications occurring over

**EL PASO'S TARGET TELEPHONE-1** (telephone number 011-52-656-282-2726, UFMI Number 62*229760*9 and IMSI Number 334010010692193)  and TARGET TELEPHONE-6 (telephone number (915) 850-2339, UFMI Number 121*729*5368, and IMSI Number 316010105520756).  Although activation of **EL PASO'S TARGET TELEPHONE-1** began on May 7, 2008, at approximately 10:03 a.m., the interception of **EL PASO'S TARGET TELEPHONE**-1 did not begin until 12:29 p.m., on May 7, 2008.  On May 7, 2008, an amended application for authorization to continue the interception of conversations occurring over **EL PASO'S TARGET TELEPHONE-1** and **EL PASO'S TARGET TELEPHONE-6** was filed with Judge Cardone, because the original paperwork filed with the court reflected that continued interception for thirty days would commence at the termination of the current order.  At the time, a current order did not exist for **EL PASO'S TARGET TELEPHONE-1**.  An amended order was entered to reflect that continued interception would begin on May 6, 2008.  The interception of conversations occurring over **EL PASO'S TARGET TELEPHONE**-1 did not begin until after Judge Cardone entered the amended order.  The following individuals were listed in the application and amended application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION:  (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a.: "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a.: "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA,  a.k.a.:  "Ulysses"; (11) Erubiel SOLIS, a.k.a.: "El Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a.: Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez

16

GARCIA, a.k.a: "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a.: "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a.: FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) Christopher SARINANA; (42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49) FNU LNU, a.k.a.: Tocayo; (50) Christian NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53) Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18; and (56) FNU LNU-19.

32.     On April 25, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE-2** (telephone number (915) 727-0328, UFMI Number 128*1021280*7 and IMSI Number 316010007454991)   and **EL PASO'S TARGET TELEPHONE-4** (telephone number (303) 350-6195, UFMI Number 121*768*1637, and IMSI Number 316010007454991).     The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION:(1) Jose Luis TERRAZAS, a.k.a.: "Gordo"; (2) Jesus Rodolfo MARTINEZ, a.k.a.: "Compita"; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a.: "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a.: "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA. a.k.a.: "ULYSSES"; (11) Erubiel SOLIS, a.k.a.: "El Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ, a.k.a.: "Manny"; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a.: Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24)

17

Rafael PEREZ- Garcia, a.k.a.: "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a.: "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a.: FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) FNU LNU-17; (42) FNU LNU-18; (43) FNU LNU-19; (44) Christopher SARINANA; (45) Herman MARRUFO; (46) Aaron ARANDA; (47) Jose Javier ARANDA; (48) Greg LNU; (49) Wayne LNU; (50) Hector LNU; (51) Lalo LNU; (52) FNU LNU, a.k.a.: Tocayo; and (53) Christian NAVARRETE.

33.     On April 15, 2008, U.S. District Judge David Briones, of the Western District of Texas, authorized the original interception of wire communications occurring over a telephone using (915) 727-3278, PTT number 128*969*3608, and IMSI number 316010159208403. The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: Rafael PEREZ-Garcia, Jose Luis TERRAZAS and Eusebio MARTINEZ.

34.     On April 3, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the original interception of wire communications occurring over **El PASO'S TARGET TELEPHONE-6** ((915) 850-2339, PTT Number 121*729*5368, IMSI Number 316010105520756). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: Jose Luis TERRAZAS; Jesus Rodolfo MARTINEZ; Richard ESCARCEGA; Hermelinda MILEDI; Alma Rosa GANEM, a.k.a. "Elma"; Miguel Arturo MILEDI; Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; Rogelio RODRIGUEZ-Lopez; Victor Hugo MONTALVO; Luis Alfonso AMAYA. a.k.a. "Ulysses"; Erubiel SOLIS, a.k.a. "El Jefe" and FNU LNU-1; Luis Carlos CORONEL; Michael

18

AVILA; Jose Luis GABALDON; Manuel Enrique GONZALEZ; Nancy LARA; Beto LNU; Carlos LNU-1; Carlos LNU-2;  Rene LNU;  Manuel LNU;  Joe LNU;  Ricardo ESPINOZA; Rafael PEREZ-Garcia, a.k.a "Guero"; Max LNU; Miguel LNU;  Eusebio MARTINEZ, a.k.a. "Chaparrito"; FNU LNU-3; FNU LNU-4; FNU LNU-5; FNU LNU-6; FNU LNU-7;  FNU LNU-8;  FNU LNU-10;  FNU LNU-11;  FNU LNU-12;  FNU LNU-13;  FNU LNU-14;  FNU LNU-15; and  FNU LNU-16.  On April 6, 2008, the interception of conversations occurring over TARGET TELEPHONE-6 commenced.

35.    On April 2, 2008, U.S. District Judge David Briones, of the Western District of Texas, authorized the original interception of wire communications occurring over a telephone using (915) 892-0868, PTT: 128*969*2700, IMSI 316010159206607, which is used by Rafael PEREZ-Garcia.  In the application for the continued authorization for this telephone Rafael PEREZ-Garcia, Manuel Enrique GONZALEZ, Jose Luis TERRAZAS and Eusebio MARTINEZ were identified as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION.

36.    On March 28, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the interception of  wire communications occurring over **EL PASO'S TARGET TELEPHONE-2** (telephone number (915) 727-0328, UFMI Number 128*1021280*7 and IMSI Number 316010007454991), TARGET TELEPHONE-3 (UFMI Number   62*13*14785 and IMSI Number 334010010880350) TARGET TELEPHONE-4 (telephone number (303) 350-6195, UFMI Number 121*768*1637, and IMSI Number 316010007454991) and **EL PASO'S TARGET TELEPHONE-5** (UFMI Number 52*302646*12, and IMSI Number 334010005003083).  The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: Jose Luis TERRAZAS; Jesus Rodolfo MARTINEZ; Richard ESCARCEGA; Hermelinda MILEDI;

19

Alma Rosa GANEM, a.k.a. "Elma"; Miguel Arturo MILEDI; Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; Rogelio RODRIGUEZ-Lopez; Victor Hugo MONTALVO; Luis Alfonso AMAYA, a.k.a. "Ulysses"; Erubiel SOLIS, a.k.a. "El Jefe" and FNU LNU-1; Luis Carlos CORONEL; Michael AVILA; Jose Luis GABALDON; Manuel Enrique GONZALEZ; Nancy LARA; Beto LNU; Carlos LNU-1; Carlos LNU-2; Rene LNU; Manuel LNU; Joe LNU; Ricardo ESPINOZA; Rafael PEREZ-Garcia, a.k.a. "Guero"; Max LNU; Miguel LNU; Eusebio MARTINEZ, a.k.a. "Chaparrito"; FNU LNU-3; FNU LNU-4; FNU LNU-5; FNU LNU-6; FNU LNU-7; FNU LNU-8; FNU LNU-10; FNU LNU-11; FNU LNU-12; FNU LNU-13; FNU LNU-14; FNU LNU-15; and  FNU LNU-16. On March 29, 2008, the interception of conversations occurring over TARGET TELEPHONE-2, TARGET TELEPHONE-3, TARGET TELEPHONE-4 and TARGET TELEPHONE-5 commenced.     On April 16, 2008, the interception of conversations occurring over TARGET TELEPHONE-3 and TARGET TELEPHONE-5 terminated.

37.    On March 26, 2008, U.S. District Judge David Briones, of the Western District of Texas, authorized the continued interception of wire communications occurring over a telephone using PTT: 62*14*53219, which is used by Roberto GUERRERO-Valles, a.k.a. "Beto." In the application for the continued authorization for this telephone Jose Luis TERRAZAS was identified as a TARGET INTERCEPTEE/SUBJECT OF THE INVESTIGATION.

38.    On March 5, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the continued interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE-1** (number 011-52-1-656-282-2726, UFMI Number 62*229760*9, and IMSI Number 334010010692193). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1)

20

Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a. "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA. a.k.a. "Ulysses"; (11) Erubiel SOLIS, a.k.a. "El Jefe", and FNU LNU-1; (12)Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON, (15) Manuel Enrique GONZALEZ, a.k.a. "Manny", (16) Nancy LARA, (17) Beto LNU, (18) Carlos LNU-1, (19) Carlos LNU-2, (20) Rene LNU, (21) Manuel LNU, (22) Joe LNU, (23) Ricardo ESPINOZA, (24) Rafael PEREZ- Garcia, a.k.a. "Guero", (25) FNU LNU-3, (26) FNU LNU-4, (27) FNU LNU-5, (28) FNU LNU-6, (29) FNU LNU-7, (30) FNU LNU-8, (31) FNU LNU-10, (32) FNU LNU-11, (33) FNU LNU-12, (34) FNU LNU-13, (35) FNU LNU-14, (36) FNU LNU-15, and (37) FNU LNU-16. On March 6, 2008, the interception of conversations occurring over El Paso's TARGET TELEPHONE-1 continued, but were terminated on April 4, 2008.

39.    On February 4, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the original interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE-1** (number 011-52-1-656-282-2726, UFMI Number 62*229760*9, and IMSI Number 334010010692193). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a. "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA a.k.a. "Ulysses"; (11) FNU LNU-1. a.k.a. "El Jefe"; (12)Luis Carlos CORONEL; (13) Michael AVILA; and (14) Jose Luis GABALDON.    On

21

February 5, 2008, the interception of conversations occurring over El Paso's TARGET TELEPHONE-1 commenced.

40.     On February 26, 2008, U.S. District Judge David Briones, of the Western District of Texas authorized the original interception of wire communications occurring over a telephone using PTT: 62*14*26012, which is used by Roberto GUERRERO-Valles, a.k.a. "Beto". Jose Luis TERRAZAS was listed as a TARGET INTERCEPTEE/SUBJECT OF THE INVESTIGATION.

### BACKGROUND OF THE INVESTIGATION

41.     On June 20, 2008, Agents with the Drug Enforcement Administration (DEA) Tulsa Resident Office initiated an investigation on the Bobby FAIRCHILD drug trafficking organization (DTO).   Agents determined that Bobby FAIRCHILD has been documented in numerous state and local law enforcement agency reports of investigation (ROI) and has been known as a large scale distributor of methamphetamine for over approximately five (5) years. Bobby FAIRCHILD is believed to have connections to higher ranking criminal associates located on the southwest border of the United States and other associates in Mexico.

42.     Bobby FAIRCHILD has been identified as a source of supply (SOS) of large amounts of methamphetamine for a number of locations throughout eastern Oklahoma and possibly throughout the entire state of Oklahoma.   Additionally, agents from the Tulsa Resident Office have received information relating to the illegal drug trafficking activities of Bobby FAIRCHILD through witnesses, law enforcement reports of investigation and through numerous conversations with state and local law enforcement agents/officers.

43.     Members of the DEA Tulsa Resident Office have determined that Bobby FAIRCHILD resides in the town of Oktaha, Muskogee County, Oklahoma, and controls and

22

coordinates his illegal enterprise from that area. Bobby FAIRCHILD has been identified as a distributor/transporter and organization leader, of his drug trafficking organization based in Oklahoma. Bobby FAIRCHILD has subsequently been identified as the cell head of the drug trafficking organization based in Oklahoma.

