

FILED

DEC 1 1 2008

WILLIAM B. GUTHRIE
Clerk, U.S. District Court

By:_____ Deputy Clerk

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF OKLAHOMA

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA FOR        Case No. 08-MC-21-JHP
AN ORDER AUTHORIZING THE INTERCEPTION
OF WIRE COMMUNICATIONS

### MOTION FOR LEAVE TO DISCLOSE
### SEALED APPLICATIONS FOR WIRE INTERCEPTION

COMES NOW the United States of America, through Sheldon J. Sperling, United States

Attorney for the Eastern District of Oklahoma, and Rob Wallace, Assistant United States

Attorney, and moves this Honorable Court to allow the government to disclose the contents of

the applications for wire interception in the noted case numbers to United States Magistrate

Judge Steven P. Shreder. In support of its motion, the government alleges and states:

    1.    The government has applied to this Court for and received from this Court the

following Title III wire intercepts:

|     |                      |                    |
|-----|----------------------|--------------------|
| a.  | (918) 704-5940       | July 23, 2008      |
| b.  | (918) 696-1755       | August 8, 2008     |
|     | Extended             | September 5, 2008  |
|     | Extended             | October 10, 2008   |
| c.  | (918) 457-8398       | September 5, 2008  |
|     | Extended             | October 3, 2008    |
| d.  | (918) 629-3876       | November 3, 2008   |
| e.  | (270) 994-3072       | December 2, 2008   |

    2.    Each of the intercept applications has been supported by an affidavit of Drug

Enforcement Administration (DEA) Special Agent Cory Hallum, DEA Tulsa Resident Agency.

    3.    Each of the applications, orders and supporting materials have been filed with this

Court under seal and access to the matters has been strictly limited.



GOVERNMENT
EXHIBIT
D

4.      On December 5, 2008, and December 8, 2008, pleadings were presented to United States Magistrate Judge Steven P. Shreder seeking the issuance of a complaint and arrest warrants on **BOBBY FAIRCHILD, MICHAEL CASON, aka Mike Cason, RICHARD BURRIS, LOUIS MONTOYA, JIMMY SMITH, CALVIN HARVEY FRENCH, aka Harvey French,** and **ALFREDO GUZMAN,** for violations of Title 21, United States Code, Section 846. Magistrate Judge Shreder declined to find probable cause to issue the arrest warrants. The pleadings included an affidavit of DEA Special Agent Michael Rupe purporting to set forth probable cause to believe that the noted subjects had conspired to violate the federal drug law. The affidavit summarized portions of the above-listed wire intercept applications.

5.      The government intends to re-present the Application for a Criminal Complaint to Magistrate Judge Shreder. Permission to disclose the intercept applications as part of its Application for Criminal Complaint will allow Magistrate Judge Shreder access to the sealed documents without the necessity and burden to recreate such documents as part of the affidavit to support the complaint and arrest warrants.

6.      Extant investigative, operational and safety concerns regarding the unsealing and disclosure of the materials contained within the subject documents, operate to limit the scope of the requested disclosure to Magistrate Judge Shreder.

WHEREFORE, premises considered, the government respectfully prays this Honorable Court for permission to disclose the above-listed Applications for Wire Interception, including the attached Affidavits in Support, to Magistrate Judge Shreder.

SHELDON J. SPERLING
United States Attorney

ROB WALLACE, OBA #13130
Assistant United States Attorney

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

**FILED**

NOV - 3 2008

WILLIAM B. GUTHRIE
Clerk, U.S. District Court

By_____
Deputy Clerk

IN THE MATTER OF THE APPLICATION        )
OF THE UNITED STATES OF AMERICA FOR      )
AN ORDER AUTHORIZING THE INTERCEPTION   )
OF WIRE COMMUNICATIONS                   )
                                         )
                                         )

**MC 08-021- JHP**

## ORDER AUTHORIZING THE INTERCEPTION OF
## WIRE COMMUNICATIONS

Application under oath having been made before me by Rob Wallace, Assistant United States Attorney, Eastern District of Oklahoma, United States Department of Justice, an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and an attorney for the Government as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure, for an Order authorizing the interception of wire communications pursuant to Section 2518 of Title 18, United States Code, and full consideration having been given to the matter set forth therein, the Court finds:

a.    there is probable cause to believe that Bobby FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, Michael SHEETS, Steve TANKERSLEY, Stephen TURLEY, Tony VILLALOBOS, Gene BROWN, Josh DUKE, Antonio ORTIZ, Danny HOUSTON, Tommy KILGORE, Melinda FAIRCHILD, Johnny WILLIS, and others as yet unknown have committed, are committing, and will continue to commit offenses involving the importation and distribution of (and possession with intent to distribute) controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843(b), 846, 952, 960 and 963; the laundering of monetary instruments being the proceeds from a specified unlawful activity and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1956 and/or 1957; interstate and foreign travel to promote, manage, establish, carry-on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity, to wit: an enterprise involving a controlled substance, in violation of Title 18, United States Code, Section 1952;  possession of a firearm by prohibited person (felon), in violation of Title 18, United States Code, Section 922(g)(1); and possession of a firearm during and in relation to or in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c);

b.    there is probable cause to believe that particular wire communications of Bobby FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH,

Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, Michael SHEETS, Steve TANKERSLEY, Stephen TURLEY, Tony VILLALOBOS, Gene BROWN, Josh DUKE, Antonio ORTIZ, Danny HOUSTON, Tommy KILGORE, Melinda FAIRCHILD, Johnny WILLIS, and others as yet unknown concerning the above-described offenses will be obtained through the interception for which authorization is herein applied. In particular, there is probable cause to believe that the communications to be intercepted will concern the telephone numbers of associates of Bobby FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, Michael SHEETS, Steve TANKERSLEY, Stephen TURLEY, Tony VILLALOBOS, Gene BROWN, Josh DUKE, Antonio ORTIZ, Danny HOUSTON, Tommy KILGORE, Melinda FAIRCHILD, Johnny WILLIS, and the dates, times, places and plans for commission of the aforementioned federal felony offenses when Bobby FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, Michael SHEETS, Steve TANKERSLEY, Stephen TURLEY, Tony VILLALOBOS, Gene BROWN, Josh DUKE, Antonio ORTIZ, Danny HOUSTON, Tommy KILGORE, Melinda FAIRCHILD, Johnny WILLIS, and others as yet unknown communicate with their co-conspirators, aiders and abettors and other participants in the conspiracy, thereby identifying the co-conspirators and others as yet unknown, their places of operation, (etc.). In addition, these communications are expected to constitute admissible evidence of the above-described offenses;

      c.    It has been established adequately that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ;

      d.    there is probable cause to believe that the cellular telephone assigned telephone number (918) 629-3876, International Mobile Subscriber Identity (IMSI) 310410212273837, which is an AT&T cellular telephone, the subscriber to which is unknown, has been, is being and will continue to be used in connection with the commission of the above-described offenses.

      WHEREFORE, IT IS HEREBY ORDERED that Special Agents of the Drug Enforcement Administration are authorized to intercept wire communications over the above-described facilities.

2

PROVIDED that such interception(s) shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which fully reveal the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception under this Order or ten (10) days after this Order is entered, whichever is earlier.

IT IS ORDERED FURTHER that, pursuant to 18 U.S.C. § 2518(3), in the event that the target facility is transferred outside the territorial jurisdiction of this court, interceptions may take place in any other jurisdiction within the United States.

IT IS ORDERED FURTHER that, based upon the request of the Applicant pursuant to Section 2518(4) of Title 18, United States Code, AT&T Wireless, a communication service provider(s) as defined in Section 2510(15) of Title 18, United States Code, shall furnish, and continue to furnish, the Applicant and the investigative agency/agencies with all information, facilities, and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such provider(s) is according the persons whose communications are to be intercepted, with the service provider(s) to be compensated by the Applicant for reasonable expenses incurred in providing such facilities or assistance.

IT IS ORDERED FURTHER that, to avoid prejudice to the Government's criminal investigation, the above provider(s) of wire communication service and its agents and employees are ordered not to disclose or cause a disclosure of this Order or the request for information, facilities, and assistance by the Drug Enforcement Administration or the existence of the investigation to any person other than those of its agents and employees who require said information to accomplish the services hereby ordered. In particular, said provider(s) and its agents and employees shall not make such disclosure to a lessee, telephone or paging device subscriber or any interceptee or participant in the intercepted communications.

IT IS ORDERED FURTHER that this Order shall be executed as soon as practicable and that all monitoring of the wire communications shall be recorded and examined by the monitoring agents or attorneys to determine the relevance of the intercepted wire communications to the pending investigation and that the disclosure of the contents or nature of the wire communications intercepted be limited to those communications relevant to the pending investigation, in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code. The interception of communications must terminate upon the attainment of the authorized objectives, not to exceed thirty (30) days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this Order or ten (10) days after the Order is entered.

3

IT IS ORDERED FURTHER that Assistant United States Attorney Rob Wallace or any other Assistant United States Attorney familiar with the facts of this case shall provide this Court with a report on or about the tenth, twentieth and thirtieth days following the date of this Order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the above-ordered reports should become due on a weekend or holiday, IT IS ORDERED FURTHER that such report shall become due on the next business day thereafter.

IT IS ORDERED FURTHER that this Order, the application, affidavit, and proposed Order(s), and all interim reports filed with this Court with regard to this matter shall be sealed until further order of this Court, except that copies of the Order(s), in full or redacted form, may be served on the Drug Enforcement Administration and the service provider(s) as necessary to effectuate this Order.

CHIEF JUDGE JAMES H. PAYNE
UNITED STATES DISTRICT COURT JUDGE
EASTERN DISTRICT OF OKLAHOMA

DATED this 3rd day of November, 2008.

I hereby certify that the annexed instrument is a true and correct copy of the original on file in my office.
ATTEST    WILLIAM B. GUTHRIE
          Clerk, U.S. District Court
          Eastern District of Oklahoma
By
                              Deputy Clerk
Dated   11/3/08

4

**FILED**

NOV - 3 2008

WILLIAM B. GUTHRIE
Clerk, U.S. District Court

By: _____
Deputy Clerk

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

IN THE MATTER OF THE APPLICATION )
OF THE UNITED STATES OF AMERICA FOR )
AN ORDER AUTHORIZING THE INTERCEPTION )
OF WIRE COMMUNICATIONS )

MC 08-021-JHP

## APPLICATION FOR INTERCEPTION OF WIRE COMMUNICATIONS

Rob Wallace, Assistant United States Attorney, Eastern District of Oklahoma, United States Department of Justice, being duly sworn, states:

1.     I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an attorney authorized by law to prosecute or participate in the prosecution of United States federal felony offenses. I am also an attorney for the Government as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure, and, therefore, pursuant to Section 2516(3) of Title 18, United States Code, I am authorized to make an application to a Federal judge of competent jurisdiction for an order authorizing the interception of wire communications.

2. .     Pursuant to Section 2516 of Title 18, United States Code, an appropriate official of the Criminal Division, United States Department of Justice, specifically David H. Hennessy, Deputy Assistant Attorney General, Criminal Division, having been specially designated by the Attorney General pursuant to Order Number 2943-2008, dated January 22, 2008, has approved this application for an order authorizing the interception of wire communications. Attached to this application as Exhibit A, and incorporated by reference herein, is a copy of that order and the memorandum of authorization approving this application.

3.     This application is for an order pursuant to Section 2518 of Title 18, United States Code, authorizing the interception of wire communications for a thirty (30) day period of Bobby FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, Michael SHEETS, Steve TANKERSLEY, Stephen TURLEY, Tony VILLALOBOS, Gene BROWN, Josh DUKE, Antonio ORTIZ, Danny HOUSTON, Tommy KILGORE, Melinda FAIRCHILD, Johnny WILLIS, and others as yet unknown to and from the cellular telephone assigned telephone number (918) 629-3876, International Mobile Subscriber Identity (IMSI) 310410212273837, which is an AT&T cellular telephone for which the subscriber is unknown, concerning federal felony offenses, that is, the importation and distribution of (and possession with intent to distribute) controlled substances; the use of wire

facilities to facilitate the same; conspiracy to do the same and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843(b), 846, 952, 960 and 963; the laundering of monetary instruments being the proceeds from a specified unlawful activity and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1956 and/or 1957; interstate and foreign travel to promote, manage, establish, carry-on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity, to wit: an enterprise involving a controlled substance, in violation of Title 18, United States Code, Section 1952; possession of a firearm by prohibited person (felon), in violation of Title 18, United States Code, Section 922(g)(1); and possession of a firearm in furtherance of or in relation to a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c).

4.     I have discussed all of the circumstances of the above offenses with Special Agent Cory Hallum of the Drug Enforcement Administration, who has directed and conducted this investigation, and have examined the Affidavit of Special Agent Cory Hallum of this date (attached to this application as Exhibit B, and which is incorporated by reference). Whereof your applicant states upon information and belief that:

a.     there is probable cause to believe that Bobby FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, Michael SHEETS, Steve TANKERSLEY, Stephen TURLEY, Tony VILLALOBOS, Gene BROWN, Josh DUKE, Antonio ORTIZ, Danny HOUSTON, Tommy KILGORE, Melinda FAIRCHILD, Johnny WILLIS, and others as yet unknown have committed, are committing and will continue to commit offenses involving the importation and distribution of (and possession with intent to distribute) controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843(b), 846, 952, 960 and 963; the laundering of monetary instruments being the proceeds from a specified unlawful activity and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1956 and/or 1957; interstate and foreign travel to promote, manage, establish, carry-on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity, to wit: an enterprise involving a controlled substance, in violation of Title 18, United States Code, Section 1952; possession of a firearm by prohibited person (felon), in violation of Title 18, United States Code, Section 922(g)(1); and possession of a firearm during and in relation to or in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c).

b.     there is probable cause to believe that particular wire communications of Bobby FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT,

Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, Michael SHEETS, Steve TANKERSLEY, Stephen TURLEY, Tony VILLALOBOS, Gene BROWN, Josh DUKE, Antonio ORTIZ, Danny HOUSTON, Tommy KILGORE, Melinda FAIRCHILD, Johnny WILLIS, and others as yet unknown concerning the above-described offenses will be obtained through the interception for which authorization is herein applied. In particular, there is probable cause to believe that the communications to be intercepted will concern the telephone numbers of associates of Bobby Fairchild, Jose Esparza and the dates, times and places for commission of the aforementioned federal felony offenses when Bobby FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, Michael SHEETS, Steve TANKERSLEY, Stephen TURLEY, Tony VILLALOBOS, Gene BROWN, Josh DUKE, Antonio ORTIZ, Danny HOUSTON, Tommy KILGORE, Melinda FAIRCHILD, Johnny WILLIS, and others as yet unknown communicate with their co-conspirators, aiders and abettors, and other participants in the conspiracy, thereby identifying the co-conspirators and aiders and abettors of Bobby Fairchild, Jose Esparza and others as yet unknown, and their places of operation. In addition, these communications are expected to constitute admissible evidence of the above-described offenses;

        c.    normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ, as are described in further detail in the attached affidavit of Special Agent Cory Hallum; and

        d.    there is probable cause to believe that cellular telephone assigned telephone number (918) 629-3876, International Mobile Subscriber Identity (IMSI) 310410212273837, which is an AT&T cellular telephone for which the subscriber is unknown, is being, and will continue to be used in connection with the commission of the above-described offenses.

The attached affidavit contains a full and complete statement of facts concerning all previous applications that have been made to any judge of competent jurisdiction for authorization to intercept, or for approval of the interception of wire, oral or wire communications involving any of the same individuals, facilities, or places specified in this application.

On the basis of the allegations contained in this application and on the basis of the attached affidavit of Special Agent Cory Hallum,

IT IS HEREBY REQUESTED that this Court issue an order, pursuant to the power conferred on it by Section 2518 of Title 18, United States Code, authorizing the Drug

Enforcement Administration to intercept wire communications to and from the above-described cellular telephone, and providing that such interceptions not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but continue until all communications are intercepted which reveal fully the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal fully the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, for a period of thirty (30) days measured from the day on which investigative or law enforcement officers first begin to conduct an interception under this Court's order or ten (10) days after this order is entered, whichever is earlier.

IT IS REQUESTED FURTHER that in the event that the target facility is transferred outside the territorial jurisdiction of this Court, interceptions may take place in any other jurisdiction within the United States.

IT IS REQUESTED FURTHER that this Court issue an order pursuant to Section 2518(4) of Title 18, United States Code, directing that AT&T Wireless, a communication service provider as defined in Section 2510(15) of Title 18, United States Code, shall furnish, and continue to furnish, the applicant and investigative agency with all information, facilities and technical assistance necessary to accomplish the interceptions unobtrusively and with a minimum of interference with the services that such providers are according the persons whose communications are to be intercepted, and to ensure an effective and secure installation of electronic devices capable of interception of wire communications to and from the above-described cellular telephone, with the service provider to be compensated by the applicant for reasonable expenses incurred in providing such facilities or assistance.

IT IS REQUESTED FURTHER that, to avoid prejudice to this criminal investigation, the Court order the said providers of wire communication service and their agents and employees not to disclose or cause a disclosure of this Court's order or the request for information, facilities and assistance by the Drug Enforcement Administration or the existence of the investigation to any person other than those of their agents and employees who require said information to accomplish the services hereby requested. In particular, said providers and their agents and employees should be ordered not to make such disclosure to a lessee, telephone subscriber, or any interceptee or participant in the intercepted communications.

IT IS REQUESTED FURTHER that this Court direct that this order be executed as soon as practicable after it is signed and that all monitoring of communications shall be recorded and examined by monitoring agents or attorneys to determine the relevance of the intercepted wire communications to the pending investigation and that the disclosure of the contents or nature of the wire communications intercepted be limited to those communications relevant to the pending investigation, in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code. The interception of communications authorized by this Court's order must terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30)

4

days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this Court's order or ten (10) days after the order is entered, whichever is earlier.

IT IS REQUESTED FURTHER that the Court order that either Assistant United States Attorney Rob Wallace, or any other Assistant United States Attorney familiar with the facts of this case, provide to the Court a report on or about the tenth, twentieth and thirtieth days following the date of this order showing what progress has been made toward achievement of the authorized objectives and the need for continued interception. If any of the aforementioned reports should become due on a weekend or holiday, IT IS REQUESTED FURTHER that such report become due on the next business day thereafter.

IT IS REQUESTED FURTHER that the Court order that its orders, this application and the accompanying affidavit and proposed order(s), and all interim reports filed with the Court with regard to this matter be sealed until further order of this Court, except that copies of the order(s), in full or redacted form, may be served on the Drug Enforcement Administration and the service provider(s) as necessary to effectuate the Court's order as set forth in the proposed order(s) accompanying this application.

DATED this 3rd day of November, 2008.

_____
ROB WALLACE
Assistant United States Attorney

SUBSCRIBED and SWORN to before me this 3rd day of November, 2008.