44.   Statements, reports of investigation and information gathered by members of the DEA Tulsa Resident Office and other law enforcement agencies show that beginning in approximately 2003 through the present time, Bobby FAIRCHILD has been and is currently responsible for coordinating and/or transporting large shipments of methamphetamine from areas in Mexico along the southwestern border to locations in Oklahoma and other locations throughout the United States yet to be identified.

45.   Intelligence and investigative information indicates Bobby FAIRCHILD is responsible for concealing shipments of drugs and/or drug proceeds in various conveyances, which he then coordinates and/or transports to a number of locations in Oklahoma and possibly to other locations in the United States. Based on conversations with agents of the Oklahoma Bureau of Narcotics and Dangerous Drugs (OBNDD), Bobby FAIRCHILD is, according to their information and investigation, one of, if not the largest methamphetamine dealer in the state of Oklahoma. Additionally, agents from OBNDD believe that Bobby FAIRCHILD is responsible for receiving and further distributing over fifty (50) kilograms of methamphetamine per month.

46.   In June 2008, members of the DEA Tulsa Resident Office received information from members of the DEA El Paso, Texas, office who, during an ongoing Title III investigation, intercepted telephone conversations between **EDOK TARGET TELEPHONE #1,** (918) 704-5940, and **EDOK TARGET TELEPHONE #2,** (918) 696-1755, both used by Bobby FAIRCHILD, and their target, Jose ESPARZA (**EL PASO'S TARGET TELEPHONE #7**).

23

Members of the DEA El Paso office relayed intercepted telephone conversations between **EL PASO'S TARGET TELEPHONE #7** (ESPARZA) and **EDOK TARGET TELEPHONE #1** and **EDOK TARGET TELEPHONE #2** in which calls the planning and coordination of a future shipment of drugs from an unidentified location destined for Bobby FAIRCHILD in Oklahoma was discussed.   On August 5, 2008, Members of the DEA El Paso office intercepted a call between **EL PASO'S TARGET TELEPHONE #7** and Bobby FAIRCHILD, utilizing **EDOK TARGET TELEPHONE #3**, (918) 457-8368 indicating Bobby FAIRCHILD had changed his telephone number to (918) 457-8368 (**EDOK TARGET TELEPHONE #3**). Agents in El Paso explained Jose ESPARZA is the target of their large Title III investigation. The agents further explained ESPARZA has been identified through their investigation, witnesses and through debriefings of confidential sources as a high ranking member of an extremely sophisticated large scale drug trafficking organization.   Agents further explained ESPARZA is the source of supply for this highly sophisticated drug trafficking organization operating in Mexico and the United States.  This DTO has known identified links to Juaquin CHAPO-GUZMON of the Sinaloa Cartel.   CHAPO-GUZMON is a part of the Attorney General's Consolidated Priority Organization Target (CPOT) list.  Agents explained that the links to the Juaquin CHAPO-GUZMON Sinaloa Cartel are direct and currently active.  Agents further explained ESPARZA also had links to the Vicente CARILLO-FUENTEZ (VCF) CPOT target.

47.   Agents from El Paso explained, in October 2005, the El Paso Field Division (EPFD) initiated an investigation into the Rogoberto Saenz Drug Trafficking Organization (DTO).  This organization was responsible for the transportation of millions of dollars of drug proceeds from cities throughout the United States to El Paso, Texas.  These proceeds were

24

subsequently smuggled into Ciudad Juarez, Mexico. This investigation has been linked to Consolidated Priority Organization Targets (CPOT) Ignacio CORONEL-Villareal and Vicente CARRILLO-Fuentes (VCF).

48.     Based on the afore-mentioned information and in conjunction with past information and intelligence, members of the DEA Tulsa Resident Office initiated an investigation regarding the illegal international drug trafficking activities of Bobby FAIRCHILD. This investigation will be conducted by the members of the DEA Tulsa Resident Office, DEA El Paso Field Division, DEA Nashville, Tennessee, DEA London, Kentucky, Oklahoma Bureau of Narcotics and Dangerous Drugs (OBNDD), the Internal Revenue Service (IRS), the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the Federal Bureau of Investigation (FBI) and the United States Attorney's Office (USAO) of the Eastern District of Oklahoma (EDOK).

49.     On August 15, 2008, at approximately 12:00 pm Bobby FAIRCHILD who was utilizing **EDOK TARGET TELEPHONE #2**, (918) 696-1755, contacted Jimmy SMITH at telephone number (918) 440-4345. The intercepted telephone conversation indicated that SMITH had already picked "the package" up and would be departing the Knoxville area at approximately 3:30 pm or 4:00 pm, and was destined for Bobby FAIRCHILD who was located in Oktaha, Oklahoma. Upon reviewing this intercepted telephone conversation, Agents identified the subscriber of telephone number (918) 440-4345 as Jimmy C. SMITH of Ochelata, Oklahoma. Through various law enforcement indices members of the DEA Tulsa Resident Office obtained further information that SMITH had an arrest and pending case on file in Cumberland County, Tennessee, from March 2007. At approximately 1:05 p.m., Deputy Casey Cox with the Cumberland County Sheriffs Department was contacted to obtain information from

25

the pending case on SMITH. Records indicated that SMITH was arrested in March of 2007, as the result of a seizure of approximately nine-hundred and eighty (980) pounds of marijuana and the seizure of approximately eighty-two thousand dollars ($82,000.00) in United States Currency (USC). That investigation is currently pending in the State Prosecutor's office in the State of Tennessee. Members of the DEA Tulsa Resident Office contacted the legal compliance center for U.S. Cellular and were informed that GPS information could be provided for the telephone number subscribed to SMITH. At approximately 3:20 pm, on August 15, 2008, members of the DEA Tulsa Resident Office received the requested GPS coordinates regarding SMITH'S cellular telephone (918) 440-4345 which indicated SMITH was west of Knoxville, Tennessee, on Interstate 40. At approximately 3:30 pm, SA Kevin Pino contacted Deputy Cox and informed him of SMITH's location. At approximately 4:30 pm, members of the Tennessee Highway Patrol stopped SMITH for a traffic violation on Interstate 40. During a search of the cab portion of the semi truck the Troopers located approximately five (5) tightly wrapped bundles containing approximately $283,210.00 hidden under the bunk in the sleeper compartment of the truck. SMITH refused to sign the property receipt for the five (5) bundles of USC, claimed to have no knowledge of the bundles, and was later released.

     50.     On August 12, 2008, a telephone conversation was intercepted between Richard Burris and Bobby FAIRCHILD on **EDOK TARGET TELEPHONE #2**. Burris asked Bobby FAIRCHILD if he had to go on "that deal" by himself or if he could make it a vacation. Bobby FAIRCHILD replied he didn't care, but that Burris would have "a little over two... at least two." On August 14, 2008, a telephone conversation was intercepted between Richard Burris and Bobby FAIRCHILD on **EDOK TARGET TELEPHONE #2**. During the conversation Bobby FAIRCHILD stated he is going to gather up some items and bring them to work. Bobby

FAIRCHILD stated he is going to bring three (3) dollars to Richard Burris. Based on these conversations, Agents with the DEA Tulsa Resident Office believed that Burris was going to drive drugs/money out of town for Bobby FAIRCHILD the following Friday. Agents were unable to locate Burris before he departed Oklahoma, but on August 16, 2008, a phone conversation was intercepted between Burris and Bobby FAIRCHILD indicating Burris was at Billy Bob's in Ft. Worth, Texas. Surveillance was then established at Billy Bob's where a 2007 Chevrolet Silverado with Oklahoma plates BXW-490 was located. Agents later discovered this vehicle was driven by Richard Burris. Burris was surveilled until he departed Billy Bob's enroute to Oklahoma. After Burris arrived in Oklahoma, Agents with the Tulsa Resident Office contacted the Oklahoma Highway Patrol. Troopers with the Oklahoma Highway Patrol conducted a traffic stop on Burris after Burris drove on the shoulder of the highway on three separate instances. Burris was asked for consent to search the vehicle and Burris consented. For officer safety Burris was patted down. During this time the Oklahoma Highway Patrol Trooper discovered approximately $14,893.00 in Burris' pockets. Burris stated he did not know how much money he had, "maybe a couple thousand dollars." Burris initially stated that he had been saving the money for a long time and hiding it from his wife. Burris later stated his wife won the money at a casino. Due to the conflicting stories, nervous behavior and the drug trafficking criminal history of Burris, the Oklahoma Highway Patrol seized the money and provided Burris with a receipt.

## BACKGROUND AND PROBABLE CAUSE TO INTERCEPT

## FAIRCHILD'S TELEPHONE

51.     On August 12, 2008, a court ordered interception began in Oklahoma, on telephone number (918) 696-1755, belonging to or utilized by Bobby FAIRCHILD, hereafter

referred to at **EDOK TARGET TELEPHONE #2**. On July 24, 2008, a court ordered interception began in Oklahoma, on telephone number (918) 704-5940, belonging to or utilized by Bobby FAIRCHILD, hereafter referred to at **EDOK TARGET TELEPHONE #1**. On June 17, 2008, a court ordered interception began in El Paso, Texas, on telephone number (915) 217-8066, belonging to or utilized by Jose ESPARZA, hereafter referred to at **EL PASO'S TARGET TELEPHONE #7**. Pursuant to the interceptions, agents identified the following telephones being utilized by Bobby FAIRCHILD to further his drug trafficking activities: (918) 704-5940 **(EDOK TARGET TELEPHONE #1)**, (918) 696-1755 **(EDOK TARGET TELEPHONE #2)** and (918) 457-8368 **(EDOK TARGET TELEPHONE #3)**. Below are some summaries from calls intercepted pursuant to the above listed Court Orders. Unless otherwise noted, the information provided is based on summaries of the telephone calls.

**EDOK TARGET TELEPHONE #1**

**(918) 704-5940**

52.     On June 19, 2008, at approximately 9:58 p.m., ESPARZA utilized **EL PASO'S TARGET TELEPHONE #7** and called Bobby FAIRCHILD on a telephone assigned number (918) 704-5940, **EDOK TARGET TELEPHONE #1**, (Call Number 218). During the conversation, Bobby FAIRCHILD stated "Hello." ESPARZA then stated "What's going on my friend?" Bobby FAIRCHILD then stated "Hey, ain't nothing man. Are you still alive?"[VOICES OVERLAP]. ESPARZA then stated "[STUTTERS] I've been calling you sending you messages, you don't answer." Bobby FAIRCHILD then stated "Bullshit!" ESPARZA then stated "I [STUTTERS] swear to God I have. I [STUTTERS] I've been to Phoenix I barely got here this morning my friend uh ..." [VOICES OVERLAP]. Bobby FAIRCHILD then stated "On my six nine six ((918) 696-1755, which is subscribed to Bobby FAIRCHILD) old number you

28

sent my messages?" ESPARZA then stated "Huh?" Bobby FAIRCHILD then stated "On my

six nine six (696) number you sent my messages?" ESPARZA then stated "[STUTTERS] I'll

tell you right now when I go to the truck I've been sending you messages and shit like that, then

I was in Phoenix and uh...."[VOICES OVERLAP]. Bobby FAIRCHILD then stated "No you've

been sending me, you've been sending me wrong on that phone that I had to throw away."