_____
JAMES H. PAYNE
UNITED STATES DISTRICT COURT JUDGE
EASTERN DISTRICT OF OKLAHOMA

5



**U.S. Department of Justice**

Criminal Division

*Washington, D.C. 20530*

**MEMORANDUM**                                    OCT 3 1 2008

TO:        Maureen H. Killion, Director
           Office of Enforcement Operations
           Criminal Division

ATTN:      Rob Wallace

FROM:      Matthew W. Friedrich
           Acting Assistant Attorney General
           Criminal Division

SUBJECT:   Authorization for Interception Order Application

        This is with regard to your recommendation that an
appropriately designated official of the Criminal Division
authorize an application to a federal judge of competent
jurisdiction for an order under Title 18, United States Code,
Section 2518, authorizing for a thirty (30) day period, the
interception of wire communications occurring to and from the
cellular telephone bearing the number (918) 629-3876, with no
subscriber information, and accessed through International Mobile
Subscriber Identity ("IMSI") number 310410212273837, in
connection with an investigation into possible violations of
Title 18, United States Code, Sections 922, 924, 1952, 1956, and
1957; and Title 21, United States Code, Sections 841, 843, 846,
952, 960, and 963, by Bobby Fairchild, Jose Esparza, Alfredo
Guzman, Calvin French, Rhonda Valdivia, Kevin Joe Wolcott, Joseph
McKinley Wolcott, Jeremy Stewart, Jimmy Smith, Richard Burris,
Chris Shelton, Deborah Green, Jose Sevilla, Jimmy Gower, Maria
Alcantara, Alejandro Perez, Luis Gonzales, Angela Buhmester,
Michael Sheets, Steve Tankersley, Stephen Turley, Tony
Villalobos, Gene Brown, Josh Duke, Antonio Ortiz, Danny Houston,
Tommy Kilgore, Melinda Fairchild, Johnny Willis, and other
persons as yet unknown.

        By virtue of the authority vested in the Attorney General by
Section 2516 of Title 18, United States Code, the Attorney
General of the United States has by Order Number 2943-2008, dated
January 22, 2008, designated specific officials in the Criminal
Division to authorize applications for court orders authorizing
the interception of wire and oral communications.  As a duly
designated official in the Criminal Division, this power is



GOVERNMENT
EXHIBIT

A

exercisable by the undersigned.  WHEREFORE, acting under this
delegated power, the appropriately designated official authorizes
the above-described application to be made by any investigative
or law enforcement officer of the United States as defined in
Section 2510(7) of Title 18, United States Code.

    The authorization given is intended to apply not only to the
target telephone number listed above, but also to any other
telephone number or telephone accessed through the above-
referenced IMSI number, and to any other IMSI number accessed
through the target telephone number referenced above, within the
thirty day period.  The authorization is also intended to apply
to the target telephone number referenced above regardless of
service provider, and to background conversations intercepted in
the vicinity of the target telephone while the telephone is off
the hook or otherwise in use.

_____
Matthew W. Friedrich
Acting Assistant Attorney General
Criminal Division

OCT 3 1 2008
_____
Date


David H. Hennessy
Acting Deputy Assistant Attorney General
Criminal Division



**U.S. Department of Justice**

Criminal Division
Office of Enforcement Operations

_Maureen H. Killion, Director_                    _Washington, D.C. 20005_

# Title III Implementation Information

In connection with the concomitantly transmitted documents approving your request to apply for a court order authorizing an interception pursuant to Title III, we would like to advise you of the following so that you might avoid issues in these areas:

**Pending Charges / Privileged Communications** - Monitoring personnel must exercise care to avoid intercepting communications of persons under indictment that may pertain to any such person's culpability in relation to the indictment, or the strategy that they contemplate employing as a defense, or communications involving a recognized privilege, e.g. doctor-patient. If such a communication is overheard inadvertently, monitoring personnel are to make notation of the incident in the intercept log and make an immediate report to the attorney who is supervising the interception.

**Sealing** - It is the obligation of the supervising attorney to ensure that the tapes of the intercepted conversations are protected adequately, and that these tapes are sealed by the court on a regular basis, preferably at the end of each 30-day period, if the interception is authorized to continue beyond the initial 30-day period. If there is a break in the interception period, this attorney should ensure that the tapes are sealed by the court as soon as practicable thereafter.

**Computation of the 30-Day Period** - Because of conflicting court decisions regarding the counting of the 30-day period for purposes of Title III interceptions, the supervising attorney should ensure that the method of computing time is set forth in the court's order and made known to monitoring personnel. *See, e.g., United States* v. *Gangi*, 33 F.Supp.2d 303 (S.D.N.Y. 1999) (counting calendar days rather than 24-hour periods, unless order provides otherwise), and *United States* v. *Smith*, 223 F.3rd 554, at 575 (7th Cir. 2000) (Fed.R.Crim.P. 45, minus weekend and holiday exception, applies). Notwithstanding the method used, communications should not be intercepted for longer than a strict counting of 30 days.

**Extensions** - All extensions **MUST** be approved by the Criminal Division before they are filed with the court.

**Reporting** - Section 2519 of Title 18, United States Code, requires that the Attorney General make an annual report to the Administrative Office of the United States Courts (AOUSC) each year regarding electronic surveillance by a federal agency under Title III. The statute requires you, through your investigative agency, to report specific post surveillance information, i.e., the number of resulting trials, the number of motions to suppress, whether the motions were granted or denied, and the number of convictions. These reports are compiled by AOUSC and provided to Congress and the public.

OEO's Electronic Surveillance Unit (ESU) can be reached at (202) 514-6809. Requests for surveillance authorized under T-III must be submitted to ESU by email through ESU.Requests@usdoj.gov or through our FAX-to-email server on (803) 726-2180.



# Office of the Attorney General
## Washington, D.C. 20530

ORDER NO. 2943-2008

### SPECIAL DESIGNATION OF CERTAIN OFFICIALS OF THE CRIMINAL DIVISION AND NATIONAL SECURITY DIVISION TO AUTHORIZE APPLICATIONS FOR COURT ORDERS FOR INTERCEPTION OF WIRE OR ORAL COMMUNICATIONS

By virtue of the authority vested in me as the Attorney General, including 28 U.S.C. § 510, 5 U.S.C. § 301, and 18 U.S.C. § 2516(1), the following officials are hereby specially designated to exercise the power conferred by section 2516(1) of title 18, United States Code, to authorize applications to a Federal judge of competent jurisdiction for orders authorizing or approving the interception of wire and oral communications by the Federal Bureau of Investigation or Federal agency having responsibility for the investigation of the offense(s) as to which such application is made, when such interception may provide evidence of any of the offenses specified in section 2516 of title 18, United States Code:

1.   The Assistant Attorney General in charge of the Criminal Division, any Acting Assistant Attorney General in charge of the Criminal Division, any Deputy Assistant Attorney General of the Criminal Division, and any Acting Deputy Assistant Attorney General of the Criminal Division;

2.   The Assistant Attorney General for National Security, any Acting Assistant Attorney General for National Security, any Deputy Assistant Attorney General for National Security, and any Acting Deputy Assistant Attorney General for National Security, with respect to those matters delegated to the supervision and responsibility of the Assistant Attorney General for National Security. These officials of the National Security Division shall exercise this authority through, and in full coordination with, the Office of Enforcement Operations within the Criminal Division.

Attorney General Order No. 2887-2007 of July 3, 2007, is revoked effective at 11:59 p.m. of the day following the date of this order.

__January 22, 2008__
Date

Michael B. Mukasey
Attorney General

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

IN THE MATTER OF THE                              )
APPLICATION OF THE UNITED                         )
STATES OF AMERICA FOR AN ORDER                    )
AUTHORIZING THE INTERCEPTION                      )
OF WIRE COMMUNICATIONS                            )
TO AND FROM AT&T WIRELESS                          )
TELEPHONE NUMBER (918) 629-3876                   )
IMSI: 310410212273837                             )
IMEI/ESN: 011231005306202                         )

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR WIRE INTERCEPTION

### INTRODUCTION

1.      Affiant, Cory Hallum, Special Agent, U.S. Department of Justice, Drug

Enforcement Administration, being duly sworn under oath, states as follows:

2.      I, Cory Hallum, am an investigative or law enforcement officer within the

meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United

States who is empowered by law to conduct investigations of, and to make arrests for, offenses

enumerated in Section 2516 of Title 18, United States Code.

3.      I am currently employed as a Special Agent with the Drug Enforcement

Administration (DEA), and have been so employed since 1998.  In February 1999, I was

temporarily assigned to the Oklahoma City District Office.  In May 1999, I reported to the

Houston Field Division, Corpus Christi Resident Office, at which time I was assigned to the

High Intensity Drug Trafficking Area (HIDTA) group.  I remained an active member of the

HIDTA group, until 2002, when I was transferred to Enforcement Group One.  In June 2006, I

was transferred to the Tulsa Resident Office where I am currently assigned to the HIDTA group.

1



4.      Since becoming a Special Agent with DEA, I have conducted investigations of unlawful drug distribution in violation of Title 21, United States Code, Sections 841, 843 and 846, and have participated in wire and physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of informants and reviews of taped conversations and drug records. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored and distributed and the methods of payment for such drugs. I have received numerous hours in training from various federal, state and local law enforcement agencies.

5.      As a Special Agent, I have initiated more than 85 DEA cases. These cases have lead to the arrest and indictment of more than 135 defendants, the successful seizure of more than 37,000 pounds of marijuana, more than 1,140 pounds of cocaine and more than 125 pounds of methamphetamine. In addition to being the Lead Case Agent in more than 85 DEA investigations, I have assisted with more than 1,000 drug trafficking investigations.

6.      I have authored Affidavits for Title III investigations and search warrants. I have participated in an undercover capacity for the purchase, distribution and trafficking of illegal substances. I have executed numerous controlled deliveries of narcotics. I have gained a considerable amount of knowledge through my training and experience. I have interviewed hundreds of defendants involved in the use, manufacture, transportation and illegal sale of controlled dangerous substances. During the course of these interviews, I have inquired and learned how individuals involved in drug distribution schemes and networks use and disperse the illegal proceeds generated by the illegal sale of controlled dangerous substances, including, but not limited to, chemicals commonly utilized in the illegal manufacture of methamphetamine. During the course of my training and interviews with various defendants, I have learned how

2

individuals involved in drug distribution schemes maintain records and conspire to deceive law enforcement as well as rival distributors of controlled dangerous substances. I have learned how individuals that are involved in these types of crimes maintain records and secret monies gained as a result of participation in illegal drug distribution networks. The information contained in this affidavit is known to me personally or was learned from other Officers or Agents and by reviewing reports and documents.

7.     I submit this affidavit in support of an application for an order pursuant to Section 2518 of Title 18, United States Code, authorizing the interception and recording of wire communications occurring over **TARGET TELEPHONE #4** assigned telephone number (918) 629-3876, International Mobile Subscriber Identity (IMSI) 310410212273837[1], with service provided by AT&T Wireless, and any telephone numbers subsequently assigned to or accessed by the instruments bearing the same IMSI as the **TARGET TELEPHONE #4,** as well as any IMSI subsequently assigned to the instrument bearing the same telephone number assigned to **TARGET TELEPHONE #4** concerning offenses enumerated in Section 2516 of Title 18, United States Code, that is, offenses involving the importation and distribution of (and possession with intent to distribute) controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843(b), 846, 952, 960 and 963; the laundering of monetary instruments being the proceeds from a specified unlawful activity and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1956 and/or 1957; interstate and

---

[1] The International Mobile Subscriber Identification (IMSI) number is encoded on a computer chip within the **TARGET TELEPHONE.** The chip can be removed and inserted into any similarly equipped telephone and be used to operate that telephone. The IMSI is unique to the subscriber and cannot be changed. Accordingly, the DEA is seeking authorization to intercept wire communications over any telephones or telephone numbers accessed by or through the IMSI number noted above.

3

foreign travel to promote, manage, establish, carry-on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity, to wit: an enterprise involving a controlled substance, in violation of Title 18, United States Code, Section 1952; possession of a firearm by prohibited person (felon), in violation of Title 18, United States Code, Section 922(g)(1); and possession of a firearm during and in relation to or in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c).

8.     I submit that there is probable cause to believe that these offenses have been committed, are being committed and will continue to be committed by persons who are the subjects of this investigation, including, among others Bobby FAIRCHILD, Jose ESPARZA, Alfredo GUZMAN, Calvin FRENCH a/k/a Harvey FRENCH, Rhonda VALDIVIA, Kevin Joe WOLCOTT, Joseph McKinley WOLCOTT a/k/a Joseph McKinley WALCOTT a/k/a Joe WOLCOTT a/k/a Joe WALCOTT a/k/a WILDCAT, Jeremy STEWART, Jimmy SMITH, Richard BURRIS, Chris SHELTON, Deborah GREEN, Jose SEVILLA, Jimmy GOWER, Maria ALCANTARA, Alejandro PEREZ, Luis GONZALES, Angela BUHMESTER, Michael SHEETS, Steve TANKERSLEY, Stephen TURLEY, Tony VILLALOBOS, Gene BROWN, Josh DUKE, Antonio ORTIZ, Danny HOUSTON, Tommy KILGORE, Melinda FAIRCHILD, Johnny WILLIS and others as yet unidentified **(TARGET VIOLATORS)**.

9.     The requested Order is sought for a period of time until the requested interceptions fully reveal the identity of and manner in which the **TARGET VIOLATORS** engage in the above-described offenses, or for a period of thirty (30) days, whichever occurs first, pursuant to Title 18, United States Code, Section 2518(5). Pursuant to Section 2518(5) of Title 18, United States Code, it is further requested that the 30-day period be measured from the

4

date on which a law enforcement agent first begins to conduct the interception under the court order or ten days after the order is entered whichever is earlier.

10.     This case is being investigated by the DEA in Tulsa, Oklahoma; El Paso, Texas; Denver, Colorado; Nashville, Tennessee; London, Kentucky; Las Cruces, New Mexico, and by the Oklahoma Bureau of Narcotics and Dangerous Drugs. The contents of this affidavit are based upon my personal participation in this investigation, reports made to me by other DEA agents and law enforcement authorities and information provided by confidential sources discussed in more detail below. Except where otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement was made by other law enforcement officers (who may have had either direct or hearsay knowledge of that statement) to whom I or other law enforcement officers have spoken or whose reports I have read and reviewed. Such statements are reported in substance and in part, unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance.

11.     Since this affidavit is being submitted for the limited purpose of securing an order authorizing the interception of wire communications, I have not included details of every aspect of this investigation. Facts not set forth herein are not being relied on in reaching my conclusion that an order should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an order authorizing the interception of wire communications. Where I have described conversations, I have described them in substance and in part, and not verbatim. Unless otherwise indicated, the information I have set forth herein is

5

based on information I have gained from reports written by other agents and officers, and discussion with other agents and officers.

## SUBJECTS AND OFFENSES

12.      This application is based upon an investigation of a drug trafficking group involved with the importation of multi-kilogram quantities of methamphetamine, cocaine and marijuana from Mexico to the United States, and with the distribution of these substances in several states within the United States.

13.      As discussed below, there is probable cause to believe that the **TARGET VIOLATORS** have committed, are committing and will continue to commit the following offenses: the importation and distribution of (and possession with intent to distribute) controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843(b), 846, 952, 960 and 963; the laundering of monetary instruments being the proceeds from a specified unlawful activity and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1956 and/or 1957; interstate and foreign travel to promote, manage, establish, carry-on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity, to wit: an enterprise involving a controlled substance, in violation of Title 18, United States Code, Section 1952; possession of a firearm by prohibited person (felon), in violation of Title 18, United States Code, Section 922(g)(1); and possession of a firearm in furtherance of or in relation to a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c). **(TARGET OFFENSES).**

6

## THE DESIGNATED CELLULAR TELEPHONES

14.     There is probable cause to believe that the **TARGET VIOLATORS** of this investigation are also the **TARGET INTERCEPTEES** and are using and will in the future use **TARGET TELEPHONE #4,** assigned telephone number (918) 629-3876, International Mobile Subscriber Identity (IMSI) 310410212273837, which is an AT&T prepaid cellular telephone distributed by Tracfone.   Due to the fact **TARGET TELEPHONE #4** is a prepaid cellular telephone, the subscriber is unknown.   Service was established with AT&T on March 6, 2008. **TARGET TELEPHONE #4** is being used to facilitate, accomplish and to commit the above-described **TARGET OFFENSES.**

15.     There is probable cause to believe that **TARGET TELEPHONE #4** will be used during the period of interception applied for herein by the **TARGET INTERCEPTEES,** Bobby FAIRCHILD and others not yet identified in order to accomplish, to discuss and to commit the **TARGET OFFENSES.**

16.     I have been informed by other law enforcement personnel who are familiar with applicable telephone technology that a "portable cellular telephone" (or a mobile telephone) can be used both within a vehicle and outside a vehicle through the use of a portable battery pack. The cellular telephone system divides Oklahoma and other areas into small coverage areas, which are called cells.   As a vehicle in which a portable cellular telephone is located or the cellular telephone itself is moved from one cell to another, transmitters within each cell and a master switching network permit wire communications to be completed.   Each portable cellular telephone that does not contain party lines bears a unique International Mobile Subscriber Identification (IMSI) and an assigned telephone number.   It is requested that interception be

7

permitted over any changed telephone numbers subsequently assigned to the instrument with the above listed IMSI for **TARGET TELEPHONE #4.**

17.    It is anticipated that the **TARGET INTERCEPTEES** will use **TARGET TELEPHONE** #4 to place calls to other telephones to and from the Eastern District of Oklahoma, as well as other locations. This belief is supported by the facts described below.

18.    In any event, pursuant to United States v. Rodriquez, 968 F.2d 130 (2d Cir.), cert. denied, 506 U.S. 847 (1992), a Court in the Eastern District of Oklahoma is empowered to issue an Order for the interception of wire communications over telephones located in other districts.

19.    In connection with the telecommunication company which provides the service for **TARGET TELEPHONE #4,** all interceptions over **TARGET TELEPHONE #4** will automatically be routed to Dallas, Texas, regardless of where the telephone calls originate or terminate. The intercepted telephone calls will be monitored by the DEA Dallas Field Division (DEA/DFD) located in Dallas, Texas. This remote monitoring is necessary due to the needed technical expertise, equipment and personnel which are available at DEA/DFD. DEA/DFD is located within the Northern District of Texas. During the requested wire surveillance, all monitoring will be performed in Dallas, Texas, by law enforcement officers authorized under Section 2510(7) of Title 18, United States Code, including law enforcement officers with the DEA and Government employees or individuals operating under a contract with the Government, including, if necessary, translators, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception, and specifically under the supervision of law enforcement officers from the DEA. The intercepted telephone calls may further be transmitted to the DEA Tulsa Resident Office located in Tulsa, Oklahoma.

8

20.     Because of the mobility of portable cellular telephones, pursuant to Title 18, United States Code, Section 2518(3), authorization is requested for interception of wire communications both within the Eastern District of Oklahoma, and, in the event that **TARGET TELEPHONE #4** is transferred outside the jurisdiction of this Court, in any other jurisdiction within the United States.   In addition, it is requested that background conversations, in the vicinity of **TARGET TELEPHONE #4** while it is off the hook or otherwise in use, also be permitted to be intercepted.