ESPARZA then stated "Oh okay, okay, okay. Yeah and, and [STUTTERS] stuff like

that..."[VOICES OVERLAP]. Bobby FAIRCHILD then stated "Anytime, anytime you couldn't

get a hold of me you called that six nine six (696) phone number and uh..."[VOICES

OVERLAP]. ESPARZA then stated "Yeah but I didn't want to you know...uh but I'm here

trying to make everything work (drug transaction) you for..."[VOICES OVERLAP]. Bobby

FAIRCHILD then stated "I've been in, I've been in, I've been in jail." ESPARZA then stated

"Uh, fuck no my friend." Bobby FAIRCHILD then stated "Yeah my son-in-law got smart with

me and I ran over him in my fucking truck." ESPARZA then stated "Oh shit!" Bobby

FAIRCHILD then stated "He was standing out in the yard and I just pulled up in the fucking

yard and I was..." ESPARZA then stated "Oh shit! [PAUSE] But everything cool with you?

Everything okay?" Bobby FAIRCHILD then stated " I don't know... he called me yesterday he

said he wanted to drop all the charges and shit for one hundred thousand ($100,000.00). And I

told him I wasn't giving him no fucking money." ESPARZA then stated "Oh okay, no, no my

friend of mine I'm just trying to get everything and uh...I'll see you uh, I've been in Phoenix my

friend. I've been staying in Phoenix. I came to my house because my wife was bitching so I

came right here to my house today and uh, and I'll go up there to."[VOICES OVERLAP].

Bobby FAIRCHILD then stated "Nah I don't need to see you I just called to check on you. I

want to make sure that you're still alive."[VOICES OVERLAP]. ESPARZA then stated "No,

no, no, no I'm fine my friend. No, no, no I'm fine my friend. I'm fine. It's just that things (drug trade) are real bad right here (El Paso, Texas) my friend. Here with the family. You understand?" Bobby FAIRCHILD then stated "Oh I know." ESPARZA then stated "And uh...but uh..." [VOICES OVERLAP]. Bobby FAIRCHILD then stated "I know that's why I was calling to check on you. I wanted to make sure that you wasn't dead." ESPARZA then stated "No, no, no, no my other friend ... they [STUTTERS] they...uh I'll tell you when I see you. I'll go up there and see you and uh, I've got a plan (drug transaction) already..." [VOICES OVERLAP]. Bobby FAIRCHILD then stated "Oscar (Oscar Rene RONQUILLO) is all right ain't he?" ESPARZA then stated "Huh?" Bobby FAIRCHILD then stated "Oscar is okay ain't he?" ESPARZA then stated "Oh yeah Oscar is okay, but uh, one of Oscar's relative's is not okay and uh...I don't know if you remember uh...two (2) dogs (men) came a long time ago to the store. Remember?" Bobby FAIRCHILD then stated "Yeah." ESPARZA then stated "Well all that family is gone (deceased)." Bobby FAIRCHILD then stated "That girl?" ESPARZA then stated "Yeah, yeah, yeah, yeah, yeah, yeah. Remember?" Bobby FAIRCHILD then stated "Yeah, they got that girl?" ESPARZA then stated "Yeah, yeah the mother, her, her brother, and the other sister and two young uh and two young ones. They uh..." [VOICES OVERLAP]. Bobby FAIRCHILD then stated "I'll be damn .... ESPARZA then stated "Yeah, yeah but it's been really bad and uh [LAUGHS] inside a vehicle..." Bobby FAIRCHILD then stated "[SNORTS]. ESPARZA then stated "...about two hundred (200), two hundred (200 rounds of ammunition) shots and little babies. You understand that's not right you know." Bobby FAIRCHILD then stated "Yeah." ESPARZA then stated "Yeah but I'll go see you my friend and I already have."..I have a plan (drug transaction) so I could make everything up to you and I already got a new plan (drug transaction)." Bobby FAIRCHILD then stated "Okay." ESPARZA then stated "I've been, I've

30

been trying. I've been working and uh...I just, I didn't know..." [VOICES OVERLAP]. Bobby FAIRCHILD then stated "Dude I ain't even, I ain't even trying to do nothing." ESPARZA then stated "Yeah..." [VOICES OVERLAP]. Bobby FAIRCHILD then stated "Because every time that I try to do something (drug transaction) it turns to shit I've just been uh. I've just been uh...I'll just sit around and wait." [VOICES OVERLAP]. ESPARZA then stated "You now what ... remember, remember, the ....the roosters (illegal drug) that we that you were going to fight the fourth (4th) of July with your friends? Remember?" Bobby FAIRCHILD then stated "Yeah." ESPARZA then stated ".....Derby?...derby those were very nice (good quality) my friend. You know uh but I know how to do it (drug transaction) and everything my friend so I'll see you up this week for sure." Bobby FAIRCHILD then stated "Okay all right it's all .... [VOICES OVERLAP]. ESPARZA then stated "I promise, I promise I'll go see you." Bobby FAIRCHILD then stated "All right, see you buddy." ESPARZA then stated "All righty? Okay my friend." Bobby FAIRCHILD then stated "Bye." ESPARZA then stated "I'll see you."

53.    In the conversation in the previous paragraph, it is believed that ESPARZA is checking in with Bobby FAIRCHILD. Further, it is believed that ESPARZA has been leaving messages for Bobby FAIRCHILD, which Bobby FAIRCHILD denies that he has received. Further, it is believed that the references to "plan" and "make things right" made by ESPARZA are references to a drug transaction. It is believed that ESPARZA possibly owes Bobby FAIRCHILD a drug transaction and it is believed that ESPARZA has a plan implemented to provide Bobby FAIRCHILD with illegal drugs. It is also believed that Bobby FAIRCHILD's reference to "Oscar" is reference to Oscar Rene RONQUILLO, who is a known drug trafficker in the El Paso, Texas, area. During the conversation ESPARZA has to explain that some relatives of Oscar Rene RONQUILLO had been shot to death. Information provided by the DEA El Paso,

Texas, Field Division indicate with the recent increase in drug related violent crimes in Juarez, Chihuahua, Mexico, it is believed that the killing involving Oscar Rene RONQUILLO's relatives was drug related.

54.     On June 21, 2008, at approximately 9:57 p.m., Bobby FAIRCHILD utilized a telephone assigned number (918) 704-5940, **EDOK TARGET TELEPHONE #1,** to call ESPARZA on **EL PASO'S TARGET TELEPHONE #7** (Call Number 838). During the conversation, ESPARZA then stated "Hello my friend." Bobby FAIRCHILD then stated "What are you doing there, you little fucker?" ESPARZA then stated "Yeah, shh... I'm trying to, I'm going to Phoenix again, my friend. I'm trying to, figure out what to do my friend." Bobby FAIRCHILD then stated "Are you really?" ESPARZA then stated "Yeah, it's been ..." [VOICES OVERLAP]. Bobby FAIRCHILD then stated "What about..." ESPARZA then stated "Huh?" Bobby FAIRCHILD then stated "What about, what about the Kelso Sage? You still can't me none of them?" ESPARZA then stated "No, my friend. No they, they, they, they uh, they had the, they, they had problems, they had problems there (unknown location)." Bobby FAIRCHILD then stated "I'll be damn, I have one (one unknown subject) bring me ten (kilograms of cocaine)." ESPARZA then stated "It, it yeah." [VOICES OVERLAP]. Bobby FAIRCHILD then stated "It's that fucking, they're fucking gone (sold), just like that. And uh..." ESPARZA then stated "Yeah my friend they had problems there at the... uh right there with the... you know where the, the people that like chicken, you know that like chicken and watermelon." Bobby FAIRCHILD then stated "Yeah." ESPARZA then stated "Yeah they had problems there. But not them, uh the... uh somebody else uh, uh I don't know exactly who, but that's what uh, but he had told me yes, and... and stuff like that but uh I'm... I'm trying on that uh, the other stuff and uh, and I'm just told them that uh, you that you needed to check everything and that uh,

32

yeah, yeah I just uh actually spoke to him (unknown subject) earlier today and I told him that uh, he needs to make up whatever... he said no, that, that was fine, that he was going to start doing that (providing more illegal drugs) and... well that what I'm trying to do, I'm on the road right now my friend." Bobby FAIRCHILD then stated "No I was... I need the, I need the new ones like I talked to you about." ESPARZA then stated "Okay." Bobby FAIRCHILD then stated "*Queso, queso*. [cheese], (cocaine)." ESPARZA then stated "Yeah, yeah I know the, the, the one that you put on the *tortilla*, yeah I know which one, I know which one my friend. And uh... the uh, the in... let me talk him today the... not today but tomorrow my friend, and I'll tell him that, the only thing my friend that uh, with those and those restaurant, on that restaurant well it has to be uh, you know, I don't know uh, has to be quicker. Is that okay?" Bobby FAIRCHILD then stated "I just, I just need a week (to dispose of or sell)." ESPARZA then stated "You just need a week?" Bobby FAIRCHILD then stated "Yeah." ESPARZA then stated "Okay my friend." Bobby FAIRCHILD then stated "Uh don't, no bring me, no more then ten (10 kilograms of cocaine) though, cause I can't, I can't take care of ten (10 kilograms of cocaine), no quicker then that, but bring me ten (10 kilograms of cocaine)." ESPARZA then stated "Okay, okay, let me, let me uh..." Bobby FAIRCHILD then stated "Now how, how, how much are they (price per kilogram of cocaine)?" ESPARZA then stated "Well I don't know, they, they say they were like uh, remember like I told you, like twenty ($20,000.00 per kilogram) dollars, I don't know how much you got em for, my friend." Bobby FAIRCHILD then stated "I promise you, I promise you, I'll tell you the truth, okay." ESPARZA then stated "Uh-huh." Bobby FAIRCHILD then stated "I promise you, I got em eighteen five ($18,500.00 per kilogram)." ESPARZA then stated "Well that's a very dis... bad-ass my friend." Bobby FAIRCHILD then stated "Right here (Oklahoma) man, they was right here (Oklahoma). They (unknown third party) wouldn't put

33

them up there for that.  They put them right here for eighteen five ($18,500.00 per kilogram)."

ESPARZA then stated "Where, at your house?" Bobby FAIRCHILD then stated "Yeah."