## OBJECTIVES

21.     There is probable cause to believe that the interception of wire communications, the authorization for which is sought herein, will help to reveal: (i) the nature, extent and methods of operation of the controlled substances activities of the **TARGET INTERCEPTEES**; (ii) the identities of the **TARGET INTERCEPTEES**, their accomplices, aiders, abettors, co-conspirators, and participants in their illegal activities; (iii) the source, receipt, and distribution of controlled substances, contraband, and money involved in those activities; (iv) the locations and items used in furtherance of those activities; (v) the existence and locations of records; (vi) the locations and sources of resources used to finance their illegal activities, and (vii) the locations and disposition of the proceeds from those activities.   In addition, these wire communications are expected to constitute admissible evidence of the commission of the above-described offenses.

## PRIOR APPLICATIONS

22.     Based upon ELSUR (electronic surveillance) record checks of the DEA, ICE and FBI indices, on October 15, 2008, there have been no other federal applications for an order authorizing or approving the interception of wire, oral or electronic communications of

9

**TARGET TELEPHONE #4** or of the **TARGET INTERCEPTEES** specified in this affidavit, except for those listed below.

23.     On October 28, 2008, United States District Judge Karen Caldwell, in the Eastern District of Kentucky, authorized the interception of wire communications occurring over **Kentucky's TARGET TELEPHONE #1** (telephone number (606) 213-1598, ESN 268435457402621053) and **Kentucky's TARGET TELEPHONE #2** (606) 634-9921, ESN 802558879.   The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jeremy STEWART; (2) Bobby FAIRCHILD; (3) Alfredo GUZMAN; (4) Cathy WHITE; (5) Homer SMALLWOOD; (6) Audy STEWART; (7) Lavon TACKETT; (8) Darren LNU; (9) Mark LNU; (10) Jimmy SMITH.

24.     On October 3, 2008, United States District Judge James H. Payne, in the Eastern District of Oklahoma, authorized the continued interception of wire communications occurring over **TARGET TELEPHONE #3** (telephone number (918) 457-8368, IMSI: 310410211638544).   The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Bobby FAIRCHILD; (2) Jose ESPARZA; (3) Alfredo Guzman; (4) Harvey French; (5) Rhonda Valdivia; (6) Kevin Wolcott, a/k/a Kevin Joe WOLCOTT; (7) Joseph McKinley WOLCOTT, a/k/a Joseph McKinley WALCOTT, a/k/a Joe WOLCOTT, a/k/a Joe WALCOTT, a/k/a WILDCAT; (8) Jeremy STEWART; (9) Jimmy SMITH; (10) Richard BURRIS; (11) Chris SHELTON; (12) Deborah GREEN; (13) Jose SEVILLA; (14) Jimmy GOWER; (15) Maria ALCANTARA; (16) Alejandro PEREZ; (17) Luis GONZALES; (18) Angela BUHMESTER; (19) Michael SHEETS; (20) Steve TANKERSLEY; (21) Stephen TURLEY; (22) Tony VILLALOBOS; (23) Gene BROWN; (24)

10

Josh DUKE; (25) Antonio ORTIZ; (26) Danny HOUSTON; (27) Tommy KILGORE; (28) Melinda FAIRCHILD and (29) Johnny WILLIS.

25.     On September 27, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the original interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE #8** (telephone number (915) 443-6703, ISMI Number 316010159203590).   The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a. "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA, a.k.a. "Ulysses"; (11) Erubiel SOLIS, a.k.a. "El Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a. Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez GARCIA, a.k.a. "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a. "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a. FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) Christopher SARINANA; (42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49) FNU LNU, a.k.a. Tocayo; (50) Christian NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53) Santos CHAVEZ, Jr., a.k.a Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18; (56) FNU LNU-19;

11

(57) Mefio LNU; (58) Patricia MORALES, a.k.a. Patty; (59) Carlos Ramon CARRILLO, a.k.a. Carlos LNU-3; (60) FNU LNU-20; (61) Jose Angel ESPARZA, a.k.a. FNU LNU-21, "El Perro," "El Perrillo," and "El Pelon;" (62) FNU LNU-22; (63) Oscar Rene RONQUILLO-Dominguez; (64) Rosa GUEVARA. a.k.a. Rosa RONQUILLO; (65) Daniel James SHAW; (66) Benny RAMOS, a.k.a. Benito Bosque RAMOS; (67) Juan Antonio TERRAZAS; (68) Edgar MAGALLANES-Cardenas; (69) Bobby FAIRCHILD; (70) Santiago Humberto PEREZ-Pifion; (71) Michael James FRERES; (72) Hugo CHAVEZ; (73) Memo LNU; (74) FNU LNU-23; (75) Donna Denise FRERES; (76) FNU LNU-24; (77) FNU LNU-25 and others yet unknown or unidentified.

26.     On September 12, 2008, United States District Judge Todd J. Campbell, in the Middle District of Tennessee, authorized the continued interception of wire communications occurring over **TENNESSEE'S TARGET TELEPHONE #2** (telephone number (931) 248-2967, IMSI 31041014489504. The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Bruce FERGUSON; (2) Joseph McKinley WOLCOTT, a/k/a Joseph McKinley WALCOTT, a/k/a Joe WOLCOTT, a/k/a Joe WALCOTT, a/k/a WILDCAT; (3) Jeffery Lynn COPAS, a/k/a Jeffery Lyn COPAS, a/k/a TERMITE; (4) Jerry Hale GLASS; (5) Kevin Joe WOLCOTT and (6) Calvin Eugene DAVIS; (7) Calvin FRENCH, a/k/a Harvey FRENCH; (8) Randall B. WILLIAMS, a/k/a Randy; (9) Jim LNU; (10) Cliff DURARD; (11) Binx LNU; (12) Tonya McKinney BREAUX; (13) Clint LNU and (14) Bobby FAIRCHILD.

27.     On September 5, 2008, United States District Judge James H. Payne, in the Eastern District of Oklahoma, authorized the interception of wire communications occurring over **TARGET TELEPHONE #3** (telephone number (918) 457-8368, IMSI:

12

310410211638544) and the continued interception of wire communications occurring over **TARGET TELEPHONE #2** (telephone number (918) 696-1755, IMSI: 310410182378968 and IMEI/ESN: 355768013462026). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Bobby FAIRCHILD; (2) Jose ESPARZA; (3) Alfredo GUZMAN; (4) Harvey FRENCH; (5) Rhonda VALDIVIA; (6) Kevin WOLCOTT, a/k/a Kevin Joe WOLCOTT; (7) Joseph McKinley WOLCOTT, a/k/a Joseph McKinley WALCOTT, a/k/a Joe WOLCOTT, a/k/a Joe WALCOTT, a/k/a WILDCAT; (8) Jeremy STEWART; (9) Jimmy SMITH; (10) Richard BURRIS; (11) Chris SHELTON; (12) Deborah GREEN; (13) Jose SEVILLA; (14) Jimmy GOWER; (15) Maria ALCANTARA; (16) Alejandro PEREZ; (17) Luis GONZALES; (18) Angela BUHMESTER; (19) Michael SHEETS; (20) Steve TANKERSLEY; (21) Stephen TURLEY; (22) Tony VILLALOBOS; (23) Gene BROWN; (24) Josh DUKE; (25) Antonio ORTIZ; (26) Danny HOUSTON; (27) Tommy KILGORE; (28) Melinda FAIRCHILD and (29) Johnny WILLIS.

28.     On August 14, 2008, United States District Judge Todd J. Campbell, in the Middle District of Tennessee, authorized the continued interception of wire communications occurring over **TENNESSEE'S TARGET TELEPHONE #1** (telephone number (270) 625-1208, IMSI 310410118069845, and the interception of **TENNESSEE'S TARGET TELEPHONE #2** (telephone number (931) 248-2967, IMSI 310410144895041). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Bruce FERGUSON; (2) Joseph McKinley WOLCOTT, a/k/a Joseph McKinley WALCOTT, a/k/a Joe WOLCOTT, a/k/a Joe WALCOTT, a/k/a WILDCAT; (3) Jeffery Lynn COPAS, a/k/a Jeffery Lyn COPAS, a/k/a TERMITE; (4) Jerry Hale GLASS; (5) Kevin Joe WOLCOTT; (6) Calvin Eugene DAVIS; (7) Calvin FRENCH, a/k/a Harvey

13

FRENCH; (8) Randall B. WILLIAMS, a/k/a RANDY; (9) Jim LNU; (10) Cliff DURARD; (11) Binx LNU; (12) Tonya McKinney BREAUX; (13) Clint LNU and (14) Bobby FAIRCHILD.

29.     On August 14, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the continued interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE #7** ((915) 217-8066, IMSI Number 310410162734704). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a. "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA, a.k.a. "Ulysses"; (11) Erubiel SOLIS, a.k.a. "El Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a. Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez GARCIA, a.k.a. "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a. "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a. FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) Christopher SARINANA; (42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49) FNU LNU, a.k.a. Tocayo; (50) Christian NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53) Santos CHAVEZ, Jr., a.k.a. Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18; (56) FNU LNU-19; (57) Meño LNU; (58) Patricia

14

MORALES, a.k.a. Patty; (59) Carlos Ramon CARRILLO, a.k.a. Carlos LNU-3; (60) FNU LNU-20; (61) Jose Angel ESPARZA, a.k.a. FNU LNU-21, "El Perro," "El Perrillo," and "El Pelon;" (62) FNU LNU-22; (63) Oscar Rene RONQUILLO-Dominguez; (64) Rosa GUEVARA. a.k.a. Rosa RONQUILLO; (65) Daniel James SHAW; (66) Benny RAMOS, a.k.a. Benito Bosque RAMOS; (67) Juan Antonio TERRAZAS; (68) Edgar MAGALLANES-Cardenas; (69) Bobby FAIRCHILD and (70) Santiago Humberto PEREZ-Piñon.

30.     On August 8, 2008, United States District Judge James H. Payne, in the Eastern District of Oklahoma, authorized the interception of wire communications occurring over **TARGET TELEPHONE #2** (telephone number (918) 696-1755, IMSI: 310410182378968 and IMEI/ESN: 355768013462026).   The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Bobby FAIRCHILD; (2) Jose ESPARZA; (3) Alfredo GUZMAN; (4) Harvey FRENCH; (5) Rhonda VALVIDIA and (6) Kevin WOLCOTT.

31.     On July 23, 2008, United States District Judge James H. Payne, in the Eastern District of Oklahoma, authorized the interception of wire communications occurring over **TARGET TELEPHONE #1** (telephone number (918) 704-5940, IMSI 310410189938550, and IMEI/ESN: 011395003051936).   The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Bobby FAIRCHILD; (2) Jose ESPARZA.

32.     On July 15, 2008, United States District Judge Todd J. Campbell, in the Middle District of Tennessee, authorized the interception of wire communications occurring over **TENNESSEE'S TARGET TELEPHONE #1** (telephone number (270) 625-1208, IMSI 310410118069845).   The following individuals were listed in the application as TARGET

15

INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Bruce FERGUSON; (2) Joseph McKinley WOLCOTT, a/k/a Joseph McKinley WALCOTT, a/k/a Joe WOLCOTT, a/k/a Joe WALCOTT, a/k/a WILDCAT; (3) Jeffery Lynn COPAS, a/k/a Jeffery Lyn COPAS, a/k/a TERMITE; (4) Jerry Hale GLASS; (5) Kevin Joe WOLCOTT and (6) Calvin Eugene DAVIS.

33.    On July 15, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the continued interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE #7** ((915) 217-8066, IMSI Number 310410162734704). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a. "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA, a.k.a. "Ulysses"; (11) Erubiel SOLIS, a.k.a. "El Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a. Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez GARCIA, a.k.a. "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a. "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a. FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) Christopher SARINANA; (42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49) FNU LNU, a.k.a. Tocayo; (50) Christian

16

NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53) Santos CHAVEZ, Jr., a.k.a. Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18; (56) FNU LNU-19; (57) Meño LNU; (58) Patricia MORALES, a.k.a. Patty; (59) Carlos Ramon CARRILLO, a.k.a. Carlos LNU-3; (60) FNU LNU-20; (61) Jose Angel ESPARZA, a.k.a. FNU LNU-21, "El Perro," "El Perrillo," and "El Pelon;" (62) FNU LNU-22; (63) Oscar Rene RONQUILLO-Dominguez; (64) Rosa GUEVARA. a.k.a. Rosa RONQUILLO; (65) Daniel James SHAW; (66) Benny RAMOS, a.k.a. Benito Bosque RAMOS; (67) Juan Antonio TERRAZAS; (68) Edgar MAGALLANES-Cardenas; (69) Bobby FAIRCHILD and (70) Santiago Humberto PEREZ-Piñon.

34. On June 17, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the original interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE #7** ((915) 217-8066, IMSI Number 310410162734704). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a. "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA, a.k.a. "Ulysses"; (11) Erubiel SOLIS, a.k.a. "El Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a. Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez GARCIA, a.k.a. "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a. "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a. FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33)

17

FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) Christopher SARINANA; (42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49) FNU LNU, a.k.a. Tocayo; (50) Christian NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53) Santos CHAVEZ, Jr., a.k.a. Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18; (56) FNU LNU-19; (57) Meño LNU; (58) Patricia MORALES, a.k.a. Patty; (59) Carlos Ramon CARRILLO, a.k.a. Carlos LNU-3; (60) FNU LNU-20; (61) Jose Angel ESPARZA, a.k.a. FNU LNU-21, "El Perro," "El Perrillo," and "El Pelon;" (62) FNU LNU-22; (63) Oscar Rene RONQUILLO-Dominguez; (64) Rosa GUEVARA. a.k.a. Rosa RONQUILLO; (65) Daniel James SHAW; (66) Benny RAMOS, a.k.a. Benito Bosque RAMOS; (67) Juan Antonio TERRAZAS and (68) Edgar MAGALLANES-Cardenas.

35.     On June 11, 2008, United States District Judge Lewis T. Babcock, in the District of Colorado, authorized the interception of wire communications occurring over **COLORADO'S TARGET TELEPHONE #4** (telephone number (303) 350-6195, UFMI Number 121*768*1637, and IMSI Number 316010007454991). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a. "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA, a.k.a. "Ulysses"; (11) Erubiel SOLIS, a.k.a. "El Jefe," and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a.

18

Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez GARCIA, a.k.a: "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a. "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a. FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) Christopher SARINANA; (42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49) FNU LNU, a.k.a. Tocayo; (50) Christian NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53) Santos CHAVEZ, Jr., a.k.a. Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18; (56) FNU LNU-19 (57) Meño LNU; (58) Patricia MORALES, a.k.a. Patty; (59) Carlos Ramon CARRILLO, a.k.a. Carlos LNU-3; (60) FNU LNU-20; (61) FNU LNU-21 and (62) FNU LNU-22.

36. On April 6, 2007, in a Federal Bureau of Investigation case, United States District Judge David Briones, of the Western District of Texas, entered an order in which he authorized the interception of wire communications occurring over a telephone. In the application Daniel SHAW, date of birth: December 9, 1973, was listed as a TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION. An order authorizing the continued interception of wire communications was signed on May 8, 2007.

37. On May 27, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the continued interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE #4** (telephone number (303) 350-6195, UFMI Number 121*768*1637 and IMSI Number 316010103004633). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1)

19

Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a. "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA, a.k.a. "Ulysses"; (11) Erubiel SOLIS, a.k.a. "El Jefe" and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a. Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez GARCIA, a.k.a. "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a. "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a. FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) Christopher SARINANA; (42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49) FNU LNU, a.k.a. Tocayo; (50) Christian NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53) Santos CHAVEZ, Jr., a.k.a. Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18; (56) FNU LNU-19 (57) Meño LNU; (58) Patricia MORALES, a.k.a. Patty; (59) Carlos Ramon CARRILLO, a.k.a. Carlos LNU-3; (60) FNU LNU-20; (61) FNU LNU-21 and (62) FNU LNU-22.

38.    On May 6, 2008, United States District Judge Kathleen Cardone, of the Western District of Texas, authorized the continued interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE #1** (telephone number 011-52-656-282-2726, UFMI Number 62*229760*9 and IMSI Number 334010010692193) and **EL PASO's TARGET TELEPHONE #6** (telephone number (915) 850-2339, UFMI Number 121*729*5368, and IMSI

Number 316010105520756).  Although activation of **EL PASO'S TARGET TELEPHONE #1**
began on May 7, 2008, at approximately 10:03 a.m., the interception of **EL PASO'S TARGET
TELEPHONE #1** did not begin until 12:29 p.m. on May 7, 2008.  On May 7, 2008, an amended
application for authorization to continue the interception of conversations occurring over **EL
PASO'S TARGET TELEPHONE #1** and **EL PASO'S TARGET TELEPHONE #6** was filed
with Judge Cardone because the original paperwork filed with the court reflected that continued
interception for thirty days would commence at the termination of the current order.  At the time,
a current order did not exist for **EL PASO'S TARGET TELEPHONE #1**.  An amended order
was entered to reflect that continued interception would begin on May 6, 2008.  The interception
of conversations occurring over **EL PASO'S TARGET TELEPHONE #1** did not begin until
after Judge Cardone entered the amended order.  The following individuals were listed in the
application and amended application as TARGET INTERCEPTEES/SUBJECTS OF THE
INVESTIGATION:  (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard
ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a. "Elma"; (6) Miguel
Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; (8) Rogelio RODRIGUEZ-
Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA,  a.k.a. "Ulysses"; (11)
Erubiel SOLIS, a.k.a. "El Jefe," and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael
AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ; (16) Nancy LARA;
(17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a.
Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael Perez
GARCIA, a.k.a. "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a.
"Chaparrito"; (28) Jesus Armando ARANDA, a.k.a. FNU LNU-3; (29) FNU LNU-4; (30) FNU
LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34) FNU LNU-10; (35) FNU

21

LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) Christopher SARINANA; (42) Herman MARRUFO; (43) Aaron ARANDA; (44) Jose Javier ARANDA; (45) Gregg LNU; (46) Wayne LNU; (47) Hector LNU; (48) Lalo LNU; (49) FNU LNU, a.k.a. Tocayo; (50) Christian NAVARRETE; (51) Juan LNU; (52) Chuy LNU; (53) Santos LNU; (54) FNU LNU-17; (55) FNU LNU-18 and (56) FNU LNU-19.

39.     On April 25, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE #2** (telephone number (915) 727-0328, UFMI Number 128*1021280*7 and IMSI Number 316010007454991) and **EL PASO'S TARGET TELEPHONE #4** (telephone number (303) 350-6195, UFMI Number 121*768*1637, and IMSI Number 316010007454991).     The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION:(1) Jose Luis TERRAZAS, a.k.a. "Gordo"; (2) Jesus Rodolfo MARTINEZ, a.k.a. "Compita"; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a. "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA. a.k.a. "ULYSSES"; (11) Erubiel SOLIS, a.k.a. "El Jefe," and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ, a.k.a. "Manny"; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene SOTELO-Alvarado, a.k.a. Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael PEREZ-Garcia, a.k.a. "Guero"; (25) Max LNU; (26) Miguel LNU; (27) Eusebio MARTINEZ, a.k.a. "Chaparrito"; (28) Jesus Armando ARANDA, a.k.a. FNU LNU-3; (29) FNU LNU-4; (30) FNU LNU-5; (31) FNU LNU-6; (32) FNU LNU-7; (33) FNU LNU-8; (34)

22

FNU LNU-10; (35) FNU LNU-11; (36) FNU LNU-12; (37) FNU LNU-13; (38) FNU LNU-14; (39) FNU LNU-15; (40) FNU LNU-16; (41) FNU LNU-17; (42) FNU LNU-18; (43) FNU LNU-19; (44) Christopher SARINANA; (45) Herman MARRUFO; (46) Aaron ARANDA; (47) Jose Javier ARANDA; (48) Greg LNU; (49) Wayne LNU; (50) Hector LNU; (51) Lalo LNU; (52) FNU LNU, a.k.a. Tocayo, and (53) Christian NAVARRETE.