ESPARZA then stated "Okay now, well I can do that." Bobby FAIRCHILD then stated "Okay,

well put them here, put them here, I'll take them tomorrow."  ESPARZA then stated "Okay, let

me, well let me tell them I'm here, and I'm headed to Phoenix."  Bobby FAIRCHILD then stated

"All right." ESPARZA then stated "Uh-huh..." Bobby FAIRCHILD then stated "I need, I need,

I need em, I need em whole (complete kilogram and uncut), with, with the tattoo (the logo

commonly stamped by drug trafficking organizations)."  ESPARZA then stated "No, no, no yes

uh, yes my friend, I you got the ta... yeah, I got the tattoo artist and everything (source of

supply)."  Bobby FAIRCHILD then stated "Okay." ESPARZA then stated "Okay? They got

the tattoo (logo) artist and everything but uh... but uh ... I mean [LAUGHS] it's getting hardly,

nobody drives more then, then ten (10 kilograms) stands, you know?  It's been, I don't know, it's

been real bad (reference to the violence in Juarez, Chihuahua, Mexico and rival drug cartels) but

I'm just trying my friend,  I'm working real hard, and I'm headed out to Phoenix and, uh call me

uh, uh... but my other phone, my other friend got's it but uh, I'll let you know exactly everything

what's going on." Bobby FAIRCHILD then stated "Okay." ESPARZA then stated "All righty

and uh, I'll let you know and... hey but you, are you okay, everything's fine over there, shit?"

Bobby FAIRCHILD then stated "Oh yeah, I mean I might wind up having go to the penitentiary,

but it'll be a year. They'll drag it out for a long time." ESPARZA then stated "Shit!"  Bobby

FAIRCHILD then stated "But... I mean, I don't know what's going to happen, I don't know, it

don't..."    ESPARZA then stated "So..."  Bobby FAIRCHILD then stated "... we gotta, it

don't..."    ESPARZA then stated "Well you know my friend, yeah..." [VOICES OVERLAP].

Bobby FAIRCHILD then stated "... even, even if, even if I go I mean, I still have to do

something (drug transaction)." ESPARZA then stated "Yeah, yeah my friend, but no, no, I hope you don't my friend, I hope you, I hope you figure out something before, you know." Bobby FAIRCHILD then stated "Yeah." ESPARZA then stated "If you can bring out something, but no, no my friend, I'm here to help you, now I'm gonna do that my friend. And uh... so I'll be calling you, to let you know, but I'm here to help my friend." Bobby FAIRCHILD then stated "Alright." ESPARZA then stated "And I'll, I'll do whatever I need to do uh, for you too." Bobby FAIRCHILD then stated "Okay." ESPARZA then stated "Okay my friend." Bobby FAIRCHILD then stated "All right." ESPARZA then stated "Now take care."

55.     In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD is calling ESPARZA to ask him for 10 kilograms of cocaine. Further, it is believed that Bobby FAIRCHILD was able to obtain an unknown quantity of cocaine for the price of $18,500 per kilogram. It is also believed that Bobby FAIRCHILD uses this to negotiate with ESPARZA in an attempt to lower ESPARZA's offer of $20,000.00 per kilogram of cocaine. It is also believed that Bobby FAIRCHILD intends to obtain the 10 kilograms of cocaine from ESPARZA and will then need a week to sell the cocaine.

56.     On July 27, 2008, at 9:05 p.m., Bobby FAIRCHILD received a call on **EDOK TARGET TELEPHONE #1** from Alfredo Guzman, utilizing telephone number (817) 733-7015. Guzman told Bobby FAIRCHILD he has someone who can work inside the houses on the sheet rock, guaranteed for 19. Bobby FAIRCHILD said as long as they are good and come back to bring him 10. Bobby FAIRCHILD asked if it is a cash deal or do they need a little time. Guzman asked Bobby FAIRCHILD if he has "the papers." Bobby FAIRCHILD said if they need "the papers" now to bring 10, if they don't to bring him 20. Guzman asked if Bobby FAIRCHILD will send "the papers" right away, Bobby FAIRCHILD replied "yes." Guzman

35

told Bobby FAIRCHILD he is going over there and needs a couple of hours; he will call to set it up. Bobby FAIRCHILD said they have to have a stamp.

57.     In the conversation in the previous paragraph, it is believed that Guzman and Bobby FAIRCHILD are discussing a delivery of drugs involving 10 to 20 pounds or possibly kilograms of an undetermined type of drug. During the conversation Bobby FAIRCHILD and Guzman utilize "papers" as code for U.S. Currency/cash. It is believed that "papers" is referring to money/cash and if a money/cash transaction is required upon delivery of the drugs then Bobby FAIRCHILD has the money to pay for 10 immediately. If the delivery of drugs does not require immediate payment, then he (Bobby FAIRCHILD) would like 20.   Toward the end of the conversation, Bobby FAIRCHILD tells Guzman that they have to have a stamp. It is believed the stamp that is placed on the face of a package of drugs which indicates that it is intact in its "original" packaging and has not been opened which further indicates that the contents of the package are in its purest form.

58.     On July 27, 2008, at 9:46 p.m., Luis Gonzales, utilizing telephone (915) 412-7461, called Bobby FAIRCHILD on **EDOK TARGET TELEPHONE #1**. Gonzales asked Bobby FAIRCHILD if he (Bobby FAIRCHILD) called from another phone.    Bobby FAIRCHILD replied yes and that it is his "new" number. Gonzales tells Bobby FAIRCHILD that he [Gonzales] will get the other one tomorrow and that he is looking into his appointment.


59.     The information provided in the previous paragraph is believed to be an indication that Bobby FAIRCHILD is utilizing more than one telephone for purposes of communication.

60.     On July 28, 2008, at 10:20 a.m., an Unknown Male (UM), utilizing telephone (606) 821-9456, called Bobby FAIRCHILD on **EDOK TARGET TELEPHONE #1**. Bobby

36

FAIRCHILD asked if the UM is ready for him to "run back out there." The UM said he has a little over 100 right now, but that "one guy" [UM], has slowed down a little bit because his father is about to die of cancer. The UM said he will look for "it" in the next day or so, and it will be "54 dollars a lick." The UM said he looks for it by this weekend, if not this week. The UM said when the source is called he will take anywhere for 48. Bobby FAIRCHILD said they're supposed to bring those "kelso docks," the UM laughed and said someone owes him for almost one already. The UM said then he has about 1 ½ left but UM1 is supposed to take care of ½ or 1 today. The UM said he is on his way to getting rid of the UM1. The UM said the other [UM2] is doing good, the UM1 owes him about 9 or 10. Bobby FAIRCHILD says the UM1 is messing up, the UM said when they get behind and you try to catch them up, they just get deeper and deeper. The UM said if they are ½ of 1 out all the time, and you give them 8 or 10, they've got to come up with 10 or 12 before you do any better. The UM said [UM1] he solely depends on him [Gonzales] to pay his bills. The UM said he has another boy picking these people up already, and everything Bobby FAIRCHILD gets from him from now on will be "worked on." Bobby FAIRCHILD said that if you don't ever tell them that it's worked on they will never know it. The UM said he told the boy his would be "worked on" so he could cut the boy out. Bobby FAIRCHILD said they all have to take losses. The UM replied that he just doesn't like the way the boy was spending it all on women.

61.    In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD and an UM are discussing the receipt and then transportation of illegal contraband. DEA Special Agent Mike Rupe believes that when they discuss the UM having about "100" right now, they are speaking of a quantity of drugs. It is further believed that when they discuss

37

something being "worked on" they specifically mean drugs being broken down and then cut with other products to increase their quantity.

62.     On July 28, 2008, at 1:24 p.m., an unidentified male [UM], utilizing telephone number (606) 821-9456, called Bobby FAIRCHILD on **EDOK TARGET TELEPHONE #1**. The UM asked Bobby FAIRCHILD if Bobby FAIRCHILD had decided to come out and look around. Bobby FAIRCHILD replied he will one of these days and he has not forgotten about it. The UM said they may double after a while. Bobby FAIRCHILD asked how long did the UM have it for, the UM said he went through the world championship and that was at the end of May. The UM said he will do a lot to help Bobby FAIRCHILD out and will take a lot off Bobby FAIRCHILD. The UM said to contact him if Bobby FAIRCHILD hears anything about those "kelsos". Bobby FAIRCHILD asked if the UM could do 5 or 6 per month. The UM said he could do about 2 or 3 a week, he has a boy to help him hustle.

63.     In the conversation in the previous paragraph, it is believed that the [UM] and Bobby FAIRCHILD are discussing a delivery of drugs. It is believed that this UM is a drug customer of Bobby FAIRCHILD. It is further believed that Bobby FAIRCHILD and the [UM] are discussing the amount of deliveries to be received each week/month.

64.     On July 28, 2008, at 2:29 p.m., Bobby FAIRCHILD utilized **EDOK TARGET TELEPHONE #1** to call Alfredo Guzman at telephone number (817) 733-7015. Bobby FAIRCHILD asked Guzman if they are going to bring "them." Guzman replied "yes," but he hasn't talked to the guy who is two hours behind him. Guzman said he should know something by tonight. Bobby FAIRCHILD said he has everything for 10 and to see if they have enough time for another 10 for a total of 20. Gonzales said he will let Bobby FAIRCHILD know tonight.

65.     In the conversation in the previous paragraph, it is believed that Guzman and

38

Bobby FAIRCHILD are discussing a delivery of drugs and the amounts to be received.

66.      On July 28, 2008, at 8:54 p.m., Luis Gonzales, utilizing telephone number (915) 412-7461, called Bobby FAIRCHILD on **EDOK TARGET TELEPHONE #1**. Gonzales asked Bobby FAIRCHILD if he is going to get his new phone there. Bobby FAIRCHILD said "okay."

67.      The information provided in the previous paragraph is believed to be an indication that Bobby FAIRCHILD is going to drop his current telephone and begin utilizing a separate telephone for purposes of communication.

68.      On July 29, 2008, at 10:14 a.m., Bobby FAIRCHILD utilizes **EDOK TARGET TELEPHONE #1** to contact Alfredo Guzman at telephone number (817) 733-7015. Guzman said the guy is working with the "cows," and that he will probably come back on Wednesday. Guzman said that after Wednesday he should know when we can go, it will be around the weekend.

69.      In the conversation in the previous paragraph, it is believed that Guzman and Bobby FAIRCHILD are discussing when Guzman will receive the drugs and then when Guzman will be able to transport the drugs to Bobby FAIRCHILD.

70.      On July 30, 2008, at 8:46 a.m., Harvey French utilized telephone number (270) 994-2504, to contact Bobby FAIRCHILD on **EDOK TARGET TELEPHONE #1**.   Bobby FAIRCHILD told French, "They keep promising they're going to bring me some 'Stags' any day." Bobby FAIRCHILD told French there are a whole bunch of "Stags" down there but they can't get them across.  Bobby FAIRCHILD asked if French wanted some "Stags" when they bring some to Bobby FAIRCHILD and French replied that he did.  Bobby FAIRCHILD told French they would not have anymore problems and that the "Stags" would be brought directly to Bobby FAIRCHILD or to French and they would bust every one of them open to make sure they

39

worked.  Bobby FAIRCHILD told French if the "Stags" didn't work, they would send them back.

71.     In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD and French are discussing future drug shipments.  It is believed that "Stags" is a code word for drug types/amounts and that Bobby FAIRCHILD told French there is a large quantity of drugs in Mexico and the drug suppliers are attempting to move the drugs across the United States/Mexico Border.  It is further believed that Bobby FAIRCHILD told French they would open each bundle containing drugs and if the drugs were not of good quality, they would send them back.