40.     On April 15, 2008, U.S. District Judge David Briones, of the Western District of Texas, authorized the original interception of wire communications occurring over a telephone using (915) 727-3278, PTT number 128*969*3608, and IMSI number 316010159208403. The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: Rafael PEREZ-Garcia, Jose Luis TERRAZAS and Eusebio MARTINEZ.

41.     On April 3, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the original interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE #6** ((915) 850-2339, PTT Number 121*729*5368, IMSI Number 316010105520756). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: Jose Luis TERRAZAS; Jesus Rodolfo MARTINEZ; Richard ESCARCEGA; Hermelinda MILEDI; Alma Rosa GANEM, a.k.a. "Elma"; Miguel Arturo MILEDI; Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; Rogelio RODRIGUEZ-Lopez; Victor Hugo MONTALVO; Luis Alfonso AMAYA, a.k.a. "Ulysses"; Erubiel SOLIS, a.k.a. "El Jefe," and FNU LNU-1; Luis Carlos CORONEL; Michael AVILA; Jose Luis GABALDON; Manuel Enrique GONZALEZ; Nancy LARA; Beto LNU; Carlos LNU-1; Carlos LNU-2; Rene LNU; Manuel LNU; Joe LNU; Ricardo ESPINOZA; Rafael PEREZ-Garcia, a.k.a "Guero"; Max LNU; Miguel LNU; Eusebio MARTINEZ, a.k.a.

23

"Chaparrito"; FNU LNU-3; FNU LNU-4; FNU LNU-5; FNU LNU-6; FNU LNU-7; FNU LNU-8; FNU LNU-10; FNU LNU-11; FNU LNU-12; FNU LNU-13; FNU LNU-14; FNU LNU-15 and FNU LNU-16. On April 6, 2008, the interception of conversations occurring over **EL PASO's TARGET TELEPHONE #6** commenced.

42.     On April 2, 2008, U.S. District Judge David Briones, of the Western District of Texas, authorized the original interception of wire communications occurring over a telephone using (915) 892-0868, PTT: 128*969*2700, IMSI 316010159206607, which is used by Rafael PEREZ-Garcia. In the application for the continued authorization for this telephone Rafael PEREZ-Garcia, Manuel Enrique GONZALEZ, Jose Luis TERRAZAS and Eusebio MARTINEZ were identified as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION.

43.     On March 28, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE #2** (telephone number (915) 727-0328, UFMI Number 128*1021280*7 and IMSI Number 316010007454991), **EL PASO'S TARGET TELEPHONE #3** (UFMI Number    62*13*14785 and IMSI Number 334010010880350) **EL PASO'S TARGET TELEPHONE #4**    (telephone number (303) 350-6195, UFMI Number 121*768*1637, and IMSI Number 316010007454991) and **EL PASO'S TARGET TELEPHONE #5** (UFMI Number 52*302646*12, and IMSI Number 334010005003083). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: Jose Luis TERRAZAS; Jesus Rodolfo MARTINEZ; Richard ESCARCEGA; Hermelinda MILEDI; Alma Rosa GANEM, a.k.a. "Elma"; Miguel Arturo MILEDI; Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; Rogelio RODRIGUEZ-Lopez; Victor Hugo MONTALVO; Luis Alfonso AMAYA, a.k.a. "Ulysses"; Erubiel SOLIS, a.k.a. "El Jefe,"

24

and FNU LNU-1; Luis Carlos CORONEL; Michael AVILA; Jose Luis GABALDON; Manuel Enrique GONZALEZ; Nancy LARA; Beto LNU; Carlos LNU-1; Carlos LNU-2; Rene LNU; Manuel LNU; Joe LNU; Ricardo ESPINOZA; Rafael PEREZ-Garcia, a.k.a. "Guero"; Max LNU; Miguel LNU; Eusebio MARTINEZ, a.k.a. "Chaparrito"; FNU LNU-3; FNU LNU-4; FNU LNU-5; FNU LNU-6; FNU LNU-7; FNU LNU-8; FNU LNU-10; FNU LNU-11; FNU LNU-12; FNU LNU-13; FNU LNU-14; FNU LNU-15 and FNU LNU-16. On March 29, 2008, the interception of conversations occurring over **EL PASO'S TARGET TELEPHONE #2, EL PASO'S TARGET TELEPHONE #3, EL PASO'S TARGET TELEPHONE #4** and **EL PASO'S TARGET TELEPHONE #5** commenced. On April 16, 2008, the interception of conversations occurring over **EL PASO'S TARGET TELEPHONE #3** and **EL PASO'S TARGET TELEPHONE #5** terminated.

44.    On March 26, 2008, U.S. District Judge David Briones, of the Western District of Texas, authorized the continued interception of wire communications occurring over a telephone using PTT: 62*14*53219, which is used by Roberto GUERRERO-Valles, a.k.a. "Beto." In the application for the continued authorization for this telephone Jose Luis TERRAZAS was identified as a TARGET INTERCEPTEE/SUBJECT OF THE INVESTIGATION.

45.    On March 5, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the continued interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE #1** (number 011-52-1-656-282-2726, UFMI Number 62*229760*9, and IMSI Number 334010010692193). The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a. "Elma"; (6) Miguel Arturo MILEDI; (7)

25

Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA, a.k.a. "Ulysses"; (11) Erubiel SOLIS, a.k.a. "El Jefe", and FNU LNU-1; (12) Luis Carlos CORONEL; (13) Michael AVILA; (14) Jose Luis GABALDON; (15) Manuel Enrique GONZALEZ, a.k.a. "Manny"; (16) Nancy LARA; (17) Beto LNU; (18) Carlos LNU-1; (19) Carlos LNU-2; (20) Rene LNU; (21) Manuel LNU; (22) Joe LNU; (23) Ricardo ESPINOZA; (24) Rafael PEREZ- Garcia, a.k.a. "Guero"; (25) FNU LNU-3; (26) FNU LNU-4; (27) FNU LNU-5; (28) FNU LNU-6; (29) FNU LNU-7; (30) FNU LNU-8; (31) FNU LNU-10; (32) FNU LNU-11; (33) FNU LNU-12; (34) FNU LNU-13; (35) FNU LNU-14; (36) FNU LNU-15 and (37) FNU LNU-16.   On March 6, 2008, the interception of conversations occurring over **EL PASO'S TARGET TELEPHONE-1** continued, but was terminated on April 4, 2008.

46.    On February 4, 2008, United States District Judge David Briones, of the Western District of Texas, authorized the original interception of wire communications occurring over **EL PASO'S TARGET TELEPHONE #1** (number 011-52-1-656-282-2726, UFMI Number 62*229760*9, and IMSI Number 334010010692193).   The following individuals were listed in the application as TARGET INTERCEPTEES/SUBJECTS OF THE INVESTIGATION: (1) Jose Luis TERRAZAS; (2) Jesus Rodolfo MARTINEZ; (3) Richard ESCARCEGA; (4) Hermelinda MILEDI; (5) Alma Rosa GANEM, a.k.a. "Elma"; (6) Miguel Arturo MILEDI; (7) Antonio RODRIGUEZ-Lopez, a.k.a. "Tony"; (8) Rogelio RODRIGUEZ-Lopez; (9) Victor Hugo MONTALVO; (10) Luis Alfonso AMAYA, a.k.a. "Ulysses"; (11) FNU LNU-1, a.k.a. "El Jefe"; (12) Luis Carlos CORONEL; (13) Michael AVILA and (14) Jose Luis GABALDON.    On February 5, 2008, the interception of conversations occurring over **EL PASO'S TARGET TELEPHONE #1** commenced.

26

47.     On February 26, 2008, U.S. District Judge David Briones, of the Western District of Texas authorized the original interception of wire communications occurring over a telephone using PTT: 62*14*26012, which is used by Roberto GUERRERO-Valles, a.k.a. "Beto". Jose Luis TERRAZAS was listed as a TARGET INTERCEPTEE/SUBJECT OF THE INVESTIGATION.

## BACKGROUND OF THE INVESTIGATION

48.     On June 20, 2008, Agents with the Drug Enforcement Administration (DEA), Tulsa Resident Office, initiated an investigation on the Bobby FAIRCHILD drug trafficking organization (DTO). Agents determined that FAIRCHILD has been documented in numerous state and local law enforcement agency reports of investigation (ROI) and has been known as a large scale distributor of methamphetamine for over approximately five (5) years. FAIRCHILD is believed to have connections to higher ranking criminal associates located on the southwest border of the United States and other associates in Mexico.

49.     Bobby FAIRCHILD has been identified as a source of supply (SOS) of large amounts of methamphetamine for a number of locations throughout eastern Oklahoma and possibly throughout the entire State of Oklahoma. Additionally, agents from the DEA Tulsa Resident Office have received information relating to the illegal drug trafficking activities of FAIRCHILD through witnesses, law enforcement reports of investigation and through numerous conversations with state and local law enforcement agents/officers.

50.     Members of the DEA Tulsa Resident Office have determined that Bobby FAIRCHILD resides in the town of Oktaha, Muskogee County, Oklahoma, and controls and coordinates his illegal enterprise from that area. FAIRCHILD has been identified as a distributor/transporter and organization leader of his drug trafficking organization based in

27

Oklahoma. FAIRCHILD has subsequently been identified as the cell head of the drug trafficking organization based in Oklahoma.

51.    Statements, reports of investigation and information gathered by members of the DEA Tulsa Resident Office and other law enforcement agencies show that beginning in approximately 2003 through the present time, Bobby FAIRCHILD has been and is currently responsible for coordinating and/or transporting large shipments of methamphetamine from areas in Mexico along the southwestern border to locations in Oklahoma and other locations throughout the United States yet to be identified.

52.    Intelligence and investigative information indicates Bobby FAIRCHILD is responsible for concealing shipments of drugs and/or drug proceeds in various conveyances, which he then coordinates and/or transports to a number of locations in Oklahoma and possibly to other locations in the United States. Based on conversations with agents of the Oklahoma Bureau of Narcotics and Dangerous Drugs (OBNDD), FAIRCHILD is, according to their information and investigation, one of, if not the largest methamphetamine dealer in the State of Oklahoma.

53.    In June 2008, members of the DEA Tulsa Resident Office received information from members of the DEA El Paso, Texas, Office who, during an ongoing Title III investigation, intercepted telephone conversations between **TARGET TELEPHONE #1**, (918) 704-5940, **TARGET TELEPHONE #2**, (918) 696-1755, and **TARGET TELEPHONE #3**, (918) 457-8368, each used by Bobby FAIRCHILD, and their target, Jose ESPARZA (**EL PASO'S TARGET TELEPHONE #7**). Members of the DEA El Paso Office relayed intercepted telephone conversations between **EL PASO'S TARGET TELEPHONE #7** (ESPARZA) and **TARGET TELEPHONE #1, TARGET TELEPHONE #2** and **TARGET TELEPHONE #3**

28

involving the planning and coordination of a future shipment of drugs from an unidentified location destined for FAIRCHILD in Oklahoma. On August 5, 2008, Members of the DEA El Paso Office intercepted a call between **EL PASO'S TARGET TELEPHONE #7** and FAIRCHILD, utilizing **TARGET TELEPHONE #3**, (918) 457-8368 indicating FAIRCHILD had changed his telephone number to (918) 457-8368 (**TARGET TELEPHONE #3**).

54.     Agents in El Paso explained Jose ESPARZA is the target of their large Title III investigation. The agents further explained ESPARZA has been identified through their investigation, witnesses and through debriefings of confidential sources as a high ranking member of an extremely sophisticated large scale drug trafficking organization. Agents further explained ESPARZA is the source of supply for this highly sophisticated drug trafficking organization operating in Mexico and the United States with known identified links to Juaquin CHAPO-GUZMON of the Sinaloa Cartel. CHAPO-GUZMON is a part of the Attorney General's Consolidated Priority Organization Target (CPOT) list. Agents explained that the links to the Juaquin CHAPO-GUZMON Sinaloa Cartel are direct and currently active. Agents further explained ESPARZA also had links to the Vicente CARILLO-FUENTEZ (VCF) CPOT target.

55.     Agents from El Paso explained, in October 2005, the El Paso Field Division (EPFD) initiated an investigation into the Rogoberto Saenz Drug Trafficking Organization (DTO). This organization was responsible for the transportation of millions of dollars of drug proceeds from cities throughout the United States to El Paso, Texas. These proceeds were subsequently smuggled into Ciudad Juarez, Mexico. This investigation has been linked to Consolidated Priority Organization Targets (CPOT) Ignacio CORONEL-Villareal and Vicente CARRILLO-Fuentes (VCF).

29

56.     On October 29, 2008, and October 30, 2008, members of the DEA London, Kentucky, Office intercepted a telephone conversations between **TARGET TELEPHONE #4**, used by Bobby FAIRCHILD, and their target, Jeremy STEWART (**Kentucky's TARGET TELEPHONE #2**).  Members of the DEA London, Kentucky, Office forwarded to the DEA Tulsa Resident Office the intercepted telephone conversation between **TARGET TELEPHONE #4** (FARICHILD) and **Kentucky's TARGET TELEPHONE #2** (STEWART) involving the planning and coordination of a future shipment of drugs.   Agents in London, Kentucky, explained Jeremy STEWART is the target of their Title III investigation.   The agents further explained STEWART has been identified through their investigation as a member of a large scale drug trafficking organization.

57.     Based on the aforementioned information and in conjunction with past information and intelligence, members of the DEA Tulsa Resident Office initiated an investigation regarding the illegal international drug trafficking activities of Bobby FAIRCHILD.  This investigation will be conducted by the members of the DEA Tulsa Resident Office, DEA El Paso Field Division, DEA Nashville, Tennessee, DEA London, Kentucky, Oklahoma Bureau of Narcotics and Dangerous Drugs (OBNDD), the Internal Revenue Service (IRS), the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the Federal Bureau of Investigation (FBI) and the United States Attorney's Office (USAO) of the Eastern District of Oklahoma (EDOK).

## BACKGROUND AND PROBABLE CAUSE TO INTERCEPT
## FAIRCHILD'S TELEPHONE

58.     On July 24, 2008, a court ordered interception began on telephone number (918) 704-5940, belonging to or utilized by Bobby FAIRCHILD, hereafter referred to at **TARGET**

30

**TELEPHONE #1**.  On August 12, 2008, a court ordered interception began on telephone number (918) 696-1755, belonging to or utilized by FAIRCHILD, hereafter referred to at **TARGET TELEPHONE #2**.  On September 5, 2008, and again on October 10, 2008, a court order was signed authorizing the continued interception of the conversations on **TARGET TELEPHONE #2**.  On September 5, 2008, a court ordered interception began on telephone number (918) 457-8368, belonging to or utilized by FAIRCHILD, hereafter referred to at **TARGET TELEPHONE #3**.  On October 3, 2008, a court order was signed authorizing the continued interception of conversations on **TARGET TELEPHONE #3**.  On June 17, 2008, a court ordered interception began in El Paso, Texas, on telephone number (915) 217-8066, belonging to or utilized by Jose ESPARZA, hereafter referred to at **EL PASO'S TARGET TELEPHONE #7**.  Pursuant to the interceptions, agents identified the following telephones being utilized by FAIRCHILD to further his drug trafficking activities: (918) 704-5940 **(TARGET TELEPHONE #1)**, (918) 696-1755 **(TARGET TELEPHONE #2)** and (918) 457-8368 **(TARGET TELEPHONE #3)**.  Below are some summaries from calls intercepted pursuant to the above listed Court Orders.  Unless otherwise noted, the information provided is based on summaries of the telephone calls.

## TARGET TELEPHONE #1

### (918) 704-5940

59.     On June 19, 2008, at approximately 9:58 p.m., Jose ESPARZA utilized **EL PASO'S TARGET TELEPHONE #7** and called Bobby FAIRCHILD on a telephone assigned number (918) 704-5940, **EDOK TARGET TELEPHONE #1**, (Call Number 218). During the conversation, FAIRCHILD stated "Hello."  ESPARZA then stated "What's going on my friend?" FAIRCHILD then stated "Hey, ain't nothing man. Are you still alive?"[VOICES

31

OVERLAP].   ESPARZA then stated "[STUTTERS] I've been calling you sending you messages, you don't answer." FAIRCHILD then stated "Bullshit!" ESPARZA then stated "I [STUTTERS] swear to God I have. I [STUTTERS] I've been to Phoenix I barely got here this morning my friend uh ..." [VOICES OVERLAP]. FAIRCHILD then stated "On my six nine six ((918) 696-1755, which is subscribed to FAIRCHILD) old number you sent my messages?" ESPARZA then stated "Huh?" FAIRCHILD then stated "On my six nine six (696) number you sent my messages?" ESPARZA then stated "[STUTTERS] I'll tell you right now when I go to the truck I've been sending you messages and shit like that, then I was in Phoenix and uh...."[VOICES OVERLAP]. FAIRCHILD then stated "No you've been sending me, you've been sending me wrong on that phone that I had to throw away." ESPARZA then stated "Oh okay, okay, okay. Yeah and, and [STUTTERS] stuff like that..." [VOICES OVERLAP]. FAIRCHILD then stated "Anytime, anytime you couldn't get a hold of me you called that six nine six (696) phone number and uh..." [VOICES OVERLAP]. ESPARZA then stated "Yeah but I didn't want to you know...uh but I'm here trying to make everything work (drug transaction) you for..." [VOICES OVERLAP]. FAIRCHILD then stated "I've been in, I've been in, I've been in jail." ESPARZA then stated "Uh, fuck no my friend." FAIRCHILD then stated "Yeah my son-in-law got smart with me and I ran over him in my fucking truck." ESPARZA then stated "Oh shit!" FAIRCHILD then stated "He was standing out in the yard and I just pulled up in the fucking yard and I was..." ESPARZA then stated "Oh shit! [PAUSE] But everything cool with you? Everything okay?" FAIRCHILD then stated "I don't know... he called me yesterday he said he wanted to drop all the charges and shit for one hundred thousand ($100,000.00). And I told him I wasn't giving him no fucking money." ESPARZA then stated "Oh okay, no, no my friend of mine I'm just trying to get everything and uh ... I'll see you uh,