72.     On July 30, 2008, at 10:45 a.m., Bobby FAIRCHILD utilized **EDOK TARGET TELEPHONE #1** to call an unknown male [UM] at telephone number (606) 821-9456. The UM asked Bobby FAIRCHILD if he remembers the tape Bobby FAIRCHILD "worked out there and liked."  Bobby FAIRCHILD replied in the affirmative.  The UM said 100 rolls come in a case and asked how many Bobby FAIRCHILD would like.  The UM said the tape is 150 dollars a case. Bobby FAIRCHILD said he wants four cases, the UM said he will get them to take two cases and he will get two more and two cases for himself.  The UM said they are pretty handy if they ever come through with that rooster stuff, the UM said in a week he will get rid of two or three hundred of that stuff right now.  The UM said that if another unidentified male [UM2] would ever get back he would start taking 120 at a time every week or two weeks, the UM said the UM2 is only taking 30 at a time now.  Bobby FAIRCHILD said he wants to make sure that whenever "they" get theirs that he gets his so he's not behind more people.  Bobby FAIRCHILD said things will go a lot better when they pick up some new people and stuff.  The UM said there is two there and one will take 100 every three weeks and a girl who will start taking 100 instead

40

of 50. The UM said he will ship Bobby FAIRCHILD something.

73.     In the conversation in the previous paragraph, it is believed that Bobby
FAIRCHILD has received drugs from the UM which were good for his customers and when
Bobby FAIRCHILD and the UM are talking about "rolls of tape" they are talking about a
quantity of drugs. It is believed that the figures of 100, 120 etc. are also quantities of drugs for
Bobby FAIRCHILD and others involved in this drug conspiracy to receive.

74.     On July 30, 2008, at 2:20 p.m., Bobby FAIRCHILD received an incoming call on
**EDOK TARGET TELEPHONE #1** from an unknown male [UM] at telephone number (606) ·
821-9456. The UM asked Bobby FAIRCHILD if he will be coming out to get the "tape" or
someone else. The UM said he has about ½ right now and wants to know if Bobby FAIRCHILD
wants him to keep it or "mail" it. Bobby FAIRCHILD said to mail it because he doesn't want to
haul it in the car with him at the same time.

75.     In the conversation in the previous paragraph, it is believed that "tape" is a
reference to drugs and to "mail" the tape is to utilize a legitimate parcel carrier or a drug courier
to get the drugs to Bobby FAIRCHILD.

76.     On August 1, 2008, at 12:57 p.m., Bobby FAIRCHILD utilized **EDOK
TARGET TELEPHONE #1** to call an unknown male [UM] at telephone number (606) 335-
3560. The UM asked Bobby FAIRCHILD when Bobby FAIRCHILD is going to be in town.
Bobby FAIRCHILD said Tuesday. The UM said "that's cool will probably take them like two
days you know…to be here." Bobby FAIRCHILD then asked the UM about the Pollo de Verte.
Bobby FAIRCHILD informed the UM that he (Bobby FAIRCHILD) would like 2,000. The UM
stated he would see what he could do. Bobby FAIRCHILD then said "if they got a 1,000 stags
tell them I'll give them something when they get here and 24 hours on the rest of it." The UM

41

then said "don't worry man." Bobby FAIRCHILD then said "all I need is just enough time...just to go through and take them all out of the boxes and look at them." Bobby FAIRCHILD further stated "once I take them out and take a look at them, I'll take care of it right then."

77.    In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD and the UM are discussing a future shipments of marijuana. It is believed when Bobby FAIRCHILD mentions "Pollo de Verte" he may have been trying to say Pollos De Verde, which translated to English means "green chickens." It is believed this is a code word for marijuana. It is further believed the numbers 1,000 and 2,000 mentioned by Bobby FAIRCHILD are pound quantities of marijuana and when Bobby FAIRCHILD stated "if they got a 1,000 stags tell them I'll give them something when they get here and 24 hours on the rest of it. It is believed that Bobby FAIRCHILD intends to pay for part of the marijuana immediately and pay the remainder of the balance within 24 hours. It is also believed when Bobby FAIRCHILD said "once I take them out and take a look at them, I'll take care of it right then." That Bobby FAIRCHILD wants to see the marijuana before making payment.

78.    On August 20, 2008, at 5:12 p.m., Bobby FAIRCHILD utilized **EDOK TARGET TELEPHONE #1** to call Chris Shelton at telephone number (918) 697-9685. Shelton told Bobby FAIRCHILD that he (Shelton) was trying to reach Bobby FAIRCHILD last week and Bobby FAIRCHILD stated that he had his phone turned off. Bobby FAIRCHILD asked Shelton if he (Shelton) is coming by. Shelton stated he had some boys out west that were supposed to be bringing him (Shelton) some "Roosters and stuff" later this week. Shelton stated that "they" had sent him some brood cocks [PH] and Shelton's friend tried to "breed" them but they weren't that good. Shelton said he told "them" to send him some "pure ones." Shelton said he would bring one to Bobby FAIRCHILD when they get into town so Bobby FAIRCHILD can

42

see how it looks. Bobby FAIRCHILD told Shelton to call when "they" get into town.

79.      In the conversation in the previous paragraph, it is believed that Shelton and Bobby FAIRCHILD are discussing a delivery of drugs and when Bobby FAIRCHILD and Shelton are speaking about the "pure ones" they are inferring to pure drugs.

### EDOK TELEPHONE #2

### (918) 696-1755

80.      On July 19, 2008, at approximately 12:13 p.m., Bobby FAIRCHILD utilized a telephone assigned number 918-696-1755 (**EDOK TARGET TELEPHONE #2**) and called Jose ESPARZA on **EL PASO'S TARGET TELEPHONE #7** (Call Number: 5534). During the conversation, ESPARZA stated "Hey, what's going on my friend?" Bobby FAIRCHILD stated "Nothing, nothing, what are you up to?" ESPARZA then stated "Uh, just right here, I'm just right here my friend. Trying to, trying to see if I can complete your, your uh, your uh, notebook (illegal drug order)." Bobby FAIRCHILD then stated "Okay. Have they. . ." ESPARZA then stated "Okay um . . ." [VOICES OVERLAP]. Bobby FAIRCHILD then stated ". . . I was trying, I was trying, I was trying . . . Oh they're (illegal drugs) still there (El Paso, Texas)?" ESPARZA then stated "Yeah, yeah, uh, I was . . ." Bobby FAIRCHILD then stated "Okay." ESPARZA then stated ". . . going to ask you, uh, he (third party source of supply) has already, uh, somebody close over there (Oklahoma) my friend so I told him (third party source of supply) and he said that was fine." Bobby FAIRCHILD then stated "Do what now?" ESPARZA then stated "Um, I told uh, Paul?" Bobby FAIRCHILD then stated "Yeah." ESPARZA then stated "And he said that uh, well when do you want them to uh, to be there? There's somebody's close through there (Oklahoma)." [PAUSE]. Bobby FAIRCHILD then stated "Oh, somebody's close to there (Oklahoma) right now?" ESPARZA then stated "Yes. Aha." Bobby FAIRCHILD then stated

43

"Oh hell they can go right now, I'm sure. Let me call." [VOICES OVERLAP]. ESPARZA then stated "Yeah. There . . . okay let me tell them it's in . . . and Gen (unknown reference to a location), who's the, who, your friend Gen, huh?" Bobby FAIRCHILD then stated "Yeah." ESPARZA then stated "Okay yeah, because uh, I uh, yesterday he didn't let the, he told me to, uh, you know, he wanted complete the whole roosters (complete the illegal drug order) and I said, because you know it's very little, he said, but right now well, that's what we're trying to do my friend, he's helping me out, going through everything right now." Bobby FAIRCHILD then stated "Okay let me call and make sure that they're, they won't let . . . . I need, I need to know for sure what day that they'll (transporter & illegal drugs) be there (Oklahoma)." ESPARZA then stated "Okay let me, let me, let me, let me just get ready my friend and I'll, I'll go see him right now again. Uh, I was there with him in the morning and let me go and then I'll tell Pauly and uh . . ." [VOICES OVERLAP]. Bobby FAIRCHILD then stated "Okay, cuz I mean, I got, I mean the, the . . ." [VOICES OVERLAP]. ESPARZA then stated ". . . because he's about an hour and a half away from me." Bobby FAIRCHILD then stated "Okay, cuz the, the stags are ready to go." ESPARZA then stated "Okay." Bobby FAIRCHILD then stated "But that, that man, but that boy's got a pretty busy schedule, you know man. I'll, I'll have him set a day aside, you know but, but I don't want him to have, I don't want to set three or four days aside." ESPARZA then stated "Okay, okay my friend. Let me, let, let me call back in an hour and a half on the other and then uh, let me go to his house because I'm about an hour and a half away from him." Bobby FAIRCHILD then stated "Okay." ESPARZA then stated "All righty?" Bobby FAIRCHILD then stated "All right, all right, bye."

81.     In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD is calling ESPARZA to check on the status of his order of illegal drugs. Further, it

44

is believed that ESPARZA is still attempting to complete the drug order through a third party, who is believed to be the source of supply. It is also believed that ESPARZA is attempting to explain to Bobby FAIRCHILD that ESPARZA and the third party might have someone near Oklahoma that can deliver or transport the illegal drugs.

82.     On August 12, 2008, at approximately 6:00 p.m., Bobby FAIRCHILD utilizes **EDOK TARGET TELEPHONE #2** to contact Richard Burris at telephone number (918) 458-7759. Burris asked Bobby FAIRCHILD if he has to go on "that deal" by himself or if he can make it a vacation. Bobby FAIRCHILD replied he didn't care, but that Burris would have a little over two at least two.

83.     In the conversation in the previous paragraph, it is believed that Burris is going to deliver an amount of drugs equal to or greater than a quantity of two (pounds/kilograms or hundred pounds/kilograms).

84.     On August 12, 2008, at approximately 7:10 p.m., Richard Burris, utilizing telephone number (918) 458-7759, called Bobby FAIRCHILD on **EDOK TARGET TELEPHONE #2**. Burris and Bobby FAIRCHILD then discuss a mutual friend of theirs named "Walter" who had an airplane crash in his back yard the day before. Bobby FAIRCHILD told Burris that if that ever happened to him [Bobby FAIRCHILD] that it would be full of cocaine, heroin and whores.

85.     In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD is alluding to his participation in a drug trafficking organization.

86.     On August 14, 2008, at approximately 2:36 p.m., an Unidentified Female (UF), utilizing telephone number (918) 680-0406, called Bobby FAIRCHILD on **EDOK TARGET**

45

**TELEPHONE #2** and stated that she was a "little short" and that there was some rocks in the center. Bobby FAIRCHILD stated that he is worried about the quality of the item still in his possession.

87.     In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD and the UF were engaged in conversation concerning the quality and possibly the quantity of drugs.

88.     On August 14, 2008, at approximately 6:12 p.m., Richard Burris, utilizing telephone number (918) 458-7759, called Bobby FAIRCHILD on **EDOK TARGET TELEPHONE #2**. During the conversation Bobby FAIRCHILD stated he is going to gather up some items and bring them to work. Bobby FAIRCHILD stated he is going to bring three (3) dollars to Richard Burris.