32

I've been in Phoenix my friend. I've been staying in Phoenix. I came to my house because my wife was bitching so I came right here to my house today and uh, and I'll go up there to." [VOICES OVERLAP]. FAIRCHILD then stated "Nah I don't need to see you I just called to check on you. I want to make sure that you're still alive."[VOICES OVERLAP]. ESPARZA then stated "No, no, no, no I'm fine my friend. No, no, no I'm fine my friend. I'm fine. It's just that things (drug trade) are real bad right here (El Paso, Texas) my friend. Here with the family. You understand?" FAIRCHILD then stated "Oh I know." ESPARZA then stated "And uh...but uh..." [VOICES OVERLAP]. FAIRCHILD then stated "I know that's why I was calling to check on you. I wanted to make sure that you wasn't dead." ESPARZA then stated "No, no, no, no my other friend ... they [STUTTERS] they...uh I'll tell you when I see you. I'll go up there and see you and uh, I've got a plan (drug transaction) already..." [VOICES OVERLAP]. FAIRCHILD then stated "Oscar (Oscar Rene RONQUILLO) is all right ain't he?" ESPARZA then stated "Huh?" FAIRCHILD then stated "Oscar is okay ain't he?" ESPARZA then stated "Oh yeah Oscar is okay, but uh, one of Oscar's relative's is not okay and uh...I don't know if you remember uh...two (2) dogs (men) came a long time ago to the store. Remember?" FAIRCHILD then stated "Yeah." ESPARZA then stated "Well all that family is gone (deceased)." FAIRCHILD then stated "That girl?" ESPARZA then stated "Yeah, yeah, yeah, yeah, yeah, yeah. Remember?" FAIRCHILD then stated "Yeah, they got that girl?" ESPARZA then stated "Yeah, yeah the mother, her, her brother, and the other sister and two young uh and two young ones. They uh..." [VOICES OVERLAP]. FAIRCHILD then stated "I'll be damn ...." ESPARZA then stated "Yeah, yeah but it's been really bad and uh [LAUGHS] inside a vehicle..." FAIRCHILD then stated "[SNORTS]. ESPARZA then stated "...about two hundred (200), two hundred (200 rounds of ammunition) shots and little babies. You understand that's not

right you know." FAIRCHILD then stated "Yeah." ESPARZA then stated "Yeah but I'll go see you my friend and I already have. . . . I have a plan (drug transaction) so I could make everything up to you and I already got a new plan (drug transaction)." FAIRCHILD then stated "Okay." ESPARZA then stated "I've been, I've been trying. I've been working and uh...I just, I didn't know..." [VOICES OVERLAP]. FAIRCHILD then stated "Dude I ain't even, I ain't even trying to do nothing." ESPARZA then stated "Yeah..." [VOICES OVERLAP]. FAIRCHILD then stated "Because every time that I try to do something (drug transaction) it turns to shit I've just been uh. I've just been uh...I'll just sit around and wait." [VOICES OVERLAP]. ESPARZA then stated "You now what ... remember, remember, the ....the roosters (illegal drug) that we that you were going to fight the fourth (4th) of July with your friends? Remember?" FAIRCHILD then stated "Yeah." ESPARZA then stated "... Derby? ...derby those were very nice (good quality) my friend. You know uh but I know how to do it (drug transaction) and everything my friend so I'll see you up this week for sure." FAIRCHILD then stated "Okay all right it's all ...." [VOICES OVERLAP]. ESPARZA then stated "I promise, I promise I'll go see you." FAIRCHILD then stated "All right, see you buddy." ESPARZA then stated "All righty? Okay my friend." FAIRCHILD then stated "Bye." ESPARZA then stated "I'll see you."

60.     In the conversation in the previous paragraph, it is believed that Jose ESPARZA is checking in with Bobby FAIRCHILD. Further, it is believed that ESPARZA has been leaving messages for FAIRCHILD, which FAIRCHILD denies that he has received. Further, it is believed that the references to "plan" and "make things right" made by ESPARZA are references to a drug transaction. It is believed that ESPARZA possibly owes FAIRCHILD a drug transaction and it is believed that ESPARZA has a plan implemented to provide FAIRCHILD with illegal drugs. It is also believed that FAIRCHILD's reference to "Oscar" is reference to

34

Oscar Rene RONQUILLO, who is a known drug trafficker in the El Paso, Texas, area. During the conversation ESPARZA has to explain that some relatives of Oscar Rene RONQUILLO had been shot to death. Information provided by the DEA El Paso, Texas, Field Division indicate with the recent increase in drug related violent crimes in Juarez, Chihuahua, Mexico, it is believed that the killing involving Oscar Rene RONQUILLO's relatives was drug related.

61.     On June 21, 2008, at approximately 9:57 p.m., Bobby FAIRCHILD utilized a telephone assigned number (918) 704-5940, **TARGET TELEPHONE #1,** to call Jose ESPARZA on **EL PASO'S TARGET TELEPHONE #7** (Call Number 838). During the conversation, ESPARZA then stated "Hello my friend." FAIRCHILD then stated "What are you doing there, you little fucker?" ESPARZA then stated "Yeah, shh... I'm trying to, I'm going to Phoenix again, my friend. I'm trying to, figure out what to do my friend." FAIRCHILD then stated "Are you really?" ESPARZA then stated "Yeah, it's been ..." [VOICES OVERLAP]. FAIRCHILD then stated "What about..." ESPARZA then stated "Huh?" FAIRCHILD then stated "What about, what about the Kelso Sage? You still can't me none of them?" ESPARZA then stated "No, my friend. No they, they, they, they uh, they had the, they, they had problems, they had problems there (unknown location)." FAIRCHILD then stated "I'll be damn, I have one (one unknown subject) bring me ten (kilograms of cocaine)." ESPARZA then stated "It, it yeah." [VOICES OVERLAP]. FAIRCHILD then stated "It's that fucking, they're fucking gone (sold), just like that. And uh..." ESPARZA then stated "Yeah my friend they had problems there at the... uh right there with the... you know where the, the people that like chicken, you know that like chicken and watermelon." FAIRCHILD then stated "Yeah." ESPARZA then stated "Yeah they had problems there. But not them, uh the ... uh somebody else uh, uh I don't know exactly who, but that's what uh, but he had told me yes, and ... and stuff like that but uh

35

I'm ... I'm trying on that uh, the other stuff and uh, and I'm just told them that uh, you that you needed to check everything and that uh, yeah, yeah I just uh actually spoke to him (unknown subject) earlier today and I told him that uh, he needs to make up whatever ... he said no, that, that was fine, that he was going to start doing that (providing more illegal drugs) and ... well that what I'm trying to do, I'm on the road right now my friend." FAIRCHILD then stated "No I was... I need the, I need the new ones like I talked to you about." ESPARZA then stated "Okay." FAIRCHILD then stated "*Queso, queso.* [cheese], (cocaine)." ESPARZA then stated "Yeah, yeah I know the, the, the one that you put on the *tortilla*, yeah I know which one, I know which one my friend. And uh... the uh, the in... let me talk him today the... not today but tomorrow my friend, and I'll tell him that, the only thing my friend that uh, with those and those restaurant, on that restaurant well it has to be uh, you know, I don't know uh, has to be quicker. Is that okay?" FAIRCHILD then stated "I just, I just need a week (to dispose of or sell)." ESPARZA then stated "You just need a week?" FAIRCHILD then stated "Yeah." ESPARZA then stated "Okay my friend." FAIRCHILD then stated "Uh don't, no bring me, no more then ten (10 kilograms of cocaine) though, cause I can't, I can't take care of ten (10 kilograms of cocaine), no quicker then that, but bring me ten (10 kilograms of cocaine)." ESPARZA then stated "Okay, okay, let me, let me uh..." FAIRCHILD then stated "Now how, how, how much are they (price per kilogram of cocaine)?" ESPARZA then stated "Well I don't know, they, they say they were like uh, remember like I told you, like twenty ($20,000.00 per kilogram) dollars, I don't know how much you got em for, my friend." FAIRCHILD then stated "I promise you, I promise you, I'll tell you the truth, okay." ESPARZA then stated "Uh-huh." FAIRCHILD then stated "I promise you, I got em eighteen five ($18,500.00 per kilogram)." ESPARZA then stated "Well that's a very dis... bad-ass my friend." FAIRCHILD then stated "Right here (Oklahoma) man, they was right

36

here (Oklahoma). They (unknown third party) wouldn't put them up there for that. They put them right here for eighteen five ($18,500.00 per kilogram)." ESPARZA then stated "Where, at your house?" FAIRCHILD then stated "Yeah." ESPARZA then stated "Okay now, well I can do that." FAIRCHILD then stated "Okay, well put them here, put them here, I'll take them tomorrow."    ESPARZA then stated "Okay, let me, well let me tell them I'm here, and I'm headed to Phoenix." FAIRCHILD then stated "All right." ESPARZA then stated "Uh-huh..." FAIRCHILD then stated "I need, I need, I need em, I need em whole (complete kilogram and uncut), with, with the tattoo (the logo commonly stamped by drug trafficking organizations)." ESPARZA then stated "No, no, no yes uh, yes my friend, I you got the ta... yeah, I got the tattoo artist and everything (source of supply)."    FAIRCHILD then stated "Okay." ESPARZA then stated "Okay? They got the tattoo (logo) artist and everything but uh... but uh ... I mean [LAUGHS] it's getting hardly, nobody drives more then, then ten (10 kilograms) stands, you know? It's been, I don't know, it's been real bad (reference to the violence in Juarez, Chihuahua, Mexico and rival drug cartels) but I'm just trying my friend, I'm working real hard, and I'm headed out to Phoenix and, uh call me uh, uh... but my other phone, my other friend got's it but uh, I'll let you know exactly everything what's going on." FAIRCHILD then stated "Okay." ESPARZA then stated "All righty and uh, I'll let you know and... hey but you, are you okay, everything's fine over there, shit?" FAIRCHILD then stated "Oh yeah, I mean I might wind up having go to the penitentiary, but it'll be a year. They'll drag it out for a long time." ESPARZA then stated "Shit!" FAIRCHILD then stated "But... I mean, I don't know what's going to happen, I don't know, it don't..." ESPARZA then stated "So..." FAIRCHILD then stated "... we gotta, it don't..."    ESPARZA then stated "Well you know my friend, yeah..." [VOICES OVERLAP].   FAIRCHILD then stated "... even, even if, even if I go I mean, I still

37

have to do something (drug transaction)." ESPARZA then stated "Yeah, yeah my friend, but no, no, I hope you don't my friend, I hope you, I hope you figure out something before, you know." FAIRCHILD then stated "Yeah." ESPARZA then stated "If you can bring out something, but no, no my friend, I'm here to help you, now I'm gonna do that my friend. And uh... so I'll be calling you, to let you know, but I'm here to help my friend." FAIRCHILD then stated "Alright." ESPARZA then stated "And I'll, I'll do whatever I need to do uh, for you too." FAIRCHILD then stated "Okay." ESPARZA then stated "Okay my friend." FAIRCHILD then stated "All right." ESPARZA then stated "Now take care."

62.    In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD is calling Jose ESPARZA to ask him for 10 kilograms of cocaine. Further, it is believed that FAIRCHILD was able to obtain an unknown quantity of cocaine for the price of $18,500 per kilogram. It is also believed that FAIRCHILD uses this to negotiate with ESPARZA in an attempt to lower ESPARZA's offer of $20,000.00 per kilogram of cocaine. It is also believed that FAIRCHILD intends to obtain the 10 kilograms of cocaine from ESPARZA and will then need a week to sell the cocaine.

63.    On July 27, 2008, at 9:05 p.m., Bobby FAIRCHILD received a call on **TARGET TELEPHONE #1** from Alfredo Guzman, utilizing telephone number (817) 733-7015. Guzman told FAIRCHILD he has someone who can work inside the houses on the sheet rock, guaranteed for 19. FAIRCHILD said as long as they are good and come back to bring him 10. FAIRCHILD asked if it is a cash deal or do they need a little time. Guzman asked FAIRCHILD if he has "the papers." FAIRCHILD said if they need "the papers" now to bring 10, if they don't to bring him 20. Guzman asked if FAIRCHILD will send "the papers" right away, FAIRCHILD

38

replied "yes." Guzman told FAIRCHILD he is going over there and needs a couple of hours; he will call to set it up. FAIRCHILD said they have to have a stamp.

64.     In the conversation in the previous paragraph, it is believed that Alfredo Guzman and Bobby FAIRCHILD are discussing a delivery of drugs involving 10 to 20 pounds or possibly kilograms of an undetermined type of drug. During the conversation, FAIRCHILD and Guzman utilize "papers" as code for U.S. Currency/cash. It is believed that "papers" is referring to money/cash and if a money/cash transaction is required upon delivery of the drugs then FAIRCHILD has the money to pay for 10 immediately. If the delivery of drugs does not require immediate payment, then he (FAIRCHILD) would like 20. Toward the end of the conversation, FAIRCHILD tells Guzman that they have to have a stamp. It is believed the stamp that is placed on the face of a package of drugs which indicates that it is intact in its "original" packaging and has not been opened which further indicates that the contents of the package are in their purest form.

65.     On July 27, 2008, at 9:46 p.m., Luis Gonzales, utilizing telephone (915) 412-7461, called Bobby FAIRCHILD on TARGET TELEPHONE #1. Gonzales asked FAIRCHILD if he (FAIRCHILD) called from another phone. FAIRCHILD replied yes and that it is his "new" number. Gonzales told FAIRCHILD that he (Gonzales) will get the other one tomorrow and that he is looking into his appointment.

66.     The information provided in the previous paragraph is believed to be an indication that Bobby FAIRCHILD is utilizing more than one telephone for purposes of communication.

67.     On July 28, 2008, at 10:20 a.m., an Unknown Male (UM), utilizing telephone (606) 821-9456, called Bobby FAIRCHILD on TARGET TELEPHONE #1. FAIRCHILD asked if the UM is ready for him to "run back out there." The UM said he has a little over 100

39

right now, but that "one guy" (UM), has slowed down a little bit because his father is about to die of cancer. The UM said he will look for "it" in the next day or so, and it will be "54 dollars a lick." The UM said he looks for it by this weekend, if not this week. The UM said when the source is called he will take anywhere for 48. FAIRCHILD said they're supposed to bring those "kelso docks." The UM laughed and said someone owes him for almost one already. The UM said then he has about 1 ½ left but UM1 is supposed to take care of ½ or 1 today. The UM said he is on his way to getting rid of the UM1. The UM said the other (UM2) is doing good, the UM1 owes him about 9 or 10. FAIRCHILD says the UM1 is messing up, the UM said when they get behind and you try to catch them up, they just get deeper and deeper. The UM said if they are ½ of 1 out all the time, and you give them 8 or 10, they've got to come up with 10 or 12 before you do any better. The UM said (UM1) he solely depends on him [Gonzales] to pay his bills. The UM said he has another boy picking these people up already, and everything FAIRCHILD gets from him from now on will be "worked on." FAIRCHILD said that if you don't ever tell them that it's worked on they will never know it. The UM said he told the boy his would be "worked on" so he could cut the boy out. FAIRCHILD said they all have to take losses. The UM replied that he just doesn't like the way the boy was spending it all on women.

68.    In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD and an UM are discussing the receipt and then transportation of illegal contraband. DEA Special Agent Mike Rupe believes that when they discuss the UM having about "100" right now, they are speaking of a quantity of drugs. It is further believed that when they discuss something being "worked on" they specifically mean drugs being broken down and then cut with other products to increase their quantity.

40

69.    On July 28, 2008, at 1:24 p.m., an unidentified male (UM), utilizing telephone number (606) 821-9456, called Bobby FAIRCHILD on **TARGET TELEPHONE #1**. The UM asked FAIRCHILD if FAIRCHILD had decided to come out and look around. FAIRCHILD replied he will one of these days and he has not forgotten about it. The UM said they may double after a while.  FAIRCHILD asked how long did the UM have it for, the UM said he went through the world championship and that was at the end of May. The UM said he will do a lot to help FAIRCHILD out and will take a lot off FAIRCHILD.  The UM said to contact him if FAIRCHILD hears anything about those "kelsos".  FAIRCHILD asked if the UM could do 5 or 6 per month. The UM said he could do about 2 or 3 a week, he has a boy to help him hustle.

70.    In the conversation in the previous paragraph, it is believed that the UM and Bobby FAIRCHILD are discussing a delivery of drugs.  It is believed that this UM is a drug customer of FAIRCHILD. It is further believed that FAIRCHILD and the UM are discussing the amount of deliveries to be received each week/month.

71.    On July 28, 2008, at 2:29 p.m., Bobby FAIRCHILD utilized **TARGET TELEPHONE #1** to call Alfredo Guzman at telephone number (817) 733-7015. FAIRCHILD asked Guzman if they are going to bring "them."  Guzman replied "yes," but he hasn't talked to the guy who is two hours behind him.  Guzman said he should know something by tonight. FAIRCHILD said he has everything for 10 and to see if they have enough time for another 10 for a total of 20. Gonzales said he will let FAIRCHILD know tonight.

72.    In the conversation in the previous paragraph, it is believed that Alfredo Guzman and Bobby FAIRCHILD are discussing a delivery of drugs and the amounts to be received.

41

73.     On July 28, 2008, at 8:54 p.m., Luis Gonzales, utilizing telephone number (915) 412-7461, called Bobby FAIRCHILD on **TARGET TELEPHONE #1**. Gonzales asked FAIRCHILD if he is going to get his new phone there. FAIRCHILD said "okay."

74.     The information provided in the previous paragraph is believed to be an indication that Bobby FAIRCHILD is going to drop his current telephone and begin utilizing a separate telephone for purposes of communication.

75.     On July 29, 2008, at 10:14 a.m., Bobby FAIRCHILD utilizes **TARGET TELEPHONE #1** to contact Alfredo Guzman at telephone number (817) 733-7015. Guzman said the guy is working with the "cows," and that he will probably come back on Wednesday. Guzman said that after Wednesday he should know when we can go, it will be around the weekend.

76.     In the conversation in the previous paragraph, it is believed that Alfredo Guzman and Bobby FAIRCHILD are discussing when Guzman will receive the drugs and then when Guzman will be able to transport the drugs to FAIRCHILD.

77.     On July 30, 2008, at 8:46 a.m., Harvey French utilized telephone number (270) 994-2504, to contact Bobby FAIRCHILD on **TARGET TELEPHONE #1**.  FAIRCHILD told French, "They keep promising they're going to bring me some 'Stags' any day." FAIRCHILD told French there are a whole bunch of "Stags" down there but they can't get them across. FAIRCHILD asked if French wanted some "Stags" when they bring some to FAIRCHILD and French replied that he did.  FAIRCHILD told French they would not have anymore problems and that the "Stags" would be brought directly to FAIRCHILD or to French and they would bust every one of them open to make sure they worked.  FAIRCHILD told French if the "Stags" didn't work, they would send them back.

42

78.     In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD and Harvey French are discussing future drug shipments.  It is believed that "Stags" is a code word for drug types/amounts and that FAIRCHILD told French there is a large quantity of drugs in Mexico and the drug suppliers are attempting to move the drugs across the United States/Mexico Border.  It is further believed that FAIRCHILD told French they would open each bundle containing drugs and if the drugs were not of good quality, they would send them back.