89.     In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD is bringing Burris money/drugs for the purpose of transportation in connection with the conversation listed in paragraph 80 and the seizure listed in 50.

90.     On August 15, 2008, at approximately 10:41a.m., Bobby FAIRCHILD, utilizing **EDOK TARGET TELEPHONE #2,** called Jimmy Smith at telephone number (918) 440-4345. Bobby FAIRCHILD asked Smith if he picked up an item.   Smith stated "done did" and mentioned he will be leaving around 3:30 or 4:00 p.m.

91.     In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD and Smith are discussing the transportation of approximately $283,000.00.   It is believed that Smith was transporting the money for Bobby FAIRCHILD (Reference the seizure listed in paragraph 50).

46

92.     On august 15, 2008, at approximately 8:13 p.m., Jimmy Smith, utilizing telephone number (918) 571-2059, contacted Bobby FAIRCHILD on **EDOK TARGET TELEPHONE #2.** Smith told Bobby FAIRCHILD that his truck was searched and Smith disclaimed ownership of an unidentified item.  Smith stated the police used a drug detector dog to locate the item. Smith stated the he refused to sign a disclaimer for the item. Bobby FAIRCHILD told Smith that he will speak to him in person.

93.     In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD and Smith are discussing the seizure of approximately $283,000.00. It is believed that Smith was transporting the money for Bobby FAIRCHILD (Reference the above paragraph and the seizure listed in paragraph 50).    This call is also indicative that Smith uses multiple telephones for the purpose of evading law enforcement.  This fact is evident in that in the previous paragraph Smith was utilizing telephone number (918) 440-4345 and during this call Smith was utilizing telephone number (918) 571-2059.

94.     On August 16, 2008, at approximately 11:47 a.m., Bobby FAIRCHILD, utilizing **EDOK TARGET TELEPHONE #2,** called telephone number: (918) 440-4345 and spoke with Jimmy Smith.  Bobby FAIRCHILD asked if Smith had spoken with his attorney.  Smith stated that he has not.  Bobby FAIRCHILD told Smith to tell the authorities to release the money because the authorities have to prove the money is drug proceeds.  Bobby FAIRCHILD commented that is what he did for his (Bobby FAIRCHILD) money seizure.    Bobby FAIRCHILD also agrees to meet Smith in person.

95.     In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD and Smith are discussing the seizure of approximately $283,000.00. It is believed that Bobby FAIRCHILD is giving Smith advise on how to get the money back from law

47

enforcement officials. (Reference the above two paragraphs and seizure listed in paragraph 50).

96.   On August 18, 2008, at approximately 2:43 p.m., Richard Burris, utilizing an unknown telephone number, called Bobby FAIRCHILD on **EDOK TARGET TELEPHONE #2**. Burris stated he has spoken to "Donny" about a recent money seizure. Burris mentioned that a traffic stop occurred involving the Oklahoma Highway Patrol that led to the seizure of an unknown quantity of money. Burris told "Donny" that the money seizure was illegal and that "Donny" said it was "Bullshit." Burris stated his wife took a retainer fee to "Donny." Bobby FAIRCHILD estimated that "Donny" will charge him $1,500.00 for his legal services. Bobby FAIRCHILD also stated that he employed "Donny" when he had an unknown quantity of money seized from him on an unspecified date.

97.   In the conversation in the previous paragraph, it is believed that "Donny" is actually Oklahoma Attorney Donn Baker. The currency to which Bobby FAIRCHILD is alluding has been seized by the Oklahoma Highway Patrol (OHP) (Reference paragraphs 78, 84 and 50). It is believed that approximately $15, 000.00 was seized from Burris during the transportation of money/drugs for Bobby FAIRCHILD.

98.   On August 18, 2008, at approximately 5:39 p.m., Richard Burris, utilizing telephone number (918) 458-7759, called Bobby FAIRCHILD on **EDOK TARGET TELEPHONE #2**. During the conversation Burris informed Bobby FAIRCHILD that he (Burris) had not heard anything back from "Donny". Bobby FAIRCHILD informed Burris to wait for "Donny" to call back. Bobby FAIRCHILD mentioned that he should bring up his deal with "Donny" but he (Donny) would tell Bobby FAIRCHILD to "leave that shit alone". Bobby FAIRCHILD believed he could make them give "it" back to him, but Bobby FAIRCHILD also

48

believes that would probably cause him "too much heat" and that he (Bobby FAIRCHILD) "could not stand it." During the conversation Bobby FAIRCHILD told Burris the main thing is to tell that "it" was acquired recently. Bobby FAIRCHILD further stated that if he had the "money" for a long time they would be able to check the serial numbers on the bills and if any bills were new they would know he (Burris) had not had the money for a long time. Burris also stated that "Donny" was angry about "it".

99.     In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD and Burris are alluding to a seizure of nearly $15,000 from Burris on August 16, 2008. It is also believed when Bobby FAIRCHILD is mentioning he could make them give "it" back Bobby FAIRCHILD, that he (Bobby FAIRCHILD) is referring to money seized by law enforcement from Bobby FAIRCHILD. It is also believed that Bobby FAIRCHILD is giving Burris information on how Burris should attempt to get the seized money back from law enforcement.

100.    On August 20, 2008., at approximately 4:58 p.m., Jimmy Smith, utilizing telephone number (918) 440-4345 contacted Bobby FAIRCHILD on **EDOK TARGET TELEPHONE #2**. Smith and Bobby FAIRCHILD talked about an Unidentified Subject (US) that may try to claim the money. Smith stated "If that boy will come clean it'll sure take a lot of heat off me." Smith told Bobby FAIRCHILD that the money was seized in Nashville, Tennessee. Smith later provided Bobby FAIRCHILD with the name and telephone number of the Attorney in Tennessee. Bobby FAIRCHILD mentioned that he is going to call that Attorney.

101.    In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD and Smith are discussing the seizure of approximately $283,000.00. It is believed that Bobby FAIRCHILD and Smith are discussing ways to legitimize the illegal proceeds in

49

attempt to get the money back from law enforcement officials. (Reference the seizure listed in paragraph 50).

## EDOK TARGET TELEPHONE #3

102.   On August 14, 2008, at approximately 12:57 p.m., Bobby FAIRCHILD utilized telephone number (918) 457-8368 (**EDOK TARGET TELEPHONE #3**) to contact (918) 696-1755 (**EDOK TARGET TELEPHONE #2**).   Bobby FAIRCHILD called and spoke with someone from a restaurant and indicated he left his phone and will be retuning shortly to pick it up.

103.   In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD had forgotten **EDOK TARGET TELEPHONE #2** at the restaurant and utilized **EDOK TARGET TELEPHONE #3** to contact **EDOK TARGET TELEPHONE #2**.   It is believed that a restaurant employee answered **EDOK TARGET TELEPHONE #2**. This phone call is also indicative that Bobby FAIRCHILD is in possession of and/or has access to **EDOK TARGET TELEPHONE #3**.

104.   On August 5, 2008, at approximately 7:33 p.m., Bobby FAIRCHILD, utilized **EDOK TARGET TELEPHONE #3**, to contact Jose Esparza on **EL PASO'S TARGET TELEPHONE #7**. Jose told Bobby FAIRCHILD that he had been trying to call him and Bobby FAIRCHILD said that he was bull riding with his son. Jose told Bobby FAIRCHILD that he was working on his track. Jose asked Bobby FAIRCHILD when was he getting home and Bobby FAIRCHILD said on Monday.   Bobby FAIRCHILD told Jose to write the number and (918) 457-8368 with the usual area code. Bobby FAIRCHILD told Jose that was the number that he (Jose) needed to be calling.

105.   In the conversation in the previous paragraph, it is believed that Bobby

FAIRCHILD is notifying Esparza of Bobby FAIRCHILD's new telephone Number (**EDOK TARGET TELEPHONE #3**). This phone call is also indicative that Bobby FAIRCHILD is in possession of **EDOK TARGET TELEPHONE #3** and utilizing the telephone to contact known drug traffickers.

## TELEPHONE TOLL ANALYSIS OF EDOK TARGET TELEPHONE #3

### (918) 457-8368

106.   The use of telephone toll records and pen register data to record numbers dialed or pulsed over various telephones; show specific telephone numbers have been called.   Such information does not indicate the manner or delivery of a drug shipment, or the methods the organization uses to import and distribute the drugs.  This type of information does not specify the identity, participation and role of the person(s) initiating or receiving the telephone calls, or the importation and distribution network of which the **TARGET INTERCEPTEES**, and others as yet unknown, are a part of.  At best, this information provides evidence of contact between telephone numbers subscribed to certain people.  Subscriber information records subpoenaed by law enforcement only provide the name of the person(s) to whom the telephone number(s) is/are assigned and does not provide accurate data about who actually speaks on the telephone.  This information is not adequate, because it is the content of the calls, not the fact that they are being made, that will reveal the totality and complexity of the conspiracy.

107.   On August 27, 2008, United States Magistrate Judge Kimberly E. West, Eastern District of Oklahoma, signed a Pen Register Order, Under Seal, authorizing the capturing of telephone numbers placing calls to/from **EDOK TARGET TELEPHONE #3** (918) 457-8368, in addition to any other dialed digits. A Pen Register for this telephone number was installed on August 28, 2008. Toll records have also been obtained through AT&T Wireless for the period of

51

July 27, 2008 through August 26, 2008.

108.   I have conducted an analysis of pen register, trap and trace and toll information for **EDOK TARGET TELEPHONE #3**.  Based upon my review of the calls made to and from this telephone facility, I believe that **EDOK TARGET TELEPHONE #3** is being used to contact conspirators (on telephones not subject to court-authorized interception) in furtherance of the criminal activity specified above.  A synopsis of the pen register, trap/trace and tolls data which substantiates my belief regarding the use of **EDOK TARGET TELEPHONE #3** follows.

109.   As a result of toll records from July 27, 2008 through August 26, 2008 **EDOK TARGET TELEPHONE #3** has placed/received four hundred (400) total telephone calls to/from different numbers.

110.   **EDOK TARGET TELEPHONE #3** placed/received seventy-three (73) calls to/from (918) 457-8039 between July 30, 2008 and August 22, 2008.  According to the analysis conducted on the tolls for **EDOK TARGET TELEPHONE #3**, August 22, 2008, was the last day **EDOK TARGET TELEPHONE #3** placed/received a call to/from (918) 457-8039. Telephone number (918) 457-8039 has been identified as being the telephone number subscribed to Richard Burris, RR 4, Box 1632, Checotah, Oklahoma.  A records check indicates that Richard Burris, also known as (AKA) James Gilbert.  The records check further indicates that Richard Burris, AKA James Gilbert, was arrested in November 1998, for trafficking marijuana. DEA records and investigations indicate that in November 2004, Richard Burris, AKA James Gilbert, was also involved in the clandestine manufacturing and distribution of methamphetamine in Adair County, Oklahoma.