79.     On July 30, 2008, at 10:45 a.m., Bobby FAIRCHILD utilized **TARGET TELEPHONE #1** to call an unknown male (UM) at telephone number (606) 821-9456. The UM asked FAIRCHILD if he remembers the tape FAIRCHILD "worked out there and liked." FAIRCHILD replied in the affirmative.  The UM said 100 rolls come in a case and asked how many FAIRCHILD would like.  The UM said the tape is 150 dollars a case.  FAIRCHILD said he wants four cases.  The UM said he will get them to take two cases and he will get two more and two cases for himself.  The UM said they are pretty handy if they ever come through with that rooster stuff.  The UM said in a week he will get rid of two or three hundred of that stuff right now.  The UM said that if another unidentified male (UM2) would ever get back he would start taking 120 at a time every week or two weeks.  The UM said the UM2 is only taking 30 at a time now.  FAIRCHILD said he wants to make sure that whenever "they" get theirs that he gets his so he's not behind more people. FAIRCHILD said things will go a lot better when they pick up some new people and stuff.  The UM said there is two there and one will take 100 every three weeks and a girl who will start taking 100 instead of 50.  The UM said he will ship FAIRCHILD something.

80.    In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD has received drugs from the UM which were good for his customers and when FAIRCHILD and the UM are talking about "rolls of tape" they are talking about a quantity of drugs. It is believed that the figures of 100, 120 etc. are also quantities of drugs for FAIRCHILD and others involved in this drug conspiracy to receive.

81.    On July 30, 2008, at 2:20 p.m., Bobby FAIRCHILD received an incoming call on **TARGET TELEPHONE #1** from an unknown male (UM) at telephone number (606) 821-9456. The UM asked FAIRCHILD if he will be coming out to get the "tape" or someone else. The UM said he has about ½ right now and wants to know if FAIRCHILD wants him to keep it or "mail" it. FAIRCHILD said to mail it because he doesn't want to haul it in the car with him at the same time.

82.    In the conversation in the previous paragraph, it is believed that "tape" is a reference to drugs and to "mail" the tape is to utilize a legitimate parcel carrier or a drug courier to get the drugs to Bobby FAIRCHILD.

83.    On August 1, 2008, at 12:57 p.m., Bobby FAIRCHILD utilized **TARGET TELEPHONE #1** to call an unknown male (UM) at telephone number (606) 335-3560. The UM asked FAIRCHILD when FAIRCHILD is going to be in town. FAIRCHILD said Tuesday. The UM said "that's cool will probably take them like two days you know...to be here." FAIRCHILD then asked the UM about the Pollo de Verte. FAIRCHILD informed the UM that he (FAIRCHILD) would like 2,000.   The UM stated he would see what he could do. FAIRCHILD then said "if they got a 1,000 stags tell them I'll give them something when they get here and 24 hours on the rest of it." The UM then said "don't worry man." FAIRCHILD then said "all I need is just enough time...just to go through and take them all out of the boxes

44

and look at them." FAIRCHILD further stated "once I take them out and take a look at them, I'll take care of it right then."

84.     In the conversation in the previous paragraph, it is believed that Bobby FAIRCHILD and the UM are discussing a future shipments of marijuana. It is believed when FAIRCHILD mentions "Pollo de Verte" he may have been trying to say Pollos De Verde, which translated to English means "green chickens." It is believed this is a code word for marijuana. It is further believed the numbers 1,000 and 2,000 mentioned by FAIRCHILD are pound quantities of marijuana and when FAIRCHILD stated "if they got a 1,000 stags tell them I'll give them something when they get here and 24 hours on the rest of it." It is believed that FAIRCHILD intends to pay for part of the marijuana immediately and pay the remainder of the balance within 24 hours. It is also believed that when FAIRCHILD said "once I take them out and take a look at them, I'll take care of it right then." FAIRCHILD wanted to see the marijuana before making payment.

85.     On August 20, 2008, at 5:12 p.m., Bobby FAIRCHILD utilized **TARGET TELEPHONE #1** to call Chris Shelton at telephone number (918) 697-9685. Shelton told FAIRCHILD that he (Shelton) was trying to reach FAIRCHILD last week and FAIRCHILD stated that he had his phone turned off. FAIRCHILD asked Shelton if he (Shelton) is coming by. Shelton stated he had some boys out west that were supposed to be bringing him (Shelton) some "Roosters and stuff" later this week. Shelton stated that "they" had sent him some brood cocks [PH] and Shelton's friend tried to "breed" them but they weren't that good. Shelton said he told "them" to send him some "pure ones." Shelton said he would bring one to FAIRCHILD when they get into town so FAIRCHILD can see how it looks. FAIRCHILD told Shelton to call when "they" get into town.

45

86.     In the conversation in the previous paragraph, it is believed that Chris Shelton and Bobby FAIRCHILD are discussing a delivery of drugs and when FAIRCHILD and Shelton are speaking about the "pure ones" they are referring to pure drugs.

87.     On August 15, 2008, at approximately 12:00 pm, Bobby FAIRCHILD who was utilizing **TARGET TELEPHONE #2**, (918) 696-1755, contacted Jimmy Smith at telephone number (918) 440-4345. The content of the intercepted telephone conversation indicated that Smith had already picked up "the package" and would be departing the Knoxville area at approximately 3:30 pm or 4:00 p.m., destined for FAIRCHILD who was located in Oktaha, Oklahoma. Upon reviewing this intercepted telephone conversation, Agents identified the subscriber of telephone number (918) 440-4345 as Jimmy C. Smith of Ochelata, Oklahoma. Through various law enforcement indices, members of the DEA Tulsa Resident Office obtained further information that Smith had an arrest and pending case on file in Cumberland County, Tennessee, from March 2007. At approximately 1:05 p.m., Deputy Casey Cox with the Cumberland County Sheriff's Department was contacted to obtain information from the pending case on SMITH. Records indicated that SMITH was arrested in March of 2007 as the result of a seizure of approximately nine-hundred and eighty (980) pounds of marijuana and the seizure of approximately eighty two thousand dollars (\$82,000.00) in United States Currency (USC). That investigation is currently pending with the State Prosecutor's office in the State of Tennessee. Members of the DEA Tulsa Resident Office contacted the legal compliance center for U.S. Cellular and were informed that GPS information could be provided for the telephone number subscribed to Smith. At approximately 3:20 pm, on August 15, 2008, members of the DEA Tulsa Resident Office received their requested GPS coordinates regarding Smith's cellular telephone (918) 440-4345 which indicated Smith was west of Knoxville, Tennessee, on Interstate

40. At approximately 3:30 pm, SA Kevin Pino contacted Deputy Cox and informed him of Smith's location. At approximately 4:30 pm, members of the Tennessee Highway Patrol had stopped Smith for a traffic violation on Interstate 40. During a search of the cab portion of the semi truck the Troopers located approximately five (5) tightly wrapped bundles containing approximately $283,210.00 hidden under the bunk in the sleeper compartment of the truck. Smith refused to sign the property receipt for the five (5) bundles of USC, claimed to have no knowledge of the money and was later released.

## TARGET TELEPHONE #2

### (918) 696-1755

88.     On October 1, 2008, Bobby FAIRCHILD utilized **TARGET TELEPHONE #2** to contact Melinda Fairchild at telephone number (918) 351-4023. FAIRCHILD told Melinda Fairchild that he was en route to a location west of Checotah, Oklahoma, to make a "drop." FAIRCHILD also instructed his wife (Melinda) to meet him at the front of their driveway because FAIRCHILD wanted to give Melinda Fairchild an unidentified item. On October 2, 2008, FAIRCHILD utilized **TARGET TELEPHONE #2** to contact Bob Epperson. During the conversation, Epperson asked FAIRCHILD if he had "counted yesterday." When FAIRCHILD replied that he did not count, Epperson stated that he could not find a "thousand." Epperson stated that he might have accidentally placed the thousand in with the sack he gave FAIRCHILD. FAIRCHILD told Epperson he would check the contents of the sack.

89.     The previous calls are believed to be discussions related to Bobby FAIRCHILD making a drug delivery on the evening of October 1, 2008, to Epperson. The term "drop" mentioned by FAIRCHILD in Call # 4315 is common terminology used by drug dealers to infer they are making a drug delivery. It is also believed the discussion between Epperson and

47

FAIRCHILD about the quantity of money that FAIRCHILD took into his possession during the evening of October 1, 2008, after making a drug delivery to Epperson.

90.      On October 2, 2008, Bobby FAIRCHILD utilized **TARGET TELEPHONE #2** to contact Bobby Epperson at telephone number (918) 360-6686.  FAIRCHILD told Epperson that he found six bundles.  Epperson stated that he had one extra package that he believed he gave FAIRCHILD by mistake.  FAIRCHILD commented that he placed all the bundles in his pickup truck.  FAIRCHILD commented to Epperson that he would "look around some more." On the same date, FAIRCHILD utilized **TARGET TELEPHONE #2** to contact Epperson at telephone number (918) 360-6686.  FAIRCHILD told Epperson that he had eight packages and that two of the packages had "two" in them.  FAIRCHILD counted out loud from one to ten on the telephone to Epperson.  FAIRCHILD was instructed to just count and "check it."  On the same date, FAIRCHILD again used **TARGET TELEPHONE #2** to contact Epperson. FAIRCHILD told Epperson that he counted it and Epperson owed FAIRCHILD a "hundred bucks." Epperson agreed with FAIRCHILD and the conversation was terminated.

91.      It is believed the previous conversations are related to the confusion between Bobby FAIRCHILD and Bobby Epperson about the quantity of money Epperson paid FAIRCHILD for a drug delivery.

92.      On October 3, 2008, John Brown utilized telephone number (601) 416-7027 to contact Bobby FAIRCHILD on **TARGET TELEPHONE #2.**  FAIRCHILD discussed the assault and battery he committed against his son-in-law in June of 2008.  FAIRCHILD stated that he had an unidentified subject beat up his son-in-law after the first assault and then had another subject break all the windows out of his house and steal his Jeep.  FAIRCHILD boasted that he paid his son-in-law's medical bills and the charges were dropped.  FAIRCHILD told

48

Brown that he still believed he would still have to kill his son-in-law in the future. FAIRCHILD stated that he would have to "end it." Brown offered to assist FAIRCHILD with the son-in-law if needed.

93.    In June of 2008, Bobby FAIRCHILD was charged with felony Assault and Battery and Assault and Battery with a Dangerous Weapon. Further, on August 15, 2008, the Muskogee County District Attorney's Office dismissed all charges against FAIRCHILD.

94.    On October 5, 2008, Bobby FAIRCHILD utilized **TARGET TELEPHONE #2** to contact Teresa Fairchild (sister). Teresa Fairchild told FAIRCHILD, "tomorrow I'll have the money for you for one." FAIRCHILD replied, "you need to be careful the way you talk on this phone." FAIRCHILD told Teresa Fairchild, "don't be spending no more money until you get me paid." Teresa Fairchild replied, "alright!" FAIRCHILD told Teresa Fairchild, "I'm telling you that for your own good, I'm not telling you that for my good, what I'm telling is you don't want to come up short and then I come over there and you done spent all this money and stuff and you got all these excuses."   Teresa Fairchild responded, "I won't be short."

95.    It is believed that Teresa Fairchild was telling Bobby FAIRCHILD that she had enough money to purchase a specific quantity of a controlled substance. The term "short" is common drug trade vernacular for not having full payment for the purchase of drugs. FAIRCHILD and Teresa Fairchild have had previous monitored conversations about her problems with drugs.

96.    On October 15, 2008, at approximately 9:10 a.m., Bobby FAIRCHILD was utilizing **TARGET TELEPHONE #2** to speak with an unknown male. During that conversation, a telephone is heard ringing in the background. At that time, FAIRCHILD told the

49

unknown male that he was getting another call. During this call, an agent monitoring the conversation noticed an incoming call on a PEN register that was recording data for **TARGET TELEPHONE #4**. The incoming call from the PEN register indicated telephone number (215) 356-8622 was placing an incoming call to **TARGET TELEPHONE #4**. It is known that area code (215) is an area code used for El Paso, Texas, a known drug source city.

97.     Based on the information in the previous paragraph, it is believed that Bobby FAIRCHILD is utilizing **TARGET TELEPHONE #4** to contact individuals in a known drug source city. It is also known through the experience of investigators that drug traffickers often use multiple telephones to thwart the efforts of law enforcement in an attempt to stay undetected.

98.     On October 15, 2008, the PEN register information for **TARGET TELEPHONE #4** indicated that **TARGET TELEPHONE #4** attempted to contact Melinda Fairchild, the wife of Bobby FAIRCHILD, six times. During that time frame, FAIRCHILD utilized **TARGET TELEPHONE #2** to contact Mike Cason. During the conversation, FAIRCHILD asked Cason if Melinda Fairchild's car was at home. Cason replied yes. FAIRCHILD then replied to Cason in an angry tone "Would you go up their and tell her I said to please answer her fucking phone."

99.     Based on the information in the two previous paragraphs, it is believed that Bobby FAIRCHILD was utilizing **TARGET TELEPHONE #4** to attempt to contact his wife, Melinda Fairchild. When Melinda Fairchild did not answer after multiple attempts, FAIRCHILD then contacted Cason on **TARGET TELEPHONE #2** and instructed Cason to go the Fairchild residence and tell Melinda Fairchild to answer her phone.

## TARGET TELEPHONE #3

### (918) 457-8368

100.   On September 6, 2008, Bobby FAIRCHILD received a call on **TARGET TELEPHONE #3** from Harvey French who utilized telephone number (270) 994-2504. FAIRCHILD told French that he'd had it on him all day and was waiting on the other boys to call him. FAIRCHILD told French that they would call him today and let him know something.

101.   SA Cory Hallum believes that based on information received from this intercepted telephone conversation between Bobby FAIRCHILD and Harvey French that FAIRCHILD was waiting to receive a call and from his source of drugs and provide him with the status of a load of drugs. FAIRCHILD would then call French to inform him of the gathered information.

102.   On September 7, 2008, Bobby FAIRCHILD made a telephone call utilizing **TARGET TELEPHONE #3** to Jose Esparza at telephone number (915) 217-8066. FAIRCHILD asked Esparza if it was breaking loose. Esparza replied that there was nothing and states that "it's real bad." FAIRCHILD asked if "it's bad on this side or on that side." Esparza replied the other side.

103.   Based on information received from this telephone conversation between Bobby FAIRCHILD and Jose Esparza, it is believed that FAIRCHILD has been anticipating a shipment of drugs from Esparza and inquired to the status of the load by asking "is it breaking loose." Also, in this conversation, FAIRCHILD and Esparza are discussing the current difficulties in getting illegal contraband past or through the U.S./Mexico border.

104.   On September 7, 2008, Bobby FAIRCHILD made a call on **TARGET TELEPHONE #3** to an Unknown Male (UM) who utilized telephone number (606) 634-9921.

51

The UM told FAIRCHILD that he was going to be "more smarter and more cautious," because that fellow ratted on him the first time he got pulled. The UM told FAIRCHILD that it was worth going to jail for that amount of money. The UM said he looked at it every way and that it could have been worse. The UM told FAIRCHILD that it has taught him some valuable lessons and that he could get rid of the bigger ones. FAIRCHILD told the UM that if he could get them that he would give them to him (UM) for $7 a piece, and that if it's too high that he (UM) could wait. The UM told FAIRCHILD "no" and that he could get it taken care of.

105.    It is believed during this intercepted conversation Bobby FAIRCHILD and the UM are discussing a loss of money that the drug trafficking organization recently suffered. During the intercepted telephone conversation, FAIRCHILD told the UM that he could give them to the UM for $7 a piece and that it was too high to just wait. It is believed that FAIRCHILD is quoting the UM $7 a piece, meaning $700.00 per pound of marijuana.

106.    On September 7, 2008, Bobby FAIRCHILD received a call on **TARGET TELEPHONE #3** from an Unknown Male (UM) who utilized telephone number (915) 667-8979. FAIRCHILD asked the UM if he was on this side or the other side. The UM replied this side and further stated that it was a good deal. The UM asked FAIRCHILD how much the entry fee was that he (FAIRCHILD) gave the last boy. FAIRCHILD replied he would check and see but thought that it was 18 or 19. The UM told FAIRCHILD that he just found out on Friday that as soon as he (the boy) left that place that he (the boy) lost the entry fee right there, and they took it away from him. FAIRCHILD said that somebody came in and took the "stags too". The UM asked FAIRCHILD if it was where he (the boy) placed them or what. FAIRCHILD said that he (the boy) moved them and it wasn't where he took them. FAIRCHILD said he (the boy) had them in a warehouse and somebody came and pulled an electric breaker and put a whole in the

52

wall and went in and took them. The UM asked if it was just someone stealing from them. FAIRCHILD replied that it was just a thief. FAIRCHILD said that he (the boy) took care of them and that they were all gone the very next day. FAIRCHILD asked the UM if he needed to know exactly how much it was. The UM said that he didn't need to know and that he was just wondering. FAIRCHILD said that if he (the boy) files for it that he should get it back and that they can't just take away money like that. The UM told FAIRCHILD that he should let his buddy know that there is no problem but that it's good for him to know. FAIRCHILD said that if it was real close then some of those guys may not want to come up there with that truck again. The UM said that it's not helping them to send him (the boy) back over there. FAIRCHILD asked if "Goofy" man is about ready. The UM said that "goofy" is just waiting on them (the UM and FAIRCHILD) and all he (the UM) needs to do is call him (Goofy). The UM said that he hopes that he can call him (Goofy) as soon as he gets enough, so he (Goofy) can come. FAIRCHILD asked if anything broke loose on those "Quesos" (cheeses). The UM replied no and told FAIRCHILD that if he wants he's going to call Bobby's buddy that was there with him (UM) the other day. The UM told FAIRCHILD that he's going to change to a new phone and told FAIRCHILD to get himself another one. The UM told FAIRCHILD that he's going to call FAIRCHILD's buddy so he (the buddy) can give FAIRCHILD the new phone number and told FAIRCHILD to call the UM from the new phone number. The UM told FAIRCHILD that he's just sitting there waiting to do "something" and told FAIRCHILD to get a new phone tomorrow and then they will take it from there. FAIRCHILD told the UM that he hopes that they can get some "stags" there pretty quick. The UM said that he's doing his hardest.

107.    Based on information received from this intercepted telephone conversation between Bobby FAIRCHILD and the unknown male (UM), it is believed that FAIRCHILD

53

determined that the UM had recently returned to the United States from Mexico. During the conversation, FAIRCHILD and the UM also discussed a price of 18 or 19 as an "entry fee". It is believed that FAIRCHILD and the UM were discussing the price of $18,000 or $19,000 per kilogram of cocaine or pound of methamphetamine that was charged on a previous shipment/load involving drugs. During the conversation, FAIRCHILD and the UM also talked about a loss of money or shipment of drugs that were being stored at a warehouse, location unknown, where FAIRCHILD and the UM suspected the warehouse had been burglarized and the load of drugs and/or money was subsequently seized by law enforcement. FAIRCHILD and the UM also discussed a loss of money recently suffered by the organization due to an interdiction by law enforcement. FAIRCHILD told the UM that the transporter of the money, referred to as "the boy," should be able to get the money back and "they" just can't take money away like that. Based on this portion of the conversation it is believed that FAIRCHILD is making reference to a seizure of drug proceeds from the organization by law enforcement. It is also believed that FAIRCHILD and the UM also discussed the truck that was driven during the seizure of currency and discussed that the particular truck cannot make any further trips involving drugs or money because the truck is now known to law enforcement. FAIRCHILD and the UM discussed utilizing a different driver, referred to as "Goofy", who is ready to make transportation trips and all they needed to do is make the call. Affiant knows through his training and experience that drug trafficking organizations often change vehicles, drivers, transportation routes and methods of concealment following seizures of drugs and/or drug proceeds. Lastly, during the conversation, the UM and FAIRCHILD discussed purchasing new telephones and talked about continuing the conversation on the new telephones. Affiant knows that drug traffickers often possess and communicate on numerous cellular telephones and often change

54

telephones in order to feel safe with their communication methods. Affiant also knows through his training and experience that drug trafficking organizations change cellular telephones following a seizure in an attempt to remain undetected by law enforcement.