111.   **EDOK TARGET TELEPHONE #3** placed/received one (1) calls to/from (915) 217-8066 on August 16, 2008.  Telephone number (915) 217-8066 has been identified as being

52

the telephone number subscribed and utilized by Jose Esparza, 12031 Valley Quail Drive, El Paso, Texas. As previously listed, Esparza is the current target in an on going Title III investigation out of El Paso Texas. During the investigation recorded conversations were captured between **EDOK TARGET TELEPHONE #3** and (915) 217-8066.

112. **EDOK TARGET TELEPHONE #3** placed/received twelve (12) calls to/from (817) 733-7015 between August 8, 2008 and August 22, 2008. According to the analysis conducted on the tolls for **EDOK TARGET TELEPHONE #3**, August 22, 2008 was the last day **EDOK TARGET TELEPHONE #3** placed/received a call to/from (817) 733-7015. DEA indices indicate that this telephone is subscribed to Alfredo Guzman in Ft. Worth, Texas. During this ongoing investigation recorded conversations were captured between **EDOK TARGET TELEPHONE #1** (no longer utilized by Bobby FAIRCHILD) and (817) 733-7015 discussing the transportation and distribution of illegal drugs.

113. **EDOK TARGET TELEPHONE #3** (918) 457-8368 placed/received twenty-four (24) calls to/from (270) 994-2504 between August 1, 2008, and August 20, 2008. According to the analysis conducted on the tolls for **EDOK TARGET TELEPHONE #3**, August 20, 2008, was the last day **EDOK TARGET TELEPHONE #3** placed/received a call to/from (270) 994-2504. DEA indices indicate that this telephone is utilized by Harvey FRENCH in Kentucky. Affiant has learned that Harvey FRENCH is a target in ongoing DEA investigations in Oklahoma and Kentucky. Affiant further learned that Harvey FRENCH is an associate of Sammy VALDIVIA, the leader of a large scale drug trafficking organization responsible for distributing thousands of pounds of marijuana throughout the United States. FRENCH is a key member of the VALDIVIA drug trafficking organization. Affiant believes that Harvey FRENCH is utilizing telephone (270) 522-7126 to assist with his ongoing criminal

53

enterprise.

114.    Based on my training and experience, narcotics traffickers often carry multiple cellular telephones. Each of these cellular telephones is assigned a different telephone number. Each cellular telephone is utilized by the narcotics trafficker to make contact with specific members of the drug trafficking organization when needed. This method of communication is commonly used by narcotics traffickers for the purpose of concealing their identity to law enforcement if one or more of the members of the drug trafficking organization were arrested. Based on the pen register activity of **EDOK TARGET TELEPHONE #3** to include the number of calls made by **EDOK TARGET TELEPHONE #3** to various cellular telephones along with the volume of calls made to specific telephones, affiant believes that **EDOK TARGET TELEPHONE #3** is specially being utilized by Bobby FAIRCHILD for the purpose of narcotics trafficking negotiations.

## NEED FOR INTERCEPTION

115.    Normal investigative procedures have been tried and failed or appear unlikely to succeed if tried, or are too dangerous to employ. These investigative procedures are detailed below. Traditional methods of investigation will not be sufficient to accomplish the full goals of this investigation, which include discovering:

a.      The manner and means of the commission of the offenses;

b.      The nature, extent and methods of operation of the drug trafficking business of the **TARGET INTERCEPTEES** and others yet unknown;

c.      The identities and roles of accomplices, aiders, abettors, co-conspirators and participants in their illegal activities;

d.      The distribution and transfer of the contraband money involved in criminal activities;

e.      The existence and location of records;

54

f.      The location and source of resources used to finance illegal activities;

g.      The locations and items used in furtherance of those activities;

h.      The location of facilities used to store narcotics in preparation of their further distribution;

i.      The location and disposition of the proceeds of the **TARGET INTERCEPTEES**' illegal activities; and

j.      The physical location of the **TARGET INTERCEPTEES**, co-conspirators, and associates.

## PHYSICAL SURVEILLANCE

116.    Physical surveillance has been regularly utilized by investigating agents in this case, and has proven useful in gathering some information as to areas frequented by Bobby FAIRCHILD. Physical surveillance, however, unaccompanied by electronic surveillance, is of limited value. For example, physical surveillance has not and will not enable agents to gather evidence of the whole scope of Bobby FAIRCHILD's criminal activity under investigation, and has not, and most likely will not establish conclusively the identities of various co-conspirators, including the identity of all the individuals supplying Bobby FAIRCHILD with narcotics or the identity of those to whom Bobby FAIRCHILD is selling the narcotics.

117.    Furthermore, the ultimate destination of the drug and currency shipments coordinated by Bobby FAIRCHILD is unknown; therefore, there has been no opportunity to perform physical surveillance on these locations. In addition, the location of Bobby FAIRCHILD's residence and property does not allow for effective surveillance. Bobby FAIRCHILD's property is located in rural Muskogee County, Oklahoma. The appearance of strange vehicles would arouse suspicion. In addition, the layout of the outbuildings would prevent observation of the residence from the roadway. Accordingly, the prospects for fruitful

physical surveillance at this time are extremely limited. In addition, based on my experience and training, drug traffickers are extremely surveillance conscious. If the intensity of existing surveillance were to be increased, and if the subjects of this investigation became alerted to the existence of such surveillance, the result might be the temporary cessation of their illegal activities or a change in their instrumentalities or methods at a critical point in the investigation. Moreover, physical surveillance will not assist law enforcement in identifying **TARGET INTERCEPTEES** or narcotics-related locations in other states. Physical surveillance, unaccompanied by electronic surveillance, is also unlikely to identify additional conspirators and their respective roles, the methods by which the narcotics are imported into and distributed in the United States, or to accomplish all of the other goals of this investigation. For the foregoing reasons, I do not believe that physical surveillance alone will be sufficient to accomplish the goals of the investigation.

## STATIONARY SURVEILLANCE

118.   Stationary surveillance, in the form of a police camera or closed circuit television, will not be sufficient to accomplish the goals of the investigation. Stationary surveillance, even when it can be utilized effectively, is unlikely to establish the nature and scope of Bobby FAIRCHILD's drug activities or the roles and identities of co-conspirators. Stationary surveillance, unaccompanied by the requested wire interception, would be insufficient to conclusively establish the identity of individuals at the identified residences who are involved in narcotics trafficking. Individuals who assist Bobby FAIRCHILD with the shipment, delivery and sale of narcotics would also be very difficult to identify.

119.   The use of pole cameras for remote surveillance would not be possible and if attempted could compromise the investigation. The only location which has been identified is the

residence of Bobby FAIRCHILD. As previously described, the location of this residence makes it such that the installation of a pole camera would not yield an appreciable amount of intelligence. In addition, the equipment and activity associated with the installation would be readily noticed and highly suspicious. Experience has shown that pole cameras, which must be placed on a utility pole with an integral power source, are placed too far away to accurately record the license plates of vehicles. Distance also prevents accurate recognition of the faces of people entering and leaving Bobby FAIRCHILD's residence. Another obstacle to stationary surveillance devices is that at night, even when augmented by artificial lights such as street lamps, the effectiveness of stationary surveillance is dramatically reduced.

120. Even if agents were successful in installing a pole camera at Bobby FAIRCHILD's residence, the information provided by this stationary surveillance device is limited. It would be unlikely that vehicles would load or unload drugs in view of the camera. Agents believe that if this type of activity would occur it would more than likely occur in one of the buildings located on the ranch. In addition, the use of pole cameras would not reveal the location of pickup and delivery points in other states, nor would it identify the other individuals involved in the organization.

## TELEPHONE TOLL RECORDS, PEN REGISTER, AND TRAP AND
## TRACE INFORMATION

121. Telephone toll, pen register, traps and trace information and data are of limited use in a traditional wire intercept investigation. The use of telephone toll records, and pen registers and trap and trace data has uncovered significant activity on **EDOK TARGET**

**TELEPHONE #3** and the other telephones being used by organization members and associates. However, due to the fact that members of the organization can disguise, change or conceal the actual users of the telephones, subscriber information obtained from toll records and pen register and trap and trace data is not very helpful or insightful.  Subscriber information records only reveal the name of the person to whom the telephone number is assigned and not the actual or ultimate user.  Pen register and trap and trace data and telephone toll records only allow the review of telephone numbers called and the duration of an unknown conversation.  Additionally, a Mexican cell phone's pen register, trap and trace, and toll data can only be captured when that telephone is utilized within the U.S.  Further, DEA cannot obtain subscriber information, pen register, trap and trace, and toll records for Mexican phones.  The accumulation of numerical statistics only indicates the known fact that the criminal subjects are regularly conversing and communicating with other individuals.  These records cannot provide the identities of the people actually making or receiving the telephone calls, their degree of criminal involvement, or any details concerning the matters discussed.  The information alone is inadequate, in that it is the content of the calls, not the fact that they are being made, that will reveal the extent of the criminal activity and the conspiracy.

122.    While DEA knows that the **TARGET INTERCEPTEES** are communicating with each other and others unknown, information derived from this data does not advise DEA who the **TARGET INTERCEPTEES** are talking to, the nature of the conversations, the manner in which they are committing the crime, the identities of the coconspirators or the location of the **TARGET INTERCEPTEES**.

**GLOBAL POSITIONING SYSTEM (GPS)**

123.    Since **EDOK TARGET TELEPHONE #3** is a United States cell phone, DEA

58

agents would be able to obtain a court warrant to authorize the activation and/or monitoring of the Global Positioning System (GPS) function of **EDOK TARGET TELEPHONE #3** to determine and to track the movement and location of **EDOK TARGET TELEPHONE #3**. However, the Los Angeles Field Division HIDTA Group 47 advised DEA agents that pursuant to a California State court authorized wire interception, they were pinging their target telephone in an attempt to locate their subject and make a large currency seizure. What the agents didn't know and what was later confirmed by Sprint/Nextel Representatives after the fact, based on their CS' information, is that every time the agents pinged the Target Telephone, a notice was going into the GPS function of his cellular telephone and confirming that law enforcement elements were pinging his telephone which was depicted with all zeros on the telephone screen. This information further corroborated why the Target had numerous cell phones and discontinued his use on a frequent basis.   This is a function built into the cell phones by the individual manufacturer.  Thus, obtaining a court warrant to authorize the activation and/or monitoring of the Global Positioning System (GPS) function of **EDOK TARGET TELEPHONE #3** may compromise the integrity of this investigation.

<u>**USE OF SEARCH WARRANTS**</u>

124.   At this stage of the investigation, without additional information from electronic surveillance and other sources, the execution of search warrants in this matter could not be reasonably expected to produce incriminating evidence indicative of the full scope of the **TARGET INTERCEPTEES'** activities or the identity of all co-conspirators.   Also search warrants would not be appropriate at this stage of the investigation, as the locations where the **TARGET INTERCEPTEES** receive, hide, and distribute their drugs have not been identified. It is my opinion that without electronic surveillance of the **TARGET INTERCEPTEES**, law

enforcement will not be able to fully identify all of the stash locations used by Bobby FAIRCHILD or his co-conspirators on which to execute search warrants.