108.    On September 11, 2008, Jeremy Stewart, utilizing telephone number (606) 634-9921, contacted Bobby FAIRCHILD on **TARGET TELEPHONE #3**. Stewart asked if "it's ever been that hard to get?" FAIRCHILD said it never has been this hard, but he talked to "them" and they say it is going to "break loose" any day. Stewart said he has been gathering "some" so that when he travels to FAIRCHILD's home he can bring as much as possible. Stewart said he sent the questionnaire off and it wasn't that bad, "they" only wanted to know about bank account information. FAIRCHILD told Stewart to be at his home Friday or Saturday. Stewart says he will be working on getting "everything" he can get.

109.    It is believed during this intercepted telephone conversation when Jeremy Stewart asked if "it's ever been that hard to get," Stewart was referring to drugs. Bobby FAIRCHILD's reply was then that he spoke with a Source of Supply who stated it will be any day now for more drugs to be available. Stewart then said he was going to gather "some" and "everything" he can get. Agents believe Stewart is referring to drug proceeds. Agents further believe that when Stewart traveled to FAIRCHILD's home for a birthday party on September 20, 2008, Stewart transported drug proceeds to FAIRCHILD. Stewart also referred to a questionnaire he completed regarding claiming drug proceeds which were confiscated by law enforcement.

110.    On September 12, 2008, Bobby FAIRCHILD utilized **TARGET TELEPHONE #3** to contact Alfredo Guzman at telephone number (817)733-7015. Guzman told FAIRCHILD that it was taking forever to do the job down there. FAIRCHILD said not to get mad at them, it's everybody. FAIRCHILD said when he first started he did one job of 1,000 feet and then a little

55

job of 200 feet. Guzman said he had $150. FAIRCHILD said if Guzman can get 200 feet to bring them. Guzman said he would make some calls.

111.    During this intercepted conversation it is believed that Alfredo Guzman was saying his Source of Supply was not able to bring drugs into the United States. During the conversation, Bobby FAIRCHILD told Guzman that everyone is in short supply of drugs. FAIRCHILD stated he used to get loads of drugs in quantities of 1,000 but now the quantities have become less: 200. It is believed that FAIRCHILD was ordering a quantity of drugs in the amount of 200 from Guzman and Guzman was willing to find a Source of Supply in order to get the drugs.

112.    On September 17, 2008, Bobby FAIRCHILD utilized **TARGET TELEPHONE #3** to contact Mike LNU at telephone number (918) 344-7958. FAIRCHILD instructed Mike to be at an unknown location at twelve o'clock. FAIRCHILD asked Mike if he recalled what a particular type of truck an unidentified subject was driving. Mike told FAIRCHILD that the truck was red and would be pulling a red trailer. Mike asked "how many are there supposed to be." FAIRCHILD responded by saying that he cannot answer the question.

113.    It is believed the subject in the red pickup truck dropped off an unknown type and quantity of drugs at Bobby FAIRCHILD'S property on September 17, 2008. During that time period, surveillance observed a red pickup truck and trailer arrive at FAIRCHILD'S residence. Further, on September 17, 2008, a subject by the name of Louis Montoya was stopped driving the above-described vehicle. During a traffic stop, approximately $34,000 in U.S. currency was seized. It is believed the seized U.S. currency was payment for a drug delivery.

114.    On September 17, 2008, Mike LNU called Bobby FAIRCHILD who was utilizing **TARGET TELEPHONE #3**. Mike told FAIRCHILD that, "it's done." Mike also asked

FAIRCHILD if FAIRCHILD wanted Mike to "count this." Mike also mentioned that he (no further identification) is putting the money in a saddle bag.

115. During that time period, surveillance observed a trailer being pulled by a tractor from the above-mentioned location. Further, during a traffic stop, approximately $34,000 of U.S. Currency was recovered from a saddle bag(s) on a motorcycle.

116. On September 17, 2008, Mike LNU called Bobby FAIRCHILD who was using **TARGET TELEPHONE #3**. Mike told FAIRCHILD that the UM was leaving and the UM had unloaded an unidentified object(s). Mike asked FAIRCHILD about the unidentified male's money. FAIRCHILD instructed Mike to go to a horse trailer at the residence. Mike was instructed to remove a lid on a seat in the trailer, and FAIRCHILD told Mike "it's in there." FAIRCHILD also told Mike to pull thirty-four (34) out and that there is forty (40) in the compartment. FAIRCHILD told "Mike" to put "thirty-four" (34) in the saddle bag of the motorcycle. Mike acknowledged FAIRCHILD'S instructions.

117. On September 17, 2008, Mike LNU called Bobby FAIRCHILD who was using **TARGET TELEPHONE #3**. Mike asked FAIRCHILD if there were forty (40). Mike also stated "he took six out." FAIRCHILD acknowledged Mike's statement. Mike also commented that the unidentified male had departed. When FAIRCHILD asked Mike if Mike "put it" in the saddle bags, Mike told FAIRCHILD that the money was placed in the saddle bags.

118. It is believed that Bobby FAIRCHILD was asking Mike LNU about placing the 34 bundles of U.S. Currency in the saddle bags of the motorcycle, which was in the back of the trailer that was stopped by law enforcement later during the day on September 17, 2008.

119. On September 20, 2008, an unknown male (UM) contacted Bobby FAIRCHILD on **TARGET TELEPHONE #3**. FAIRCHILD spoke to the UM in a cryptic manner about the

loss of approximately $280,000 in Tennessee, which was seized by law enforcement during August of 2008. FAIRCHILD commented to the UM that he "lost a few dollars." FAIRCHILD told the UM that he is confident that he will successfully recover the money in a pending forfeiture hearing. FAIRCHILD told the UM that he anticipated some "stags" arriving in the next two to three weeks. FAIRCHILD told the UM that a stag will cost eight dollars apiece. The UM told FAIRCHILD that he would pay eight dollars for a stag.

120.    Agents know that during August of 2008, the Tennessee Highway Patrol stopped a known associate of Bobby FAIRCHILD by the name of Jimmy Smith while Smith was operating a tractor-trailer.    A subsequent search of the cab resulted in the seizure of approximately $280,000 from Smith.    Monitored calls between Smith and FAIRCHILD indicated that Smith had been dispatched to Tennessee to pick up the money by FAIRCHILD. Smith also called FAIRCHILD after he was released by law enforcement authorities to tell FAIRCHILD that the money had been seized.  During the course of monitored calls between FAIRCHILD and his criminal associates, FAIRCHILD relied upon the use of code words when he spoke to another co-conspirator about money or drugs.  It is believed the word "stag" is a code word for the quantity of a drug and possibly also a code word describing the type of drug.

121.    On September 22, 2008, Bobby FAIRCHILD received an incoming call on **TARGET TELEPHONE #3** from telephone (915) 443-6703 being utilized by Jose Esparza. FAIRCHILD asked Esparza if he had looked at any of the stags, Esparza replied yes. FAIRCHILD asked if they looked pretty nice.  Esparza replied that they are very nice stags. FAIRCHILD told Esparza if he gets some gathered up to try and send them up there where they picked up the other ones.

58

122.    It is believed during this intercepted telephone conversation Jose Esparza had recently obtained a load of marijuana which was being referred to as "stags." Also, during the conversation, FAIRCHILD asked Esparza if he had seen the marijuana and inquired about the quality of the marijuana.

123.    On September 22, 2008, Bobby FAIRCHILD received an incoming call on **TARGET TELEPHONE #3** from an Unknown Male (UM) who utilized telephone number 52-467-969-0254.  FAIRCHILD explained to the UM that he tried to call but his calls go to voicemail and asked the UM his location and the UM told FAIRCHILD that he was in Mexico building a house. The UM told FAIRCHILD that he spoke with the guys with the big truck and they have three and they (guys with the truck) will be there in a week if FAIRCHILD wanted them.  The UM told FAIRCHILD to change the number and FAIRCHILD replied that he (FAIRCHILD) was going to change it.  The UM told FAIRCHILD that he's calling from a pay phone and asks FAIRCHILD if he (FAIRCHILD) wants to write the UM'S new number down. FAIRCHILD told the UM he can't right now and the UM told FAIRCHILD he would call FAIRCHILD back in a few days.

124.    It is believed that in this intercepted telephone conversation the Unknown Male (UM) and Bobby FAIRCHILD were discussing a load of drugs, referred to as "3", which was in possession of the guys with the big truck and would make delivery to FAIRCHILD if he (FAIRCHILD) wanted the load of drugs. It is also believed that the UM was making reference to 300 hundred pounds of marijuana.  Also in the intercepted conversation, the UM told FAIRCHILD he was in Mexico and that he had a new personal telephone number that he (the UM) wanted FAIRCHILD to contact him on.

125.   On September 27, 2008, Bobby FAIRCHILD received an incoming call on **TARGET TELEPHONE #3** from Jeremy Stewart.  Stewart asked FAIRCHILD if his drug supplier was close to deciding on a delivery date.  FAIRCHILD responded by saying his source of supply is not willing to deliver from a "small highway" and asked Stewart if he had a location in the vicinity of 40.  FAIRCHILD also told Stewart that the load will be "stags."  Stewart told FAIRCHILD that he has a friend that is a welder that has a place on 40.  FAIRCHILD said that the location will have to accommodate a "big truck."  Stewart agreed to check and call FAIRCHILD back.

126.   It is believed that FAIRCHILD and Stewart were discussing the arrangement of a delivery of controlled substance.  The reference to "40" is actually Interstate 40.  FAIRCHILD's comment about a "big truck" actually means a tractor trailer.  It is also believed that FAIRCHILD was using the word "stag" to describe a particular type and weight of a controlled substance.

127.   On September 27, 2008, Bobby FAIRCHILD received an incoming call on **TARGET TELEPHONE #3** from Jeremy Stewart.  Stewart told FAIRCHILD that he had two possible sites located on 40.  Stewart told FAIRCHILD that one of the locations even had a locked gate.  Stewart told FAIRCHILD that the location "would be safer than we ever done it before."  Stewart expressed his concern about the law in Tennessee.  Further, that Stewart was "spooked up" about Tennessee and their "bad luck."  FAIRCHILD told Stewart that his source is afraid of "small highways."  FAIRCHILD claimed that the shipment is originating from El Paso, Texas.

128.    It is believed that Jeremy Stewart's concerns about Tennessee are related to a money seizure by the Tennessee Highway Patrol in August of 2008 that led to the seizure of approximately $280,000.

## FAIRCHILD'S INTERCEPTED CONVERSATIONS OVER
## KENTUCKY'S TARGET TELEPHONE #2

129.    On October 28, 2008, Bobby FAIRCHILD utilized **TARGET TELEPHONE #4** to contact Jeremy STEWART on Kentucky's **TARGET TELEPHONE #2**. During the conversation Stewart stated they needed to keep the Thursday deal and that is was still on schedule for Thursday.   Stewart also stated "they think you got all kinds of it."  Stewart further stated "That's what all of them seems to think, even out here.  They think that I've got some 'Stags' just sitting."

130.    Based on the previous conversation, it is believed that Stewart and Fairchild were discussing the delivery of drugs on Thursday.  During the conversation Stewart used the term "Stags." Based on information obtained from previous recorded conversations, it is believed the term "Stags" actually is a reference to marijuana.

131.    On October 30, 2008, Jeremy Stewart utilized **Kentucky's TARGET TELEPHONE #2** to contact an unknown Hispanic male at telephone number 915-356-8622. The unknown male informed Stewart that he expected they would "have an early dinner." Stewart then told the unknown male that he (Stewart) would take any "stags" he could get regardless of condition because he "needs them to fight". The unknown male then told Stewart that he would call him back around lunch and give him a status.

132.    On October 30, 2008, Jeremy Stewart utilized **Kentucky's TARGET TELEPHONE #2** to contact Bobby Fairchild on **TARGET TELEPHONE #4**.  During the

61

conversation Stewart informed Fairchild about the previous conversation with the unknown Hispanic male. Fairchild then told Stewart to unload it and the other guy that has been bugging him (Fairchild) to death will come get it.

133. Based on the previous conversations it is believed that an unknown Hispanic male plans to deliver an unknown quantity of drugs to Stewart. It is also believed that Fairchild instructed Stewart to unload the drugs and another unknown individual, directed by Fairchild, would later retrieve the drugs.

### TELEPHONE TOLL ANALYSIS OF TARGET TELEPHONE #4

#### (918) 629-3876

134. The use of telephone toll records and pen register data to record numbers dialed or pulsed over various telephones show specific telephone numbers have been called. Such information does not indicate the manner or delivery of a drug shipment, or the methods the organization uses to import and distribute the drugs. This type of information does not specify the identity, participation and role of the person(s) initiating or receiving the telephone calls, or the importation and distribution network of which the **TARGET INTERCEPTEES**, and others as yet unknown, are a part of. At best, this information provides evidence of contact between telephone numbers subscribed to certain people. Subscriber information records subpoenaed by law enforcement only provide the name of the person(s) to whom the telephone number(s) is/are assigned and does not provide accurate data about who actually speaks on the telephone. This information is not adequate, because it is the content of the calls, not the fact that they are being made, that will reveal the totality and complexity of the conspiracy.

135. On October 3, 2008, United States Magistrate Judge Steven P. Shreder, Eastern District of Oklahoma, signed a Pen Register Order, under seal, authorizing the capturing of

telephone numbers of calls to and from **TARGET TELEPHONE #4** (918) 629-3876, in addition to any other dialed digits. A Pen Register for this telephone number was installed on October 6, 2008. Toll records have also been obtained through AT&T Wireless for the period of September 9, 2008, through September 24, 2008.

136.   I have conducted an analysis of pen register, trap and trace and toll information for **TARGET TELEPHONE #4**. Based upon my review of the calls made to and from this telephone facility, I believe that **TARGET TELEPHONE #4** is being used to contact conspirators (on telephones not subject to court-authorized interception) in furtherance of the criminal activity specified above. A synopsis of the pen register, trap/trace and toll data which substantiates my belief regarding the use of **TARGET TELEPHONE #4** follows.

137.   As a result of toll records from September 9, 2008 through September 24, 2008, and a PEN register analysis from October 6, 2008 through October 28, 2008, **TARGET TELEPHONE #4** has placed/received approximately three hundred fifty-eight (358) total telephone calls to/from different numbers.

138.   **TARGET TELEPHONE #4** placed/received twenty-three (23) calls to/from (918) 457-8039 between September 9, 2008, and October 18, 2008. According to the analysis conducted on the tolls for **TARGET TELEPHONE #4**, October 18, 2008, was the last day **TARGET TELEPHONE #4** placed/received a call to/from (918) 457-8039. Telephone number (918) 457-8039 has been identified as being the telephone number subscribed to Richard Burris, RR 4, Box 1632, Checotah, Oklahoma. A records check indicated that Richard Burris was also known as (a/k/a) James Gilbert. The records check further indicated that Richard Burris, a/k/a James Gilbert, was arrested in November 1998 for trafficking marijuana. DEA records and investigations indicate that in November 2004, Richard Burris, a/k/a James Gilbert, was also

63

involved in the clandestine manufacturing and distribution of methamphetamine in Adair County, Oklahoma. During this investigation recorded conversations were captured between Bobby FAIRCHILD and Burris indicating his involvement with the drug trafficking organization.

139. **TARGET TELEPHONE #4** placed/received eight (8) calls to/from (817) 733-7015 between October 8, 2008, and October 24, 2008. According to the analysis conducted on the tolls for **TARGET TELEPHONE #4**, October 24, 2008, was the last day **TARGET TELEPHONE #4** placed/received a call to/from (817) 733-7015. DEA indices indicate that this telephone is subscribed to Alfredo Guzman in Ft. Worth, Texas. During this ongoing investigation, recorded conversations were captured between Bobby FAIRCHILD and Guzman, (817) 733-7015, discussing the transportation and distribution of illegal drugs.

140. **TARGET TELEPHONE #4** placed/received fourteen (14) calls to/from (918) 351-4023 between September 9, 2008, and October 18, 2008. According to the analysis conducted on the tolls for **TARGET TELEPHONE #4**, October 18, 2008, was the last day **TARGET TELEPHONE #4** placed/received a call to/from (918) 351-4023. DEA indices indicate that this telephone is utilized by Melinda Fairchild, the wife of Bobby Fairchild. During the ongoing investigation, recorded conversations were captured between Bobby FAIRCHILD and Melinda Fairchild discussing the transportation and distribution of illegal drugs and drug proceeds6

141. **TARGET TELEPHONE #4** placed/received two (2) calls to/from (915) 217-8066 between October 15, 2008 and October 19, 2008. According to the analysis conducted on the tolls for **TARGET TELEPHONE #4**, October 19, 2008, was the last day **TARGET TELEPHONE #4** placed/received a call to/from (915) 217-8066. Telephone number (915) 217-

8066 has been identified as being the telephone number subscribed and utilized by Jose Esparza, 12031 Valley Quail Drive, El Paso, Texas. As previously listed, Esparza is the current target in an on going Title III investigation out of El Paso Texas. During the investigation, recorded conversations were captured between Esparza and Fairchild negotiating the distribution of illegal drugs.

142.   **TARGET TELEPHONE #4** placed/received eight (8) calls to/from (918) 360-6686 between October 15, 2008 and October 28, 2008. According to the analysis conducted on the tolls for **TARGET TELEPHONE #4**, October 28, 2008, was the last day **TARGET TELEPHONE #4** placed/received a call to/from (918) 360-6686. DEA indices indicate that this telephone is subscribed to Bobby EPPERSON in Muskogee, Oklahoma. Telephone number (918) 360-6686 is documented in an ongoing narcotics investigation by the Muskogee Police Department. During the ongoing investigation, recorded conversations were captured between Bobby FAIRCHILD and Bobby Epperson, discussing the transportation and distribution of illegal drugs.

143.   Based on my training and experience, narcotics traffickers often carry multiple cellular telephones. Each of these cellular telephones is assigned a different telephone number. Each cellular telephone is utilized by the narcotics trafficker to make contact with specific members of the drug trafficking organization when needed. This method of communication is commonly used by narcotics traffickers for the purpose of concealing their identity to law enforcement if one or more of the members of the drug trafficking organization were arrested. Based on the pen register activity of **TARGET TELEPHONE #4,** including the number of calls made by **TARGET TELEPHONE #4** to various cellular telephones along with the volume of

65

calls made to specific telephones, affiant believes that **TARGET TELEPHONE #4** is specially

being utilized by Bobby FAIRCHILD for the purpose of narcotics trafficking negotiations.