125.     Furthermore, it is unlikely that all or even many of the co-conspirators would be present during the execution of any search warrants at the various locations, which may become the subject of search warrants in the future. Those not present during the execution of the search warrants would likely be alerted to the existence of this investigation, allowing them to further insulate themselves from successful detection. Furthermore, I know that following seizures and other enforcement activity, it is common practice for trafficking groups to flee to Mexico for months at a time, apparently returning only after assuring themselves that law enforcement is no longer interested in their activities.

## USE OF UNDERCOVER AGENT(S)

126.     The use of undercover (UC) government agents to infiltrate the **TARGET INTERCEPTEES'** organization does not appear likely to succeed in producing evidence that will achieve all of the goals of the investigation. At this juncture in the investigation, Affiant believes it would be of little value to introduce an under cover agent into the DTO. Essentially, under these circumstances in this investigation, there is not a role which an undercover agent could assume to further the investigation.

127.     I have learned through agents with the Oklahoma Bureau of Narcotics (OBN) concerning the use of undercover agents (UC) into the Bobby FAIRCHILD Drug Trafficking Organization (DTO). During the course of the OBN investigation into Bobby FAIRCHILD's DTO, beginning in or around 2002, UC agents were utilized to make a purchase from members of the DTO. The use of undercover agents was successful to a limited degree with lower level

members of the DTO.  Further attempts to utilize UC agents for the purpose of purchasing and identifying higher ranking organization members failed.

128.    The use of undercover agents is an important part of an investigation of narcotics law violations. However, unless an undercover agent is taken into the confidence of significant narcotics violators, he/she is unlikely to learn the full scope of the violators' illegal activities. In addition, it is not in the interest of narcotics violators to reveal to others, including other narcotics traffickers, the way he/she conducts his/her narcotics trafficking activities, since other traffickers may seek to interfere with those activities.

### CONFIDENTIAL SOURCE/SOURCE OF INFORMATION

129.    Since the beginning of the Oklahoma Bureau of Narcotics (OBN) investigation, attempts have been made to identify confidential informants capable of infiltrating, providing testimony and fully neutralizing the illegal activities of the **TARGET INTERCEPTEES** and other co-conspirators not yet identified.  To date, the government has been unsuccessful in locating such a confidential informant.  Although the OBN has identified and utilized a Source of Information (SOI) who was successful in the introduction of an agent to a lower ranking member of the drug trafficking organization.  The SOI is currently not in a position to infiltrate the current Interceptees.

### USE OF GRAND JURY SUBPOENAS

130.    Based on my training and experience, I believe that serving grand jury subpoenas on persons and their associates believed to be involved in this conspiracy would not be successful in achieving the stated goals of this investigation.  If Bobby FAIRCHILD, his co-conspirators, or other participants were to be called to testify before a grand jury, they would

most likely be uncooperative and invoke their Fifth Amendment privilege not to testify.

131.   The issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the **TARGET INTERCEPTEES** to this investigation.  Witnesses who could provide additional relevant evidence to a grand jury have not been identified or would themselves be participants trafficking drugs. Such individuals would face prosecution themselves; it is unlikely therefore that any of them would testify voluntarily.  Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony.   Immunizing them could thwart the public policy that they be held accountable for their crimes.  Moreover, it is likely that such subjects would prefer to be held in contempt rather that testify.

132.   The issuance of grand jury subpoenas to other individuals likely would not lead to the discovery of critical information and undoubtedly would alert the **TARGET INTERCEPTEES** to the pendency of an investigation.  Moreover, not all of the **TARGET INTERCEPTEES** have been identified or located, and, in absence of further evidence identifying co-conspirators and their respective involvement in drug trafficking, it is difficult to determine whom to subpoena to the Grand Jury.   Finally, some of the **TARGET INTERCEPTEES** may travel or live outside the United States, beyond the Grand Jury's subpoena power.

## INTERVIEWS OF TARGET INTERCEPTEE

133.   Based upon my training and experience, I believe interviews of Bobby FAIRCHILD, or his other known and unknown associates, would produce negligible results and also compromise the investigation. Foremost, the majority of the **TARGET INTERCEPTEES** have not yet been identified or located.  I also believe that any responses to interviews would

contain a significant number of untruths, diverting the investigation with false leads that would frustrate the purposes of this investigation. Additionally, questioning any of the co-conspirators would alert the other co-conspirators, and cause a change in their methods of operation before all of the co-conspirators are identified, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence, and the possibility of harm to cooperating sources whose identities may become known or whose existence may otherwise be compromised. Finally, for the same reasons set forth above in connection with use of Grand Jury subpoenas, the use of interviews will not accomplish the stated goals of this investigation, and would prematurely alert Bobby FAIRCHILD and co-conspirators of this investigation.

### FINANCIAL INVESTIGATION

134.   Although this investigation has lead Agents to believe that money laundering has been committed, is being committed and/or will be committed, Agents have not obtained any financial records, but are beginning to identify assets. DEA Tulsa is waiting to seize U.S. currency and/or illegal drugs before moving forward with an aggressive financial investigation.

### OTHER COURT AUTHORIZED WIRE INTERCEPTIONS

135.   If the Court were to authorize the interception of conversations occurring over **EDOK TARGET TELEPHONE #3**, I believe that these interceptions would confirm that Bobby FAIRCHILD distributes large quantities of narcotics throughout the United States and would provide information on who are Bobby FAIRCHILD's co-conspirators. Further, the intercepted conversations of Bobby FAIRCHILD will possibly provide Agents with Bobby FAIRCHILD's day-to-day drug activities and will fully disclose the conversations between Bobby FAIRCHILD and other interceptees. I believe that conducting a court authorized wire

interception of conversations occurring over **EDOK TARGET TELEPHONE #3**, which is utilized by Bobby FAIRCHILD, will also assist Agents to identify possible stash houses in the Muskogee, Oklahoma, area.

## TRASH SEARCHES

136.   No trash searches at this stage of this investigation have been conducted.   The reason for this is that no locations have been credibly established as stash houses that would likely yield any controlled substances, or potentially useful evidence.   Therefore, no intelligence can be gathered utilizing this investigative technique.   The **TARGET INTERCEPTEES'** heightened awareness of law enforcement surveillance will likely cause them to become even more cautious in their illegal activities.   In addition, the use of trash searches to gain intelligence is not possible at Bobby FAIRCHILD's residence.   As previously described, it is located off of the main road in a rural area.   There is no central location for the accumulation of trash by area residents.   Therefore, the risk of being detected and compromised during a trash search far outweighs the amount of intelligence to be gained from an effort.   I believe that only a court authorized wire interception conducted on **EDOK TARGET TELEPHONE #3** will be able to provide real time information that will allow this investigation to attain the investigative goals set forth herein.

## ARRESTS

137.   Attempting to arrest the **TARGET INTERCEPTEES** at this point would mean that several of the objectives of this investigation would be unfulfilled.   Most of the **TARGET VIOLATORS** have yet to be identified.   If the DEA tried to make any arrests, unidentified co-conspirators would almost certainly cease their illegal activities or change the locations,

64

instrumentalities and methods used to conduct their illegal activities, thereby frustrating the investigation.

138.    As discussed above, the purpose of this investigation is to identify, locate and arrest the persons responsible for the importation and distribution of the above-described shipments of Methamphetamine.    As indicated above, and as discussed below, several investigative techniques have been tried, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ to achieve these objectives

139.    For the above listed reasons, I believe that alternative investigative techniques would fail to accomplish the objectives of the investigation.

## MINIMIZATION

140.    All monitoring of wire communications over the **TARGET TELEPHONES** will be minimized in accordance with Chapter 119 of Title 18, United States Code.

141.    The investigative or law enforcement officers of the United States and translators, if necessary, who are to carry out the requested interception of wire communications, will be instructed concerning the steps they should take to avoid infringing upon any attorney-client privilege or other recognized privileges.   In addition, all communications intercepted will be conducted in such a way as to minimize the interception of communications not otherwise criminal in nature or subject to interception under Chapter 119, Title 18, United States Code. All monitoring will cease when it is determined that the monitored conversation is not criminal in nature.   Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that target subjects or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.   If

an interception is minimized, monitoring agents shall spot check to insure that the conversation has not turned to criminal matters.

142.    It is requested that the order provide that, if necessary, translators be authorized to assist in conducting this wire surveillance and to receive disclosure of intercepted communication.   Certain subjects of this investigation may communicate with each other in Spanish. It is therefore necessary to secure the services of translators in order to assist the agents in monitoring the wire surveillance and translating the intercepted communications.   All such translators will be under contract to the DEA and will be directly supervised by the DEA and/or deputized law enforcement officers. It is further requested, pursuant to Section 2518(5), Title 18, United States Code, that in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, that minimization may be accomplished as soon as practicable after such interception.

## AUTHORIZATION REQUEST

143.    As described above, **EDOK TARGET TELEPHONE #3** is crucial to the drug transportation/distribution activities of the Bobby FAIRCHILD Drug Trafficking Organization. Bobby FAIRCHILD is believed to use (918) 457-8368 (**EDOK TARGET TELEPHONE #3**) to coordinate the pick up and transportation schemes of drug and currency shipments arranged by Bobby FAIRCHILD and other individuals not yet identified.

144.    Based on the foregoing, it is my opinion that the interception of communications occurring over **EDOK TARGET TELEPHONE #3**, as specified above, is essential to uncover the full scope of the illegal activity described herein.

66

145.   Inasmuch as the illegal operation described herein is a continuing conspiracy involving persons as yet unidentified and unknown, it is requested that it be ordered, as more fully stated in the accompanying application, that authorization to intercept not terminate when the sought wire communications are first obtained, but continue until interception fully reveals the objectives set forth above, or for a period of thirty (30) days, whichever is earlier.  The 30-day period shall be measured from the date on which a law enforcement agent first begins to conduct the interception under the court order or ten days after the order is entered, whichever is earlier.

146.   Pursuant to the provisions of Title 18, United States Code, Sections 2518 (4), it is requested that it be ordered that AT&T Wireless, the service provider for **EDOK TARGET TELEPHONE #3,** furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the person whose communications are to be intercepted (including all dial digits, including all incoming and outgoing calls pen register information, and audio interception capability whether the cellular telephone is in roaming mode or otherwise).  The assistance of this provider is required to accomplish the objectives of the requested interceptions.  Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

147.   Because the need for contemporaneous information concerning the intercepted communications is especially important in the present investigation, it is further requested that AT&T Wireless, and any other service providers of intercepted telephone calls be ordered to provide originating and terminating cell site information for the intercepted wire communications, by permitting the DEA to access such information.  It is requested that this

affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

Cory Hallum, Special Agent
United States Drug Enforcement Administration

Subscribed and sworn to before me this **5** th day of September, 2008.

JAMES H. PAYNE
UNITED STATES DISTRICT JUDGE

I hereby certify that the annexed instrument is a true and correct copy of the original on file in my office.

ATTEST: WILLIAM B. GUTHRIE
Clerk, U.S. District Court
Eastern District of Oklahoma

BY _____ Deputy Clerk

DATED ___9/5/08___

68