## NEED FOR CONTINUED INTERCEPTION

144.    Normal investigative procedures have been tried and failed or appear unlikely to

succeed if tried, or are too dangerous to employ. These investigative procedures are detailed

below. Traditional methods of investigation will not be sufficient to accomplish the full goals of

this investigation, which include discovering:

a.    The manner and means of the commission of the offenses;

b.    The nature, extent and methods of operation of the drug trafficking business of the **TARGET INTERCEPTEES** and others yet unknown;

c.    The identities and roles of accomplices, aiders, abettors, co-conspirators and participants in their illegal activities;

d.    The distribution and transfer of the contraband money involved in criminal activities;

e.    The existence and location of records;

f.    The location and source of resources used to finance illegal activities;

g.    The locations and items used in furtherance of those activities;

h.    The location of facilities used to store narcotics in preparation of their further distribution;

i.    The location and disposition of the proceeds of the **TARGET INTERCEPTEES**' illegal activities; and

j.    The physical location of the **TARGET INTERCEPTEES**, co-conspirators, and associates.

## PHYSICAL SURVEILLANCE

145.    Physical surveillance has been regularly utilized by investigating agents in this

case and has proven useful in gathering some information as to areas frequented by Bobby

66

FAIRCHILD. Physical surveillance, however, unaccompanied by electronic surveillance, is of limited value. For example, physical surveillance has not and will not enable agents to gather evidence of the whole scope of Bobby FAIRCHILD's criminal activity under investigation, and has not, and most likely will not, establish conclusively the identities of various co-conspirators, including the identity of all the individuals supplying Bobby FAIRCHILD with narcotics or the identity of those to whom Bobby FAIRCHILD is selling the narcotics.

146.    Furthermore, the ultimate destination of the drug and currency shipments coordinated by Bobby FAIRCHILD is unknown; therefore, there has been no opportunity to perform physical surveillance on these locations.    In addition, the location of Bobby FAIRCHILD's residence and property does not allow for effective surveillance.    Bobby FAIRCHILD's property is located in rural Muskogee County, Oklahoma. The appearance of strange vehicles would arouse suspicion. In addition, the layout of the outbuildings would prevent observation of the residence from the roadway.    Accordingly, the prospects for fruitful physical surveillance at this time are extremely limited. In addition, based on my experience and training, drug traffickers are extremely surveillance conscious. If the intensity of existing surveillance were to be increased, and if the subjects of this investigation became alerted to the existence of such surveillance, the result might be the temporary cessation of their illegal activities or a change in their instrumentalities or methods at a critical point in the investigation. Moreover, physical surveillance will not assist law enforcement in identifying **TARGET INTERCEPTEES** or narcotics-related locations in other states.    Physical surveillance, unaccompanied by electronic surveillance, is also unlikely to identify additional conspirators and their respective roles, the methods by which the narcotics are imported into and distributed in the United States, or to accomplish all of the other goals of this investigation. For the foregoing

67

reasons, I do not believe that physical surveillance alone will be sufficient to accomplish the goals of the investigation.

## STATIONARY SURVEILLANCE

147.    Stationary surveillance, in the form of a pole camera or closed circuit television, will not be sufficient to accomplish the goals of the investigation. Stationary surveillance, even when it can be utilized effectively, is unlikely to establish the nature and scope of Bobby FAIRCHILD's drug activities or the roles and identities of co-conspirators.    Stationary surveillance, unaccompanied by the requested wire interception, would be insufficient to conclusively establish the identity of individuals at the identified residences who are involved in narcotics trafficking.   Individuals who assist Bobby FAIRCHILD with the shipment, delivery and sale of narcotics would also be very difficult to identify.

148.    The use of pole cameras for remote surveillance would not be possible and if attempted could compromise the investigation. The only location which has been identified is the residence of Bobby FAIRCHILD. As previously described, the location of this residence makes it such that the installation of a pole camera would not yield an appreciable amount of intelligence. In addition, the equipment and activity associated with the installation would be readily noticed and highly suspicious. Experience has shown that pole cameras, which must be placed on a utility pole with an integral power source, are placed too far away to accurately record the license plates of vehicles. Distance also prevents accurate recognition of the faces of people entering and leaving Bobby FAIRCHILD's residence. Another obstacle to stationary surveillance devices is that at night, even when augmented by artificial lights such as street lamps, the effectiveness of stationary surveillance is dramatically reduced.

149.    Even if agents were successful in installing a pole camera at Bobby FAIRCHILD's residence, the information provided by this stationary surveillance device is limited. It would be unlikely that vehicles would load or unload drugs in view of the camera. Agents believe that if this type of activity would occur it would more than likely occur in one of the buildings located on the ranch. In addition, the use of pole cameras would not reveal the location of pickup and delivery points in other states, nor would it identify the other individuals involved in the organization.

## TELEPHONE TOLL RECORDS, PEN REGISTER, AND TRAP AND TRACE INFORMATION

150.    Telephone toll, pen register, trap and trace information and data are of limited use in a traditional wire intercept investigation. The use of telephone toll records, pen registers, and trap and trace data have uncovered significant activity on **TARGET TELEPHONE #4** and the other telephones being used by organization members and associates. However, due to the fact that members of the organization can disguise, change or conceal the actual users of the telephones, subscriber information obtained from toll records, pen registers, and trap and trace data are not very helpful or insightful. Subscriber information records only reveal the name of the person to whom the telephone number is assigned and not the actual or ultimate user. Pen register, trap and trace data, and telephone toll records only allow the review of telephone numbers called and the duration of an unknown conversation. Additionally, a Mexican cell phone's pen register, trap and trace, and toll data can only be captured when that telephone is utilized within the U.S. Further, DEA cannot obtain subscriber information, pen register, trap and trace, and toll records for Mexican phones. The accumulation of numerical statistics only indicates the known fact that the criminal subjects are regularly conversing and communicating

with other individuals. These records cannot provide the identities of the people actually making or receiving the telephone calls, their degree of criminal involvement, or any details concerning the matters discussed. The information alone is inadequate, in that it is the content of the calls, not the fact that they are being made, that will reveal the extent of the criminal activity and the conspiracy.

151.    While DEA knows that the **TARGET INTERCEPTEES** are communicating with each other and others unknown, information derived from this data does not advise DEA who the **TARGET INTERCEPTEES** are talking to, the nature of the conversations, the manner in which they are committing the crime, the identities of the co-conspirators or the location of the **TARGET INTERCEPTEES**.

## GLOBAL POSITIONING SYSTEM (GPS)

152.    Since **TARGET TELEPHONE #2** is a United States cell phone, DEA agents would be able to obtain a court warrant to authorize the activation and/or monitoring of the Global Positioning System (GPS) function of **TARGET TELEPHONE #4** to determine and to track the movement and location of **TARGET TELEPHONE #4**. However, the Los Angeles Field Division HIDTA Group 47 advised DEA agents that pursuant to a California State court authorized wire interception, they were pinging their target telephone in an attempt to locate their subject and make a large currency seizure. What the agents did not know and what was later confirmed by Sprint/Nextel Representatives after the fact, based on their CS' information, is that every time the agents pinged the Target Telephone, a notice was going into the GPS function of the Target's cellular telephone and confirming that law enforcement elements were pinging his telephone which was depicted with all zeros on the telephone screen. This information further corroborated why the Target had numerous cell phones and discontinued his use on a frequent

basis. This is a function built into the cell phones by the individual manufacturer. Thus, obtaining a court warrant to authorize the activation and/or monitoring of the Global Positioning System (GPS) function of **TARGET TELEPHONE #4** may compromise the integrity of this investigation.

## USE OF SEARCH WARRANTS

153.    At this stage of the investigation, without additional information from electronic surveillance and other sources, the execution of search warrants in this matter could not be reasonably expected to produce incriminating evidence indicative of the full scope of the **TARGET INTERCEPTEES**' activities or the identity of all co-conspirators. Also search warrants would not be appropriate at this stage of the investigation, as the locations where the **TARGET INTERCEPTEES** receive, hide, and distribute their drugs have not been identified. It is my opinion that without electronic surveillance of the **TARGET INTERCEPTEES**, law enforcement will not be able to fully identify all of the stash locations used by Bobby FAIRCHILD or his co-conspirators on which to execute search warrants.

154.    Furthermore, it is unlikely that all or even many of the co-conspirators would be present during the execution of any search warrants at the various locations, which may become the subject of search warrants in the future. Those not present during the execution of the search warrants would likely be alerted to the existence of this investigation, allowing them to further insulate themselves from successful detection. Furthermore, I know that following seizures and other enforcement activity, it is common practice for trafficking groups to flee to Mexico for months at a time, apparently returning only after assuring themselves that law enforcement is no longer interested in their activities.

71

## USE OF UNDERCOVER AGENT(S)

155.    The use of undercover (UC) government agents to infiltrate the **TARGET INTERCEPTEES'** organization does not appear likely to succeed in producing evidence that will achieve all of the goals of the investigation. At this juncture in the investigation, Affiant believes it would be of little value to introduce an undercover agent into the DTO. Essentially, under these circumstances in this investigation, there is not a role which an undercover agent could assume to further the investigation.

156.    I have talked with agents of the Oklahoma Bureau of Narcotics (OBN) concerning the use of undercover agents (UC) in the Bobby FAIRCHILD Drug Trafficking Organization (DTO). During the course of the OBN investigation into Bobby FAIRCHILD's DTO, beginning in or around 2002, UC agents were utilized to make a purchase from members of the DTO. The use of undercover agents was successful to a limited degree with lower level members of the DTO. Further attempts to utilize UC agents for the purpose of purchasing and identifying higher ranking organization members failed.

157.    The use of undercover agents is an important part of an investigation of narcotics law violations. However, unless an undercover agent is taken into the confidence of significant narcotics violators, he/she is unlikely to learn the full scope of the violators' illegal activities. In addition, it is not in the interest of narcotics violators to reveal to others, including other narcotics traffickers, the way he/she conducts his/her narcotics trafficking activities, since other traffickers may seek to interfere with those activities.

## CONFIDENTIAL SOURCE/SOURCE OF INFORMATION

158.    Since the beginning of the Oklahoma Bureau of Narcotics (OBN) investigation, attempts have been made to identify confidential informants capable of infiltrating, providing

72

testimony and fully neutralizing the illegal activities of the **TARGET INTERCEPTEES** and other co-conspirators not yet identified. To date, the government has been unsuccessful in locating such a confidential informant. Although the OBN has identified and utilized a Source of Information (SOI) who was successful in the introduction of an agent to a lower ranking member of the drug trafficking organization. The SOI is currently not in a position to infiltrate the current Interceptees.

### USE OF GRAND JURY SUBPOENAS

159.    Based on my training and experience, I believe that serving grand jury subpoenas on persons and their associates believed to be involved in this conspiracy would not be successful in achieving the stated goals of this investigation. If Bobby FAIRCHILD, his co-conspirators, or other participants were to be called to testify before a grand jury, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify.

160.    The issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the **TARGET INTERCEPTEES** to this investigation. Witnesses who could provide additional relevant evidence to a grand jury have not been identified or would themselves be participants trafficking drugs. Such individuals would face prosecution themselves; it is unlikely therefore that any of them would testify voluntarily. Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony. Immunizing them could thwart the public policy that they be held accountable for their crimes. Moreover, it is likely that such subjects would prefer to be held in contempt rather that testify.

161.    The issuance of grand jury subpoenas to other individuals likely would not lead to the discovery of critical information and undoubtedly would alert the **TARGET**

73

**INTERCEPTEES** to the pendency of an investigation. Moreover, not all of the **TARGET INTERCEPTEES** have been identified or located, and, in absence of further evidence identifying co-conspirators and their respective involvement in drug trafficking, it is difficult to determine whom to subpoena to the Grand Jury. Finally, some of the **TARGET INTERCEPTEES** may travel or live outside the United States, beyond the Grand Jury's subpoena power.

<u>**INTERVIEWS OF TARGET INTERCEPTEE**</u>

162.    Based upon my training and experience, I believe interviews of Bobby FAIRCHILD, or his other known and unknown associates, would produce negligible results and also compromise the investigation. Foremost, the majority of the **TARGET INTERCEPTEES** have not yet been identified or located. I also believe that any responses to interviews would contain a significant number of untruths, diverting the investigation with false leads that would frustrate the purposes of this investigation. Additionally, questioning any of the co-conspirators would alert the other co-conspirators, and cause a change in their methods of operation before all of the co-conspirators are identified, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence, and the possibility of harm to cooperating sources whose identities may become known or whose existence may otherwise be compromised. Finally, for the same reasons set forth above in connection with use of Grand Jury subpoenas, the use of interviews will not accomplish the stated goals of this investigation, and would prematurely alert Bobby FAIRCHILD and co-conspirators of this investigation.

<u>**FINANCIAL INVESTIGATION**</u>

74

163.    Although this investigation has lead Agents to believe that money laundering has been committed, is being committed and/or will be committed, Agents have not obtained any financial records, but are beginning to identify assets. DEA Tulsa is waiting to seize U.S. currency and/or illegal drugs before moving forward with an aggressive financial investigation.

## OTHER COURT AUTHORIZED WIRE INTERCEPTIONS

164.    If the Court were to authorize the interception of conversations occurring over **TARGET TELEPHONE #4**, I believe that these interceptions would confirm that Bobby FAIRCHILD distributes large quantities of narcotics throughout the United States and would provide information on who are FAIRCHILD's co-conspirators. Further, the intercepted conversations of FAIRCHILD will possibly provide Agents with FAIRCHILD's day-to-day drug activities and will fully disclose the conversations between FAIRCHILD and other interceptees. I believe that conducting a court authorized wire interception of conversations occurring over **TARGET TELEPHONE #4,** which is believed to be utilized by FAIRCHILD, will also assist Agents to identify possible stash houses in the Muskogee, Oklahoma, area. The prior intercepts authorized by the Court on July 23, 2008, (**TARGET TELEPHONE #1**); August 8, 2008 (**TARGET TELEPHONE #2**) with extensions authorized on September 5, 2008, and October 10, 2008; and September 5, 2008 (**TARGET TELEPHONE #3**), with an extension granted on October 3, 2008, have produced valuable information regarding the criminal conduct of the **TARGET VIOLATORS**, but have failed thus far to reveal the identity of all of the conspirators, their methods of operation, and the full scope of the criminal activity. The objectives of the investigation have not been met, and further interception is necessary to fulfill those objectives

75

## TRASH SEARCHES

165.   No trash searches at this stage of this investigation have been conducted. The reason for this is that no locations have been credibly established as stash houses that would likely yield any controlled substances, or potentially useful evidence. Therefore, no intelligence can be gathered utilizing this investigative technique. The **TARGET INTERCEPTEES'** heightened awareness of law enforcement surveillance will likely cause them to become even more cautious in their illegal activities. In addition, the use of trash searches to gain intelligence is not possible at Bobby FAIRCHILD's residence. As previously described, it is located off of the main road in a rural area. There is no central location for the accumulation of trash by area residents. Therefore, the risk of being detected and compromised during a trash search far outweighs the amount of intelligence to be gained from an effort. I believe that only a court authorized wire interception conducted on **TARGET TELEPHONE #4** will be able to provide real time information that will allow this investigation to attain the investigative goals set forth herein.

## ARRESTS

166.   Attempting to arrest the **TARGET INTERCEPTEES** at this point would mean that several of the objectives of this investigation would be unfulfilled. Most of the **TARGET VIOLATORS** have yet to be identified. If the DEA tried to make any arrests, unidentified co-conspirators would almost certainly cease their illegal activities or change the locations, instrumentalities and methods used to conduct their illegal activities, thereby frustrating the investigation.

167.   As discussed above, the purpose of this investigation is to identify, locate and arrest the persons responsible for the importation and distribution of the above-described

shipments of controlled substances. As indicated above, and as discussed below, several investigative techniques have been tried, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ to achieve these objectives

168.    For the above listed reasons, I believe that alternative investigative techniques would fail to accomplish the objectives of the investigation.

## **MINIMIZATION**

169.    All monitoring of wire communications over the **TARGET TELEPHONES** will be minimized in accordance with Chapter 119 of Title 18, United States Code.

170.    The investigative or law enforcement officers of the United States and translators, if necessary, who are to carry out the requested interception of wire communications, will be instructed concerning the steps they should take to avoid infringing upon any attorney-client privilege or other recognized privileges. In addition, all communications intercepted will be conducted in such a way as to minimize the interception of communications not otherwise criminal in nature or subject to interception under Chapter 119, Title 18, United States Code. All monitoring will cease when it is determined that the monitored conversation is not criminal in nature. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that target subjects or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If an interception is minimized, monitoring agents shall spot check to insure that the conversation has not turned to criminal matters.

171.    It is requested that the order provide that, if necessary, translators be authorized to assist in conducting this wire surveillance and to receive disclosure of intercepted

77

communication. Certain subjects of this investigation may communicate with each other in Spanish. It is therefore necessary to secure the services of translators in order to assist the agents in monitoring the wire surveillance and translating the intercepted communications. All such translators will be under contract to the DEA and will be directly supervised by the DEA and/or deputized law enforcement officers. It is further requested, pursuant to Section 2518(5), Title 18, United States Code, that in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, that minimization may be accomplished as soon as practicable after such interception.

## **AUTHORIZATION REQUEST**

172. As described above, **TARGET TELEPHONE #4** is crucial to the drug transportation/distribution activities of the Bobby FAIRCHILD Drug Trafficking Organization. Bobby FAIRCHILD is believed to use (918) 629-3876 (**TARGET TELEPHONE #4**) to coordinate the pick up and transportation schemes of drug and currency shipments arranged by Bobby FAIRCHILD and other individuals not yet identified.

173. Based on the foregoing, it is my opinion that the interception of communications occurring over **TARGET TELEPHONE #4**, as specified above, is essential to uncover the full scope of the illegal activity described herein.

174. Inasmuch as the illegal operation described herein is a continuing conspiracy involving persons as yet unidentified and unknown, it is requested that it be ordered, as more fully stated in the accompanying application, that authorization to intercept not terminate when the sought wire communications are first obtained, but continue until interception fully reveals the objectives set forth above, or for a period of thirty (30) days, whichever is earlier. The 30-

78

day period shall be measured from the date on which a law enforcement agent first begins to conduct the interception under the court order or ten days after the order is entered, whichever is earlier.

175.   Pursuant to the provisions of Title 18, United States Code, Sections 2518 (4), it is requested that it be ordered that AT&T Wireless, the service provider for **TARGET TELEPHONE #4,** furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as those providers accord the person whose communications are to be intercepted (including all dial digits, including all incoming and outgoing calls pen register information, and audio interception capability whether the cellular telephone is in roaming mode or otherwise).   The assistance of this provider is required to accomplish the objectives of the requested interceptions.   Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

176.   Because the need for contemporaneous information concerning the intercepted communications is especially important in the present investigation, it is further requested that AT&T Wireless, and any other service providers of intercepted telephone calls be ordered to provide originating and terminating cell site information for the intercepted wire communications, by permitting the DEA to access such information.   It is requested that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

Cory Hallum, Special Agent
United States Drug Enforcement Administration

Subscribed and sworn to before me this 3rd day of November, 2008

JAMES H. PAYNE, Chief Judge
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF OKLAHOMA